# EXHIBIT B

ORIGINAL

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE, PALM SPRINGS BRANCH

CHRISTOPHER ROSS,                    )
                                     )
                Plaintiff,           )
          v.                         )      Case No.
                                     )   P.S.C. 1403729
COUNTY OF RIVERSIDE, et al.,         )
                                     )      (Volume I)
                Defendants.          )   (Pgs. 1 - 252)
                                     )
_____

Videotaped
Deposition of:   CHRISTOPHER ROSS   (Volume I)


Date and time:   Tuesday, December 9, 2014,
                 9:40 a.m.


Location:        555 Anton Boulevard, Suite 1200
                 Costa Mesa, California


Reporter:

Patricia Tornell, CSR, RPR
Certificate No. 2974

www.tornellandcotten.com
e-mail: depos@tornellandcotten.com

**TORNELL & COTTEN**

PROFESSIONAL COURT REPORTERS
1401 N. TUSTIN AVE., STE. 160
SANTA ANA, CA 92705
(714) 543-1600
FAX (714) 543-1614

SECURITY NOTICE: The enclosed materials may contain Personally Identifiable Information and/or Protected Health Information which is protected by state and federal law. Failure to protect this information can result in civil and criminal penalties. By opening this transcript you acknowledge your obligations to implement reasonable and appropriate security measures to protect the information.

1            SUPERIOR COURT FOR THE STATE OF CALIFORNIA

2          FOR THE COUNTY OF RIVERSIDE, PALM SPRINGS BRANCH

3

4

5

6

7    CHRISTOPHER ROSS,              )
                                    )
8                   Plaintiff,      )
                                    )
          v.                        )      Case No.
9                                   )   P.S.C. 1403729
     COUNTY OF RIVERSIDE, et al.,   )
10                                  )     (Volume I)
                    Defendants.     )   (Pgs. 1 - 252)
11   _____)

12

13

14

15   Videotaped
     Deposition of:   CHRISTOPHER ROSS   (Volume I)
16

17

18   Date and time:   Tuesday, December 9, 2014,
                       9:40 a.m.
19

20

     Location:        555 Anton Boulevard, Suite 1200
21                    Costa Mesa, California

22

23
     Reporter:
24
     Patricia Tornell, CSR, RPR
25   Certificate No. 2974

```
 1              Volume I of the videotaped deposition of

 2   CHRISTOPHER ROSS, taken before Patricia Tornell,

 3   Certified Shorthand Reporter, Certificate No. 2974,

 4   commencing at 9:40 a.m. on Tuesday, December 9, 2014,

 5   at the Law Offices of Woodruff, Spradlin & Smart,

 6   555 Anton Boulevard, Suite 1200, Costa Mesa,

 7   California.

 8

 9

10   APPEARANCES OF COUNSEL:

11

         For the Plaintiff:
12
             AITKEN CAMPBELL HEIKAUS WEAVER, LLP
13           BY:  CHRIS HEIKAUS WEAVER, ESQ.
             3890 Eleventh Street, Suite 210
14           Riverside, California  92501
             (951) 530-4840
15           chris@achwllaw.com

16

17       For the Defendant:

18           WOODRUFF, SPRADLIN & SMART
             BY:  MS. CYNTHIA KOLE
19           555 Anton Boulevard, Suite 1200
             Costa Mesa, California  92626
20           (714) 558-7000
             ckole@wss-law.com
21

22

23   VIDEOGRAPHER:

24       Tom McCarthy
         Tornell & Cotten Court Reporters
25       (714) 543-1600
```

```
1

2

3

4                        I N D E X

5

6

7    Witness:   CHRISTOPHER ROSS (Volume I)

8

9

10   Examination                                    Page

11

12       BY MS. KOLE ------------------------------  6

13

14

15

16                     E X H I B I T S

17

18   Defendant's              Description           Page

19

20   Exhibit 1           Plaintiff Christopher Ross's
                         Responses to Defendant
21                       County of Riverside's
                         Special Interrogatories,
22                       Set One                     67

23

24   Exhibit 2           Summons and Complaint for
                         Retaliatiion and Disability
25                       Discrimination - Demand for
                         Jury Trial                  169


                             3                Volume I
```

```
 1   E X H I B I T S (Continued)

 2

 3

 4   Defendant's              Description              Page

 5

 6

 7   Exhibit 3          Email from Christopher Ross
                        to Sean Lafferty dated
                        September 27, 2013, with
 8                      attached typewritten document
                        dated September 27, 2013       186
 9

10   Exhibit 4          District Attorney's Office,
                        Riverside County, Memorandum
11                      dated September 16, 2013       190

12

13

14

15

16

17

18

19

20

21

22   INFORMATION REQUESTED:     IDENTIFIED FOR COUNSEL:

23      Page      Line             Page      Line

24        (None)                      (None)

25
```

```
 1                    TUESDAY, DECEMBER 9, 2014
 2                     COSTA MESA, CALIFORNIA
 3                          9:40 A.M.
 4
 5        VIDEOGRAPHER:  Good morning.  My name is Tom
 6   McCarthy, and I'm a notary public and video technician
 7   here on behalf of Tornell & Cotten Court Reporters
 8   located in Santa Ana, California.                          09:41:00
 9            This is the deposition of Christopher Ross
10   beginning at 9:41 a.m. on December 9, 2014, in the
11   matter of Christopher Ross vs. County of Riverside, et
12   al., in the Superior Court of the County of Riverside.
13   The case number is P.S.C. 1403729.
14            This deposition is taking place at Woodruff,
15   Spradlin & Smart located at 555 Anton Boulevard,          09:41:27
16   Suite 1200, in Costa Mesa California, and is being
17   taken on behalf of the defendants.
18            Could we please have introductions beginning
19   with the witness.
20        THE WITNESS:  Christopher Ross.
21        MR. WEAVER:  Chris Heikaus Weaver, Mr. Ross's
22   attorney in this matter.
23        MS. KOLE:  Cynthia Kole, Woodruff, Spradlin &
24   Smart, on behalf of defendant County of Riverside and
25   the named defendants.
```

```
 1          VIDEOGRAPHER:  Would you please administer the
 2     oath.
 3
 4                       CHRISTOPHER ROSS,
 5                the plaintiff herein, called as a
 6                witness, and having been first
 7                duly sworn by the Certified
 8                Shorthand Reporter, was examined
 9                and testified as follows:
10
11                       EXAMINATION
12     BY MS. KOLE:                                        09:41:56
13          Q    Mr. Ross, would you spell your name for us.
14          A    Christopher C-h-r-i-s-t-o-p-h-e-r, last name
15     Ross, R-o-s-s.
16          Q    I'm here today to ask you some questions to
17     determine what facts you know about the lawsuit,
18     and have you ever been deposed before?
19          A    Once.                                     09:42:31
20          Q    And what type of case was that?
21          A    It was a personal injury case.  I was hit by
22     a drunk driver and almost killed, so there was a
23     lawsuit on that.
24               I think there was -- I'm -- it's been a long
25     time.  I'm 41 now, so I was probably ten years old,
```

```
 1    maybe 11, so that would have been probably 1984.  That
 2    would have been at -- I'll stop.  Sorry.
 3        Q    That's okay.
 4             Were you represented by an attorney in that        09:43:00
 5    lawsuit?
 6        A    Yes, I was.
 7        Q    And was -- who was the plaintiff in that
 8    lawsuit?
 9        A    We were the plaintiff.
10        Q    You were one of the named plaintiffs?
11        A    Yes.
12        Q    And who was the adult who was the plaintiff
13    in that?
14        A    There was no adult.  As far as what --
15    myself, I was independent.  I had my own lawsuit.
16        Q    I see.
17             And was there your mother or father who had a
18    related lawsuit?
19        A    No.
20        Q    And who were you riding with?                      09:43:29
21        A    Friends.
22        Q    Other than the time that you were deposed as
23    a child, have you been deposed before?
24        A    Not that I can recall.  I don't think so.
25        Q    Have you been a plaintiff in any other civil
```

```
 1    action?
 2         A    No.
 3         Q    Have you been a defendant in any other civil
 4    action?
 5         A    No.
 6         Q    Have you spoken with your attorney regarding
 7    the procedures for the deposition today?
 8         A    No.
 9         Q    So I'm going to tell you a little bit about      09:44:01
10    those procedures.
11              The oath that you took a few moments ago is
12    similar to an oath you would take in court to tell the
13    truth, and that obligates you to testify truthfully
14    today.
15              Do you understand that?
16         A    Yes.
17         Q    The testimony that you give today has the
18    same force and effect as you if you were testifying in
19    a court of law.
20              Do you understand that?
21         A    Yes.
22         Q    And I saw a little hesitation with that.  Do
23    you have a question about that?                           09:44:29
24         A    What do you mean, "force and effect"?
25         Q    The oath that you take to tell the truth
```

```
 1    today is similar to an oath you would take if you were

 2    in court testifying at a hearing or a trial, so the

 3    testimony that you give today has the same force and

 4    effect as if you were sitting in court testifying as a

 5    witness.

 6              Does that make sense?

 7    A    I think so.

 8    Q    Do you disagree with that?

 9    A    No.  No, I don't.  I -- just when you say

10    "force and effect," that -- I'm new to civil law.      09:44:57

11    Q    Sure.

12    A    I don't know, so sorry.

13    Q    No problem.  And I want to make sure it's

14    clear for you.

15              And by "force and effect" I think it means

16    that if you're a witness testifying at trial, a judge

17    may tell the jury what effect the witness testimony

18    could have, the judge could strike some of the

19    testimony, the testimony may come in straight, so it's

20    the same situation today --

21    A    Okay.

22    Q    -- with your deposition testimony.  All of

23    those things could happen with it --                   09:45:29

24    A    Thank you.

25    Q    -- at trial.
```

1          And it can also be -- because you're the

2     plaintiff in the lawsuit, the defendant could read

3     your deposition testimony straight into the record at

4     trial.

5          A     Okay.

6          Q     The court reporter is going to transcribe

7     everything we're saying today, and my questions, your

8     answers, and your counsel's questions, if he has any,

9     or objections, and it will be made into a booklet for

10    you to review afterwards.

11          I believe you're probably familiar with

12    transcripts.                                              09:46:00

13          A     Yes.

14          Q     You'll be asked to sign the transcript under

15    penalty of perjury.

16          Do you understand that?

17          A     Yes.

18          Q     And you can make changes to your answers when

19    you get the transcript.   However, I'd like to caution

20    you that substantive changes can be commented upon by

21    myself or another lawyer for the County of Riverside

22    at trial.

23          A     Okay.

24          Q     And those comments may reflect poorly on your

25    credibility.   So the type of changes I'm talking about   09:46:28

```
 1   are, you know, a "Yes" answer to a "No" to a critical
 2   question.
 3           It could also be not providing much
 4   information on a question as an answer and then
 5   providing contradictory information or a whole bunch
 6   more detail.  Counsel might comment on that as "Why
 7   didn't you tell us this at your deposition?"
 8       A    Okay.
 9       Q    Does that make sense?                           09:46:59
10       A    Okay.
11       Q    I saw that you noticed the sound in the room.
12       A    Yes.
13       Q    I don't know what that is?
14       A    That's plumbing.
15       Q    Okay.  Thank you.
16       A    The benefits of working construction.
17       Q    Also, the court reporter needs audible
18   responses to have a clear record, so nodding doesn't
19   work, but you've been giving me yeses, noes, and other
20   answers, so I don't anticipate a problem there.        09:47:28
21           And responses like "Uh-huh" and "Huh-uh"
22   don't help with a clear record, so if you could try to
23   respond with an audible response that's not a sound.
24       A    Yes.
25       Q    And if I catch that, I'll ask you, "Is that a
```

 1    yes or a no?" just to have a clear record.

 2         A    Okay.

 3         Q    Also, talking over each other makes it hard

 4    to get a clear record, and I will try my best to let      09:47:57

 5    you complete an answer before I jump in, and I'd ask

 6    that you also try that with my questions, wait until

 7    I'm done.

 8         A    Absolutely.  I'll try -- if I interrupt you,

 9    just stop me.  I'm sorry.  I don't mean to.  So --

10         Q    Yes.  Absolutely.  And depositions are a

11    little bit different than regular conversations.

12    There's more pauses.  And so sometimes we'll probably

13    unintentionally step on each other, but we'll try to

14    avoid it if we can.

15              I may ask a question that you do not           09:48:31

16    understand and not through any fault of your own.

17    Perhaps I've asked a question that has too many

18    subparts or is ambiguous in some way.

19              Please let me know if you don't understand

20    the question, and I will rephrase it, and I'll try not

21    to ask you compound questions.

22         A    Understood.

23         Q    Do you understand that?

24         A    Yes.

25         Q    If you don't tell me that you don't

                          12                    Volume I

1  understand the question, it's going to appear on the          09:48:58

2  record as if you did understand it.

3          Do you understand that?

4      A    Yes.

5      Q    And if you realize through the course of the

6  day that you've given an answer that you think is

7  incomplete or inaccurate, you know, please just bring

8  it up and provide the answer you would like to

9  provide.

10     A    Okay.  Understood.

11     Q    And I would ask that you not speculate today,

12  so I'm sure you have a lot of experience with the

13  difference between speculating and a best estimate.    09:49:37

14          Is that something that has come up in your

15  practice?

16     A    Yes.

17     Q    So I'd ask you to give me your best estimate

18  or if you have a basis for your answer, but if you

19  have no basis at all and you're just guessing, that's

20  not the kind of response that I'm looking for today.

21          Okay?

22     A    Okay.

23     Q    And then I'm going to ask you -- this is very

24  standard in civil litigation in depositions -- if

25  you're able to give your best testimony today.         09:49:57

1    A    I'm sorry.  I don't understand.

2    Q    Okay.  Some of the questions that are

3    standard -- and I don't mean any offense by these at

4    all -- are if the witness, yourself today, is taking

5    any type of medication that might interfere with your

6    memory.

7    A    No.

8    Q    And sometimes people are ill or they'll have

9    a very bad headache and that makes it difficult for

10   them to testify accurately.

11   A    Okay.

12   Q    Are there any circumstances like that?

13   A    No.

14   Q    And then just other times people may be so        09:50:27

15   preoccupied with a difficult circumstance going on in

16   their life that it makes it difficult for them to

17   think clearly and answer the questions accurately.

18        Is there anything like that that would impede

19   you from testifying today?

20   A    I don't think so.  We all have things on our

21   mind, but I don't think it would impede me from

22   accurately testifying.  If there is, I'll let you

23   know.

24   Q    Thank you.

25   A    You're welcome.

```
 1      Q    I did have one deposition recently where the
 2   witness was, I guess, awakened and awake for quite a
 3   while in the middle of the night due to a dog barking,      09:50:58
 4   and she testified for quite a while before she
 5   realized that she actually wasn't thinking very
 6   clearly, not remembering anything, because she hadn't
 7   gotten enough sleep, so that makes me remember to ask
 8   that question.  Is it -- do you feel that you're well
 9   rested to give --
10      A    No, but we can -- we can go ahead.  I had
11   about three hours of sleep because I had to drive from
12   Indio to my mom's place in Los Angeles, and I got in
13   late and so talked with my mom, and then I ended up       09:51:30
14   putting all my stuff away and going to bed.  I
15   probably got to bed about probably 2:30 in the
16   morning, and I got up at about 6:00, 6:30, right in
17   there.
18      Q    Okay.
19      A    So --
20      Q    That does cause me a little bit of concern.
21   That's not a lot of sleep for your deposition.
22           How are you feeling right now?
23      A    I'm feeling okay.
24      Q    Okay.
25      A    But later in the day I'm sure I'm going to
```

```
 1  feel it.
 2       Q     So you'll let us know if you feel like you
 3  can no longer testify to the best of your ability?        09:52:00
 4       A     Yes.
 5       Q     Okay.  What did you do, if anything, to
 6  prepare for your deposition today?
 7       A     Ate my Musilex and ate a banana and my
 8  diet -- what is it? -- Canada Dry, and used the GPS to
 9  get down here, and did some breathing exercises in
10  traffic as I sat there thinking I'm going to be late.     09:52:29
11  That's it.
12       Q     Okay.  And specifically with regard to
13  reviewing any documents, did you review some documents
14  to prepare to testify today?
15       A     No.  I did review some emails, however,
16  not -- not so much to prepare but just to -- for my
17  own awareness.
18       Q     How many emails do you believe you
19  reviewed?
20       A     Just one.                                      09:52:56
21       Q     Do you recall what the content of that one
22  was?
23       A     The email had -- there were attachments -- or
24  an attachment with emails from work, so it's kind of
25  confusing, but it's one email but it had an attachment
```

```
 1    with multiple emails.

 2         Q    I see.

 3              And what was the subject matter of the

 4    attached emails?

 5         A    It was regarding this case.  It was my

 6    understanding that it was discovery provided by your          09:53:29

 7    law firm.

 8         Q    Did looking at those emails help you remember

 9    any of the facts related to your lawsuit?

10         A    Yes.  Yes, it did.

11         Q    Are you able to identify which facts it

12    helped you remember?

13         A    No.  There were, I think, a hundred -- there

14    were approximately a hundred pages.

15         Q    Did it help you with any time frame or dates         09:53:59

16    with regard to events in your lawsuit?

17         A    Yes.  I will -- if I may.

18         Q    Sure.

19         A    It was a little bit revealing.  There were

20    emails that I had never seen before.  They were from

21    management where I used to work at the D.A.'s office

22    between one another, so --

23         Q    So some of it was new information for you?           09:54:28

24         A    Correct.  Some of it was revealing.

25         Q    Do you recall sending any emails to -- from
```

1    your work -- prior work email address, the County of

2    Riverside address, to an email address that is

3    cross227@hotmail.com?

4        A    Yes.                                                        09:54:58

5        Q    And do you recall when you did that?

6        A    When I was working there.  I don't recall a

7    specific date.

8        Q    Do you recall sending emails regarding the

9    Parker case from your County of Riverside email

10   address to the cross227 email address in January of

11   2014?                                                              09:55:27

12       A    No, not -- it wouldn't have been in January

13   of 2014 because I was still technically employed, but

14   I'd been laid off by that point.  I think in November

15   I'd been put on administrative leave, so not that I

16   recall.

17            And I think, as I recall, I tried to get on

18   my email, and I think I couldn't get on it, my work

19   email address, that is.                                           09:55:56

20       Q    What is your current address?

21       A    82286 -- pardon me.  We're not going to

22   broadcast this for all the criminal defendants to come

23   get me, are we?

24       MS. KOLE:  Could we go off the record for a

25   moment.

```
 1        MR. WEAVER:  Certainly.

 2        VIDEOGRAPHER:  The time is 9:56 a.m. and we are

 3   off the record.

 4               (Whereupon a discussion was held

 5          off the record.)                              09:57:46

 6        VIDEOGRAPHER:  The time is 9:57 and we are back on

 7   the record.

 8   BY MS. KOLE:

 9        Q    Mr. Ross, is your current address in Indio?

10        A    Yes.

11        Q    Is that the address that the County of       09:57:58

12   Riverside had as your work address when you were

13   working at the district attorney's office?

14        A    Yes.

15        Q    Was there a period of time you were living in

16   Los Angeles --

17        A    Yes.

18        Q    -- recently?

19        A    Yes.

20        Q    And what -- do you recall when you started

21   living in Los Angeles and when you moved back to

22   Indio?

23        A    Yes.  I temporarily moved to Los Angeles to

24   take care of my mom.  She had a stroke right around

25   Christmastime of 2013, so the end of December.  She
```

|   |   |   |
|---|---|---|
| 1 | had emergency surgery on Christmas Eve, the 24th, I | 09:58:29 |
| 2 | believe, of December.  She had an endarterectomy. | |
| 3 | That's where they take an artery out and they replace | |
| 4 | it with a cow -- with a cow vein, because she had | |
| 5 | multiple strokes in her brain, so it was in Los | |
| 6 | Angeles, so I -- she was in the hospital for, I think, | |
| 7 | about two weeks, and I ended up moving out there | |
| 8 | temporarily.  I didn't move any of my stuff.  I just | |
| 9 | went and stayed at her place to take care of her | |
| 10 | animals and to take care of her and then stay with her | |
| 11 | at the hospital and then take her home once she was | 09:58:59 |
| 12 | done.  She needed some rehabilitation and things like | |
| 13 | that.  So I stayed with her until -- oh, I want to say | |
| 14 | till recently, and I was always going back and forth | |
| 15 | to Indio because I have things to do there, bills to | |
| 16 | pay and whatnot, so I was constantly going, you know, | |
| 17 | back and forth maybe once a month or something like | |
| 18 | that. | |
| 19 | And then she had another surgery done.  The | |
| 20 | artery started -- the surgery didn't work.  She | 09:59:29 |
| 21 | started having scar tissue, not only on the outside | |
| 22 | but on the inside of the artery, so it caused almost | |
| 23 | another stroke.  It was at 93 percent blockage.  So | |
| 24 | she went in for an angiogram where they stick a camera | |
| 25 | through the femoral artery and they go up and they see | |

```
 1    if they could either do the surgery over and put
 2    another cow vein in there or put a stent in there, and
 3    they said she was a candidate for the stent.  And then
 4    the problem was is when they pulled the camera out,
 5    they didn't sew the artery up correctly so in the
 6    hospital she had an aneurysm -- bad luck -- and so,        09:59:59
 7    yeah, there was another one.  And luckily she was
 8    there so she didn't die, but it was an emergency so
 9    now they had to keep her for another few days until it
10    healed.  So I continued to stay with her, and I
11    think -- I want to say that was in June or -- I want
12    to say in June she had that surgery done -- and that's
13    to the best of my recollection -- and so I stayed with
14    her through -- I want to say through August maybe --      10:00:25
15    yeah, August, I think, right in there, maybe September
16    even, until she was back on her feet and she went back
17    to work part time, so --
18        Q    So you believe it was sometime in the fall of
19    this year that you moved back -- moved back to the
20    Indio address full time?
21        A    Correct.  Fall being around August, I
22    presume, summer, fall, whatever you want to call it.
23    But I think it was around August.  May have been
24    September, but right in there, late August, early
25    September.
```

```
 1      Q    And you consider the Indio address your
 2  full-time address --                                      10:01:00
 3      A    Yes.
 4      Q    -- at present?
 5      A    Yes.
 6      Q    And putting aside the period of time that you
 7  were staying with your mother in Los Angeles, how long
 8  have you lived at the Indio address?
 9      A    Years.  I don't want to speculate and guess,
10  but I want to say six years, maybe five years,
11  something like that.
12      Q    Does it -- do you live with anyone at the      10:01:29
13  Indio address?
14      A    I do.
15      Q    And who is that person?
16      A    Joe Forth.
17      Q    And he's also -- he is employed by the County
18  of Riverside?
19      A    Yes.
20      Q    And is he a public defender?
21      A    He is.  You must know him.
22      Q    I don't know him.
23      A    Oh.  Know of him then.
24      Q    I do recognize the name.
25           Is there anyone else that lives with you and
```

```
 1    Mr. Forth at the Indio address?                          10:01:57
 2         A    No.
 3         Q    At the address where you were staying at with
 4    your mother in Los Angeles, is there anyone else that
 5    was living with you and your mother at the Los Angeles
 6    address?
 7         A    No.
 8         Q    Do you have a younger brother who was living
 9    at that address?
10         A    No.
11         Q    Do you have a younger brother?
12         A    No.
13         Q    Do you have an older brother?
14         A    I do.
15         Q    Was your older brother living with you at
16    that address?
17         A    No.
18         Q    Does your older brother live in the state of   10:02:29
19    California?
20         A    Yes.
21         Q    And can you tell me what city he lives in?
22         A    Pardon me for a moment.  My microphone fell
23    off.
24              He is -- I believe he's up by Fresno.  It's a
25    town up by Fresno.  I don't know the name of the town,
```

```
 1    but it's right up by Fresno.  He used to live in

 2    Fresno, but then he had to move.  But it's right

 3    around Fresno, in that area.

 4        Q    And where were you born?

 5        A    I was born in California.

 6        Q    Have you ever gone by any other names?           10:03:02

 7        A    No.

 8        Q    Have you ever testified in court?

 9        A    I'm trying to think on that one.

10             I don't think I have, no.

11        Q    Have you ever filed a workers' compensation

12    claim?

13        A    No.

14        Q    Did you attend high school in California?        10:03:36

15        A    I did.

16        Q    And what year did you graduate?

17        A    1991.

18        Q    And where did you attend college?

19        A    Attend or graduate?  I went to multiple

20    colleges.

21        Q    Oh, you did?

22        A    Yes.

23             New York, Albany.  Regents College,

24    University of the State of New York.                      10:03:56

25        Q    And what year did you graduate college?
```

```
 1        A    Undergraduate, I graduated in -- I'm thinking
 2    '97, I think, maybe '98, somewhere in there.
 3        Q    In between high school and college, did you
 4    have -- did you work at that time?
 5        A    Yes, I did.
 6        Q    And what was your employment?
 7        A    At -- that's during that eight-year period or     10:04:29
 8    seven-year period -- I don't remember dates -- but I
 9    worked at -- I worked construction.  I did concrete,
10    labor.  In other words, I dug ditches and set forms
11    and poured what we called mud, cement, concrete,
12    screed it and level it out.
13            Then I worked house cleaning, cleaned houses,
14    D & J Cleaners.  And we did everything.  We did
15    commercial.  We did residential.  We did on the side    10:04:59
16    of the highways, the rest-stop areas.  We cleaned it.
17    Construction sites prior to once they're done cleaning
18    all the mess up, we did that.  And then -- who else
19    did I work for?
20            I worked for Bank One:  "Thank you for
21    calling Credit Card Services.  My name is Chris, and
22    how may I help you today?"
23            So Bank One, First U.S.A., that was in Tempe,
24    Arizona.  And -- let's see.  What else?  I'm trying to
25    think.  That's a long period of time.
```

1          I was in the army.  I'm trying to think of          10:05:29
2    what else I did.
3        Q    If you don't mind if I stop you there a
4    minute, do you recall the period of time you were in
5    the army?
6        A    I was in several periods of active duty and
7    several periods of reserve.  So when you say do I
8    recall the period, from what dates?
9        Q    That's what I was referring to is dates.
10             Why don't we try it this way:
11             Did you -- when you began your service with
12    the army, was it in active duty?
13        A    Yeah.  Yes.  Everyone starts off on active          10:05:58
14    duty.  You go through your boot camp and then you go
15    through your M.O.S. training, Military Occupational
16    Specialty.
17        Q    Do you recall when you started active duty
18    with the army?
19        A    Three days after high school.  I think that
20    was -- it was a mistake when I got there.
21        Q    It took you the fourth day to figure out it
22    was a mistake?
23        A    Took me the first day.
24        Q    The first day?
25        A    First day at three o'clock in the morning,

1    South Carolina.

2         When was that?  June?  It was early June,

3    June -- June 5th, I think.  I think I graduated on          10:06:29

4    June 3rd, and by June 5th I think I was having

5    somebody yell at me.

6         Q    And at some point were you discharged from

7    the army?

8         A    Yes, I was.  The way it works is you get a --

9    you get a discharge.  You get a DD214 when you

10   complete your training.  And I did what was called

11   split option, so I went on active duty for basic

12   training, did a year of college, went back to my

13   active duty again to get another, you know, entry and

14   exit discharge and DD214, and then I went back on          10:06:57

15   active duty in '95, I want to say, and I think I got

16   out in '97, so for about two years.

17        And then I went back in '99, and I went back

18   until 2001, right in there.

19        Q    And then at 2001 did you have -- did you

20   complete or end your military service then?

21        A    Yes, I did.

22        Q    So you were no longer active or reserve?

23        A    Correct.  I got hurt, so I could not continue   10:07:29

24   with active service or reserve service for that

25   matter.

```
 1      Q    What type of injury did you have that ended
 2  your service?
 3      A    It was a skeletal injury, my legs.
 4      Q    Is that, like, a broken leg or something like
 5  that?
 6      A    Yes, bilateral, both sides.
 7      Q    When you left the army in 2001, were you        10:08:06
 8  aware of any other type of injury that you had
 9  sustained --
10      A    No.
11      Q    -- while you were in the army?
12      A    No.  But they keep coming up.  Let me tell
13  you.
14      Q    But in 2001 it -- you weren't aware of any
15  conditions you had at that point?                        10:08:29
16      A    No.
17      Q    And then when you left the army in 2001, is
18  that when you began college or you completed all your
19  college by then?
20      A    I completed college.  I started law school.
21      Q    And when did you start law school?
22      A    I think July or August of 2001.
23      Q    And when did you graduate from law school?
24      A    July of 2004.                                   10:08:59
25      Q    And where did you attend law school?
```

1       A     Southwestern.

2       Q     During law school did you have some

3    employment as a -- some sort of legal-related

4    employment?

5       A     Toward the -- I think my last year of law

6    school I did.  I worked for the V.A., Veterans

7    Administration, doing medical malpractice claims, so I

8    worked part time.                                           10:09:29

9       Q     Any other positions like that, part-time

10   positions --

11      A     No.

12      Q     -- in law school?

13      A     No.

14      Q     After graduating, did you -- what was the

15   first legal position you obtained?

16      A     I -- excuse me.  I worked for the district

17   attorney's office in Los Angeles.

18             Excuse me.

19             I worked for Major Crimes, downtown, Criminal

20   Courts Building, CCB.

21      Q     Was that prior to passing the bar?

22      A     Yes, before and after passing the bar.  So I

23   graduated in July, so I couldn't take the July bar        10:09:59

24   because in May when you have to apply for it you had

25   to have graduated, and so I went from a night student

```
 1    to a day student, so it kind of made me not graduate
 2    on time.  So I graduated in the summer and then -- in
 3    July of 2004, and then I didn't take the bar till
 4    February, 2005, and I think they tell you -- in May
 5    you get the results back, I think.  Thank God I
 6    passed.  I didn't want to do that one again.          10:10:27
 7         Q    And then in -- you found out you passed the
 8    bar in February of 2005?
 9         A    Yes.
10         Q    And at that point were you still working at
11    the L.A. district attorney's office?
12         A    Yes, I was.
13         Q    And at some point you moved to the County of
14    Riverside district attorney's office?
15         A    Correct.
16         Q    And how did that come about?
17         A    I was -- there was a job that came open in    10:10:59
18    Riverside, and I applied for it, applied for other
19    jobs, too, and I got interviewed, and they told me,
20    "We're hiring you," and so I decided to go from
21    Riverside to Los Angeles.  And when I say Riverside
22    hired me, it was for Indio.  I didn't know that when I
23    applied.  And they asked me in the interview, "Have
24    you ever heard of Indio?" and I hadn't.  I thought
25    they were joking.  I thought they meant India, and I    10:11:29
```

1    went, "Ha-ha-ha, you're funny."  And, you know, India,

2    everyone had a real serious face, and I went, "Oh,

3    great."

4              And they had to go, "It's out by Palm

5    Springs," and I was thinking Blythe.  And I went,

6    "Isn't that by Arizona?"

7              And they were, "No, no, no.  That's Blythe.

8    You're in Indio."

9              "Yeah, I'll take it," so --

10        Q    But you were unfamiliar with Indio?

11        A    Yes, I was.  "They have a town out here?"

12             Palm Springs, I knew where that -- everyone

13   knows where Palm Springs is.

14        Q    When you were in law school, did you know          10:11:59

15   that you wanted to be a prosecutor?

16        A    No.

17        Q    When did you decide that that was the type of

18   legal job you wanted?

19        A    I put in for an externship, I think, in 2003,

20   and they were the only ones that took me for an

21   externship, so I went, "Okay.  That's where we'll go."

22   And I liked it, so -- and then when I graduated, I put

23   in a lot of applications, you know, for a lot of

24   firms.  Excuse me.  I'm sorry.

25        MR. WEAVER:  You can do it to your coat if you          10:12:28

                          31                    Volume I

 1    don't want it on --

 2        THE WITNESS:  Oh.

 3        MR. WEAVER:  -- your tie.

 4        THE WITNESS:  Thank you.

 5        MR. WEAVER:  That will work; right?

 6        THE WITNESS:  So I -- I'm sorry.  Where was I?

 7    BY MS. KOLE:

 8        Q    So you were not exclusively looking for work

 9    as a prosecutor?

10        A    No, I was not.  I probably sent out 90

11    applications, and I got one interview -- or I received

12    one interview with -- it was a firm in West L.A.  They

13    did medical malpractice.  And I went to Southwestern,

14    and so they kind of -- I was surprised I got the

15    interview, and they went, "Well, you know, we're

16    looking for someone with a little more civil            10:12:58

17    experience than what you have" as opposed to my

18    medical malpractice experience was with the Federal

19    Torts Claim Act, and it was with the federal

20    government for the V.A. only, limited liability,

21    things like that, so it's almost completely different.

22    It's a special field of law.

23            So they went, "You don't have really any

24    civil experience, so thank you but no thank you."

25            So then I got hired by the D.A.'s office.  I

```
 1    went, "All right.  We'll go there."
 2         Q    So you began work with the County of
 3    Riverside in the district attorney's office in 2005?
 4         A    Correct.                                        10:13:29
 5         Q    Do you recall what you -- what your position
 6    was when you entered?
 7         A    With the Riverside district attorney's
 8    office?
 9         Q    Yes.
10         A    I was a Deputy District Attorney I.
11              I presumed that was my job title, prosecutor.
12    Deputy district attorney is what we officially call it
13    with the County.  So that was my position and title.
14    And it's graded I through V.  Everyone starts out
15    there a I unless you come in under other special        10:13:57
16    conditions, which I did not.
17         Q    Over the course of time that you worked for
18    the County of Riverside in the district attorney's
19    office, did you receive promotions?
20         A    Yes.
21         Q    And what was the last -- the title of the
22    last position you worked in at the County of Riverside
23    district attorney's office?
24         A    Just so we're clear, there's job assignments,
25    and then there's actual -- what do we call it? --      10:14:27
```

1    positions -- or job titles.

2          So job titles, Deputy District Attorney I,

3    Grade II, Grade III, Grade IV, et cetera.  You can

4    have that grade, but you were put into multiple

5    different positions or can be.  There's a variety of

6    positions.  So when you ask which one or what was my

7    position, do you mean my actual job title or what

8    section was I working at or what position within the

9    D.A.'s office.

10        Q    Right now I'm just asking about the job          10:14:58

11   title.

12        A    My last position was a -- or pardon me -- my

13   last title was a Deputy District Attorney, Grade IV-T,

14   as in tango.

15        Q    During the time period that you were at the

16   County of Riverside district attorney's office, did

17   you receive promotions from D.D.A. I up to IV-T in

18   a -- let me start that again.  It got a little too      10:15:30

19   long.

20        Were you satisfied with the promotions that

21   you received from, like, a I to II?  Did you feel like

22   it came at the right time, or did you have some

23   concerns that you weren't being promoted quickly

24   enough?

25        A    No.  Just so -- if I can clarify -- would you

```
 1    like me to do that?

 2         Q    Sure.

 3         A    Okay.  Grade I, II and III is a set

 4    promotion, or it was when I was in the D.A.'s office,

 5    and I don't remember the time periods, but I think

 6    everyone went from Grade I to Grade II unless it was        10:15:57

 7    objected to or you weren't doing your job.  If you

 8    weren't competent, then they wouldn't.  But it was

 9    automatic.

10         And I think it was after nine months you went

11    to Grade II.

12         And then I think after that it was automatic

13    a year later, I think -- I think it was a year later,

14    maybe 18 months, something like that -- everyone went

15    to a Grade III unless you weren't doing your job.  You

16    were on probation for 18 months.  So the good news was

17    somewhere around that time period you were getting

18    promoted to a Grade III and you were off probation, so    10:16:28

19    that makes everyone feel good.

20         And then Grade IV is -- that is -- for

21    instance, when I was hired by Grover Trask and also

22    Rod Pacheco, they both said the same thing:

23         When you make Grade IV, that's like

24         making partner in a law firm, so we don't

25         promote everyone to Grade IV.
```

```
 1              That had particular requirements, and I think
 2    you had to do a certain number of homicide trials, a
 3    certain number of --
 4              I'll let you finish writing.                    10:16:59
 5              You had to do a certain number of homicide
 6    trials.
 7              You had to do a certain number of other
 8    requirements, had to have so many assignments in --
 9    different assignments.
10              You had to do felony assignments, misdemeanor
11    assignments.
12              You had to do some sort of -- you had to be a
13    head of something -- I can't remember what it was --
14    some special project assigned to you, either
15    legislative or, you know, injunction or something.
16    And mine was the head medical marijuana prosecutor in
17    the County when they passed that law about            10:17:28
18    cooperatives and whatnot, so --
19         Q    So is it your -- I'm sorry.
20         A    No.  Go ahead.
21         Q    Is it your recollection that you received the
22    promotions to II and III as you expected to receive
23    them on an automatic basis?
24         A    Yes.
25         Q    And you also passed probation at the time you
```

1    expected to do that?

2         A    Yes.

3         Q    And so were there -- did you have any

4    concerns about your employment with regard to

5    promotions to -- up to the level III?

6         A    No.

7         Q    And how about with regard to promoting to IV?

8    Did you promote to IV at a time that you felt was                    10:18:00

9    appropriate to do so based on your work?

10        A    Yes, very much so.

11        Q    And do you recall who promoted you?

12        A    The district attorney was Rod Pacheco, so I

13   think it gets approved -- the way it works in my

14   understanding from my experience there is there is --

15   once a month or once every few months there's a -- I                 10:18:28

16   think it's -- pardon me -- I think it's about every

17   four to six months there's a promotion board who meets

18   in Riverside because we have Temecula, the Southwest

19   Division, the Eastern Division and then the Central

20   Division in Riverside proper.  Everybody meets there,

21   and a packet has to be submitted.  There's a checklist

22   of what have you accomplished, you know, A, B, C and

23   D, and you have to fill it out, resume, everything.

24             You send it in, and they -- you're given

25   notice in an email, anyone who wants to apply for

                          37                    Volume I

1    Grade IV, and then so you get it approved by your

2    supervisor to apply, and you send the packet in, and          10:19:00

3    then it gets reviewed by this board, and the board

4    decides collectively if somebody is going to be

5    promoted to Grade IV.

6         And then it's approved by Rod Pacheco who was

7    the D.A. at that point in time.

8         Q    Do you recall who your supervisor was at the

9    time who approved you to send in the packet?

10        A    No, I don't.  I'm sorry, I don't.

11        Q    And do you recall getting a notification that          10:19:28

12   you had been approved to Level IV?

13        A    Yes.  I got a phone call from Rod Pacheco.  I

14   was in trial.  I'd just received a verdict.  It was in

15   Riverside proper, in the city of Riverside, and I was

16   on my way back out to Indio sitting in traffic, and my

17   phone rang and I went, "Oh, no," looked, and I went,

18   "That's the office, I better answer it."

19        So I answered the phone, and, lo and behold,

20   "This is Rod Pacheco."  Wow.

21        And so he said, "I'd just like to welcome you

22   aboard.  Congratulations.  You've been promoted to          10:20:00

23   Grade IV.  We consider you a part of -- or a partner

24   in the firm, so to speak, and you've done a wonderful

25   job.  You've exceeded our expectations."

```
 1              So that was a good feeling.  That was good.

 2       Q    That was a nice phone call?

 3       A    Yes, it was.

 4       Q    Do you recall what year that occurred in?

 5       A    No, I don't.

 6       Q    You said you'd just finished a trial.  Do you

 7   have a memory of the title of that particular case?

 8       A    I do not.  I've done a few of them.

 9            It's -- we have -- it's recorded in the

10   documents at the office.  You can look in the

11   personnel file.  They have the -- they send out an          10:20:29

12   email with your date of promotion, so there's no need

13   to memorize it.  I mean the office has it, so --

14       Q    Okay.

15       A    -- look at your paycheck, make sure it's been

16   signed.  "Are they paying me?"

17       Q    So you told me you were a IV-T, like tango.

18       A    Yes.

19       Q    Are there other IVs with other letters after

20   them?

21       A    Yes.  It starts at a Grade IV.  Then there's

22   IV-S, which is a -- it's a supervisory Grade IV.

23   You're basically a trial team leader, and you fill in     10:20:57

24   for your Grade V who's the actual supervising deputy

25   district attorney.
```

1          So a Grade V, just for clarification, may
2    have multiple teams under them.  They might have a
3    misdemeanor team.  They might have a domestic violence
4    felony unit.  They might have the preliminary hearing
5    unit.  They may have the drug unit, gang unit,
6    homicide unit.
7          A Grade V can have multiple units underneath
8    them.  A grade IV-S is on one of those teams or those
9    units, and they -- when they are at court they can act          10:21:27
10   as a Grade V de facto in the absence of a Grade V.
11   They have authority to dispose of cases, approve
12   counteroffers, things like that to a point.
13          And after that Grade IV-S, then there's a
14   IV-T.  A IV-T is somebody who does death penalty
15   cases.  You're assigned to a death penalty unit,
16   capital case litigation, and you have death penalty
17   cases, and you're carrying a caseload of death penalty
18   cases.
19        Q    So before promoting to a IV-T, you were a          10:21:57
20   IV-S?
21        A    Yes.
22        Q    And do you know when you became a IV-T?
23        A    No.
24        Q    At the -- let's go with January of 2013.
25        A    Okay.


                              40                    Volume I

```
 1        Q    I'm picking that date because it's a while
 2   before you went out on paid leave.
 3        A    Right.
 4        Q    In January of 2013, do you recall if you were
 5   a IV-T at that time?                                      10:22:30
 6        A    I'm sorry?
 7             January -- just so I'm, clear January 2013,
 8   2013 was a while before I went out on paid leave.
 9   That was November, correct?  Yes.  I think -- didn't I
10   go out in November, I think November, like, 7th or
11   something like that --
12        Q    Yes.
13        A    -- 'cause I'm getting the years mixed up.
14             Is that '13 or '14?
15             We're in '14 now.  That was '13.
16             Okay.  I'm with you.  I'm tracking.
17        Q    Okay.  So January of 2013, was your position
18   title IV-T?
19        A    Yes.
20        Q    Could you describe your responsibilities at    10:22:58
21   that time?
22        A    Sure.
23             I carried a caseload, meaning I was
24   responsible for however many cases were assigned to me
25   by my Grade V, my supervisor.  That was Ms. Fransdal.
```

1          It was my responsibilities to show up in

2     court, manage those cases.  That means all trial

3     readiness conferences, settlement conferences, any

4     motions that are on calendar for any particular case.

5     That means doing the preliminary hearings.  That means        10:23:25

6     filing of the informations at the complaint stage, and

7     once somebody's been held to answer, probable cause by

8     a judge, then we refile the complaint, it becomes

9     technically a felony.

10         In the old days when we used to have separate

11    municipal and superior courts, it went -- the

12    complaint went to municipal court.

13         Once the magistrate held the case to answer,

14    meaning found there was probable cause to charge this

15    person, then an arraignment date was set and the        10:23:59

16    defendant was rearraigned for a felony, and it became

17    an information at that point.

18         So the goal is you get it from the inception

19    when it's filed and then you take it through the

20    complaint stage to the preliminary hearing, then you

21    go to the felony information stage.  It's all one

22    court now, but they used to call it superior court or

23    super court.

24         When you got promoted from municipal court to

25    superior court, that was another big deal in the        10:24:27

1    office.

2         And then -- so you take the case -- once it

3    gets to superior court, now it's a matter of preparing

4    it for trial, conducting further investigation with

5    the law enforcement agencies who actually filed the

6    case and initially investigated it.  You have your own

7    bureau of investigation -- we did -- and so we were

8    assigned investigators if we had tasks.  We'd put it

9    in a computer system, find this witness, provide other

10   documentation, you know, conduct interviews, various

11   tasks that you needed to do.                          10:24:58

12        Then the discovery had to be all turned over,

13   you know, to the defense.  It's a little different in

14   criminal.  You have to turn over everything.

15   Everything.  There's no, "Well, I didn't think..."

16   No.  You turn it over.  That's the prosecutor.  The

17   defense, different story.  They don't have to.

18        Sorry.

19   Q    Were you also responsible for trying cases?

20   A    Yes.

21   Q    In -- I believe you testified earlier that --

22   and perhaps I got this wrong -- the IV-T was -- is a

23   designation that indicates death penalty cases?       10:25:29

24   A    It indicates that you are trying death

25   penalty cases.  You have to have at least one death

```
 1    penalty case, which means you're going to be on the
 2    homicide unit.
 3              Homicide cases -- or pardon me -- death
 4    penalty cases are only for people who are assigned to
 5    the homicide unit and who are a IV-T because once it's
 6    assigned, then you're eligible for a IV-T.  And,
 7    typically, once a death penalty case is assigned to a
 8    prosecutor, they're going to promote him or her to a          10:25:59
 9    Grade IV-T, albeit --
10       Q    I see.  So the case comes first, and then the
11    T designation follows?
12       A    Correct, because the requirement, at least
13    when I was there, was that you had to actually have a
14    IV-T case that you were currently assigned to for
15    prosecution.
16       Q    Did the T designation come with any
17    additional compensation?
18       A    Yes.
19              Excuse me.
20       Q    Were death penalty cases considered the most
21    difficult cases in the office?                                10:26:30
22       A    Yes.
23       Q    Would you --
24              It's okay.  You can have some water.
25              Could you give me a little bit of a
```

 1   description as to why the death penalty case was

 2   considered the most difficult case in the office?

 3       A    There's multiple phases to the case itself,          10:26:57

 4   so there's a penalty phase and there's a guilt phase.

 5   The guilt phase comes first.

 6           More over, when somebody's life is on the

 7   line, the defense attorneys, believe it or not, they

 8   have more resources than we do as prosecutors.  So

 9   when I showed up for a death penalty case, my

10   opponents on the defense side had two prosecutors, not

11   just one.  I had asked for, you know, help and

12   assistance.  Denied.  Denied.  Denied.  Okay?

13           They would have a paralegal who would show up     10:27:28

14   every day with the two attorneys.

15           They would also have at least two

16   investigators assigned and as many as five in some

17   cases.

18           They had any and every available asset or

19   resource that they needed.  We were limited.  We did

20   not have that.  I was lucky if I could have my

21   investigator show up every day to assist me in the

22   case.  I was never allowed to have a second -- a

23   second attorney to assist.  So this is one thing that     10:27:51

24   makes it hard.

25           Another thing is death penalty cases, you --

```
 1    we have a manual, we have a protocol we go through,
 2    and it's based off the Department of Justice -- the
 3    United States Department of Justice manual, but it's a
 4    lot more in depth than what they use.  It's just we
 5    use their framework.  You pull somebody's life apart
 6    literally.  You get every single document from the
 7    time they were in kindergarten, from the time of any
 8    C.P.S. records on their parents, their grandparents,
 9    any of their relatives who they live with, their
10    brothers, their sisters, siblings.  And what you're          10:28:26
11    looking for is not just what they did, a certain act,
12    but you're also looking for how their life -- how they
13    grew up in life, did they have all the benefits and
14    rewards that somebody in a working class family had,
15    or were they poor, did they grow up with no chance
16    whatsoever.
17            These are considerations that we take into
18    account before a case is actually filed as a death
19    penalty case.  Then we look at the criminal record, so
20    you have to pull apart an entire criminal record of a          10:28:57
21    person, and most of the time these people -- it's not
22    their first offense.  They usually have a litany, a
23    criminal history that starts from the time they were a
24    juvenile, and so you have to pull every one of those
25    cases in the discovery, every one of the witnesses.
```

```
 1    You have to go interview all the family members.

 2              For instance, one time I had to go -- the

 3    last case I did, I had to go to Trinidad, Tobago, the

 4    country, had to interview the defendant's father.

 5    It's a requirement that we have.  So we pull              10:29:25

 6    everything apart now.  Once you get to that, called

 7    the discovery phase, there's memorandums that have to

 8    be drafted.  There's a staffing that takes place with

 9    the A.D.A.s, assistant district attorneys, chief

10    district attorneys, your supervisor, yourself, and the

11    lead investigator from the filing agency.  And that

12    information is all vetted and the criteria is applied,

13    a vote is taken, and -- it's changed over the years

14    depending on who runs these cases -- with Rod Pacheco   10:29:56

15    it was everybody came in the room.  We vetted the

16    information and we took a vote, and however it -- you

17    know, however it came out majority, that's what we

18    did.

19              With Mr. Zellerbach it was a little

20    different.  What he said went.  So that's how it

21    starts.

22              Now, once you actually get to trial and you

23    decide you're going to go there, everything is on the

24    record.  There are no discussions with counsel at

25    sidebar or talking to each other.  Everything has to
```

```
 1   be on the record.  Everything is scrutinized for
 2   habeas corpus, for appellate rights.  A defendant in          10:30:29
 3   that case has a guaranteed appellate right, so they go
 4   straight to the California Supreme Court and they're
 5   guaranteed to go to -- they can do state habeas
 6   corpus.  They're guaranteed that right.
 7        MS. KOLE:  Should we take a break for a second?
 8            Do you mind if we take a break?
 9        MR. WEAVER:  Of course not, no.  Of course.
10            Sorry.
11        VIDEOGRAPHER:  The time is 10:30 a.m., and we are
12   are off the record.
13                (Whereupon a discussion was held
14            off the record.)                                      10:42:00
15        VIDEOGRAPHER:  The time is 10:43 a.m. and we're          10:43:16
16   back on the record.
17   BY MS. KOLE:
18        Q    Mr. Ross, I think when we stopped I had asked
19   you what made death penalty cases more difficult than
20   others.
21        A    Uh-huh.
22        Q    Was there something else you'd like to add to      10:43:30
23   that --
24        A    Just --
25        Q    -- answer?
```

```
 1        A     I'm sorry.
 2              The appellate remedy, I think it's the
 3     preparation that's involved, the investigation, the
 4     two phases of trial, and then the appellate remedies.
 5     There's multiple appellate remedies.  And this all has
 6     to be preserved at the trial court level.
 7        Q     And do you remember how many years you were
 8     handling death penalty cases at County of Riverside?
 9        A     Pardon me a second.  I'm jogging the memory          10:44:00
10     banks.
11              Several years.  I don't know how many.  I
12     want to say three maybe, no more than four.
13        Q     And when you first started handling death
14     penalty cases, did you feel at that period of time
15     your employment with the County of Riverside was
16     satisfactory?
17        A     Yes.                                                  10:44:29
18        Q     And at some point that changed?
19        A     Yes.
20        Q     Do you recall when that began to change for
21     you?
22        A     To -- when Mr. Zellerbach took over.  It
23     would have been in 2011.
24        Q     And do you recall -- what was the change in
25     2011 that -- things became unsatisfactory in 2011?
```

```
 1        A     Yes.

 2        Q     And do you recall what became

 3   unsatisfactory?

 4        A     Supervision, management.

 5              There were a number of things.  It was the          10:44:58

 6   policies implemented by Mr. Zellerbach and the

 7   executive staff, the A.D.A.s and the chiefs and even

 8   supervisors.

 9        Q     And these new policies implemented, how did

10   they impact you in a negative way.

11              I'm sorry.  I should ask you did they impact        10:45:28

12   you in a negative way?

13        A     Yes.

14        Q     And how did they impact you in a negative

15   way?

16        A     They created much more workload for somebody,

17   not just me, but for everybody.

18              We had no autonomy.

19              We were micromanaged.

20              We were given no direction as to definitively       10:45:55

21   what we could do and what we couldn't do.  It appeared

22   to be arbitrary or capricious.

23              Whenever management wanted to get you in

24   trouble, "You did this wrong."  "Why didn't you get

25   approval before you did that?" or "Why aren't you
```

1   doing this to satisfaction?" or -- there was a lot

2   more paperwork.  "You need to fill out more memos."

3   "You need to have a staffing memo."

4        There was no more open-door policy with the

5   A.D.A. in charge of the Eastern Division.  Things      10:46:29

6   became much more formalized or structuralized.

7        For instance, Grover Trask, you call him

8   "Grover."  Everything was a first-name basis.  It was

9   a very friendly, cordial place to work. It was nice.

10  It was pleasant.  He was a gentleman.

11       Rod Pacheco, the same thing, first-name

12  basis.

13       You didn't feel like you were being

14  scrutinized or under the gun.

15       Mr. Zellerbach, for instance, on day one I      10:46:58

16  was told by his secretary, "You will call him

17  'Mr. Zellerbach,' period."

18       And, for instance, you go back and try cases

19  and you tell the judges -- they ask why you're not

20  settling a case, and you have to tell them, "Well,

21  Mr. Zellerbach says we're not going to settle this

22  case."  And he says, "You mean Paul?"

23       "Well, Mr. Zellerbach.  I have to call him

24  'Mr. Zellerbach.'"

25       And the judges would say, "You're kidding.

```
 1    Even at work in the office he makes you call him
 2    'Mr. Zellerbach'?  That's unheard of."                    10:47:28
 3            And so it just became very -- I don't know,
 4    it's hard to explain -- but there's a lot of things.
 5            And I'll let you ask questions because,
 6    otherwise, I'm rambling on.  I'm sorry.
 7    BY MS. KOLE:
 8        Q    Who -- do you recall who the secretary was
 9    that told you you had to call Mr. Zellerbach
10    "Mr. Zellerbach"?
11        A    I think Rizzie was her name, R-i-z-z-i-e.
12            And I think Viki was her first name.  She
13    retired after -- I'm going to say after about a year    10:47:58
14    and a half Mr. Zellerbach was in office, and somebody
15    took over for her.
16            I may have it confused.  It may have been
17    Viki Rizzie that took over, but to the best of my
18    memory, I think the initial secretary who told me this
19    was Viki Rizzie and then she retired and somebody else
20    took over.  That is to the best of my memory.
21        Q    Who was your immediate supervisor prior to    10:48:27
22    Mr. Zellerbach becoming the district attorney?
23        A    I want to say Otis Sterling.  He's a judge
24    now, Judge Sterling.
25        Q    Did your immediate supervisor change after
```

```
 1   Mr. Zellerbach took office?

 2        A    Eventually, yes, but not immediately.

 3        Q    So you believe Mr. Sterling was still your

 4   supervisor for a while?

 5        A    For -- yes, yes, he was.                        10:48:59

 6        Q    And did Mr. Sterling move to a different

 7   position in the office?

 8        A    He -- I think he did, yes.  He got moved to a

 9   different position.  Ms. Fransdal took over.  She told

10   Mr. Zellerbach, "You give the homicide and gang team

11   to me, and I'll whip them into shape."

12             So she convinced him to transfer the homicide

13   and, I believe, gang team over to Mrs. Fransdal.        10:49:27

14        Q    Was Ms. Fransdal in Indio prior to becoming

15   your immediate supervisor?

16        A    Yes and no.

17             When I first started, Ms. Fransdal was a -- I

18   think she was a -- she was a coworker of mine.  She

19   was senior to me.  She'd been in the office for quite

20   a while.  And then she was promoted to a supervisor,

21   Grade V.  She was sent down to Riverside, the main

22   office -- Riverside Proper we call it -- and she was   10:49:59

23   there, I think, for about a year, year and a half, and

24   then she was sent back to Indio.

25             And I can't remember dates.  I'm sorry.
```

1      Q     When she came back to Indio, was that when
2   she became your immediate supervisor?
3      A     She had been back for a while before she
4   became my immediate supervisor.
5      Q     You testified just a moment ago about a
6   conversation between Ms. Fransdal and Mr. Zellerbach        10:50:26
7   where she told Mr. Zellerbach that she could whip the
8   homicide team in Indio into shape.
9      A     And the gang unit, yes.
10      Q     And gang unit?
11      A     Yes.
12      Q     And how did you become aware of that
13   conversation?
14      A     She told me.
15      Q     And was that a conversation between you and
16   Ms. Fransdal only?
17      A     Yes.
18      Q     Was she -- what was the context of her
19   telling you that?
20      A     I don't recall.  She had told had me that on
21   several occasion, and I can't recall each -- each        10:50:59
22   occasion.
23           I think generally it was just we were talking
24   about changes for rotations and assignments in the
25   office, performance of the units.

1  Q What was your understanding, if any, as to

2 why she was sharing that conversation with you?

3  A That I don't know.  That would be

4 speculation.            10:51:24

5  Q Was that something she said to you at the

6 beginning of the time she became your immediate

7 supervisor?

8  A No.  That was before she was my supervisor.

9  Q Did that conversation have an impact on you

10 as to how you felt about her supervising you?

11  A No, because she wasn't my supervisor at that

12 point in time, so no.

13   More over, I don't know -- I wasn't in

14 management, so I wasn't privy to the meetings that  10:51:58

15 they have.

16   They all have secret meetings, and we're not

17 privy to those conversations, so I had no idea what

18 was going to happen.

19   And, also, Mr. Zellerbach was new.  Nobody

20 knew what he was going to do.  It was almost like he

21 would make things up as he went along.

22  Q When Ms. Fransdal did become your immediate

23 supervisor, did the fact that she had told you she was

24 going to whip the homicide and gang units into shape

25 or that she had told Mr. Zellerbach that, did that  10:52:30

1  affect your opinion of her immediately as your

2  supervisor?

3      A    No.

4      Q    Did you have an opinion when she became your

5  supervisor as to what type of supervisor she would

6  be?

7      A    No, because when I knew her, she wasn't a

8  supervisor, she was a co-worker.  We both worked under

9  Dave Downing, I believe is who it was.  He eventually

10 became a judge, and then he retired.  He still sits          10:53:00

11 out in Indio, I think.

12     Q    So when Ms. Fransdal became your supervisor

13 and when you found out about that, you didn't have an

14 opinion one way or another whether this was going to

15 be a good relationship or maybe not so much?

16     A    No, I didn't focus on that.  I focused on my

17 cases.

18          Otis used to be a co-workers of mine as well.

19 His office used to be a couple doors down from mine.

20 We were on the third floor.  So when he became my

21 supervisor, I didn't -- I didn't worry about it.  I          10:53:30

22 didn't think one way or the other.  I just did what I

23 was told to do and did my cases.

24     Q    And it was the same with Ms. Fransdal?  When

25 she became your supervisor, you were focused on your

```
 1   cases, not whether she was going to be a good or bad

 2   supervisor?

 3        A    Correct.

 4             I will say we did focus, though, however, on      10:53:58

 5   Mr. Zellerbach.  The whole office did.  That's always

 6   a -- kind of an unnerving thing.  When a new D.A.

 7   comes in, you want to know what policies and

 8   procedures are going to happen and --

 9        Q    The changeover from Mr. Pacheco to

10   Mr. Zellerbach?

11        A    Correct.

12        Q    Okay.  When you said the whole office focused

13   on that, what were you referring to?

14        A    Indio, the Indio office.  When I say "the       10:54:30

15   office," I was out in Indio, so --

16        Q    And focusing on it, what did you mean by

17   that?  Like, discussions?

18        A    Discussions.  Exactly.  Questions, that sort

19   of thing.

20             We talked to each other.  "What do you think

21   he's going to do on this?"

22             "A new policy got implemented."

23             "Oh, great."  How are we -- and that gave us

24   other questions:  What about A, B, C and D?

25        Q    When Mr. Zellerbach became district attorney,   10:54:59
```

```
 1   was Sean Lafferty already in place at the Indio
 2   office?
 3       A    No.
 4       Q    Did that happen sometime after?
 5       A    Yes.  It was -- Bill Mitchell initially was
 6   in charge of Indio.  Before that it was Sue Stedding.
 7   My opinion of both, very good supervisors.  They were
 8   both great.  Great people, too.  But Bill Mitchell          10:55:30
 9   was -- Sue had retired, and then Bill Mitchell took
10   over.  Then Bill Mitchell -- once Mr. Zellerbach was
11   elected, Bill Mitchell was sent down -- actually, he
12   was sent downtown -- actually -- pardon me -- we did
13   have -- what was her name? -- we had Linda Dunn as the
14   chief, and we had Sara Danville.  She was out there        10:55:57
15   for about a year prior to Mr. Zellerbach taking over.
16   And Bill Mitchell at that point in time had been sent
17   downtown to be -- to take Jeff Van Wagenen's place --
18   or before Jeff was there, Mr. Van Wagenen had
19   executive A.D.A.  That's what Bill Mitchell did.  And
20   then once Mr. Zellerbach took over, there was a change
21   of command.
22       Q    Do you recall when Mr. Lafferty was assigned     10:56:29
23   to Indio?
24       A    No, I don't.  Sorry.
25       Q    That's okay.  No problem.
```

1          Do you remember when you began to work with

2   Mr. Lafferty when he was in the Indio office?

3     A    It would have been right when he came out.

4          Let me ask you this.  What do you mean, "work

5   with him"?  I mean technically I worked under him, so

6   that's -- you know, I was in the same location as him,

7   so that's working with him.  If you could just clarify

8   what you mean.  I'm sorry.                                    10:57:00

9     Q    Sure.

10          What was Mr. Lafferty's position when he came

11   into Indio?

12     A    He was the assistant district attorney, the

13   A.D.A.

14     Q    When Mr. Lafferty was the assistant district

15   attorney in Indio, did he hold meetings for the entire

16   office?

17     A    In what way?

18     Q    Like an attorney staff meeting, an all-hands

19   meeting, something of that nature.

20     A    You mean when he first took over?

21     Q    Yes.

22     A    Kind of an introduction?                              10:57:30

23     Q    No, I'm -- just like it's a regular matter of

24   in the course of working in Indio, would that be a

25   type of thing that he did where you would see him

1   at?

2       A    Yes and no.  Much less so than what we used

3   to have under Rod Pacheco's administration and Grover

4   Trask's administration.

5            Sue Stedding used to have us have weekly

6   meetings every Thursday, and it was --

7   employee-of-the-month awards were given out on a

8   weekly basis.  People were recognized for their

9   accomplishments, their achievements, not just          10:57:59

10  victories in trials, however, how they did in the

11  office helping other people out, their performance,

12  work effort, things of that nature.  That ceased -- it

13  was done under Sara Danville as well -- and that

14  actually ceased when Mr. Zellerbach took over when

15  Sean Lafferty was put in place.  We did have meetings,

16  however.  I can't say we had no meetings.  We did.

17  But I think it was maybe once a month.                 10:58:30

18      Q    And at those meetings would that be an

19  occasion when you would have the opportunity to

20  interact with Mr. Lafferty?

21      A    Yes.

22      Q    And those meetings were for all the attorneys

23  in the Indio office?

24      A    No.

25      Q    What -- just groups of -- different groups?

```
 1        A     Under Rod and under Grover Trask -- I'm

 2   sorry -- my memory's fleeting -- those meetings were

 3   held ever Thursday for everybody, and it was not only        10:58:58

 4   "Great job everybody" but any -- it was like a review

 5   of what do we need to do to improve anybody.

 6             If somebody new comes up or any issues or

 7   anybody's having problems, it was all discussed, and

 8   it was a team-building experience.

 9             Under the Zellerbach regime, the meetings

10   were not for the whole Indio office to show up.  They

11   were only for -- it was employee-of-the-month, so if        10:59:26

12   you got an award, then you were invited.

13        Q     So none of the other attorneys would attend

14   to see the employee-of-the-month award?

15        A     Correct, only the employees who were also

16   getting an award.

17        Q     So there wouldn't be a meeting where the

18   homicide unit attorneys would get together with

19   Mr. Lafferty?

20        A     Oh, no.  No.  No.  As far as I remember, that

21   never happened.

22        Q     What was your frequency of interaction with        11:00:01

23   Mr. Lafferty while -- after he became the ADA?

24        A     It depends.

25             For a short while he was going back and
```

1    forth.  He lived, I think, around Murrieta, Temecula,

2    so -- and that's where he -- and under Rod Pacheco, he

3    was, I think, a chief or an A.D.A. -- I think maybe an

4    A.D.A -- down in Temecula.

5           So once he got reassigned to Indio, he wasn't

6    always in Indio.  Sometimes he was -- you know, there          11:00:29

7    were a lot of meetings that were done downtown in

8    Riverside so he had to be downtown or in Temecula, but

9    mostly downtown.

10   Q    Are you able to estimate your frequency of

11   interaction with Mr. Lafferty on a weekly basis?

12   A    At what point in time?

13   Q    So I'm guessing from your answer that it

14   changed over time.

15   A    Correct.

16   Q    Why don't -- do you recall what it was like          11:00:59

17   when he was first assigned as A.D.A. in Indio?

18   A    Yes.  It would be every couple days maybe.

19   If he was in the office, maybe even every day.

20   Q    And were those occasions when you would go to

21   seek communication with him about a particular case?

22   A    Correct.

23          Initially it started out that way.  Again,

24   previous to the Zellerbach administration there was an

25   open-door policy for the A.D.A.s  You could come in          11:01:29

```
 1    and see Sue or Sara or Bill any time.  You didn't need

 2    an appointment any time.  If you needed advice on a

 3    case -- because these people are very experienced --

 4    well, not Sean, but Sue and Bill and Sara were -- so

 5    they were there and available for any sort of

 6    consultation that you needed or any advice or approval

 7    on matters.

 8           Sean Lafferty started out that way, but after      11:01:57

 9    a couple months he then changed that policy and said,

10    "No more open-door policy.  You have to have an

11    appointment to come see me.  You'll check with Sylvia

12    Davila and she'll tell you when an appointment is

13    ready."

14           So that made things hard because there's just

15    administrative stuff that takes maybe, you know, 30

16    seconds or a minutes.

17           "I need approval to do this now."

18           Now you have to get on the phone with Sylvia,

19    even though Sean's in his office alone, "No, you can't    11:02:27

20    see him now.  You have to get an okay.  What day will

21    work for you?"

22           So now everything's on hold while I have to

23    wait for the schedule.  "Can I just -- it will take

24    ten seconds?  Can I talk to him?"

25           "No."
```

1          So that's how -- that's how things started to
2     change.  That changed the interaction with him as
3     well.
4          Q     In that answer you just gave, there was a
5     little bit of back-and-forth.
6          A     Uh-huh.
7          Q     So I'm going to ask you who the players were
8     in that back-and-forth.
9          I believe you said someone was telling you,
10    no, you can't see him that way.  Who told you that?
11         A     Sylvia Davila, his personal secretary.          11:02:58
12         Q     Did Mr. Lafferty also tell you that you
13    needed to make an appointment rather than just
14    stopping by?
15         A     Yes.
16         Q     Did he tell you why?
17         A     I think he -- initially no, when he told me.
18    However, there were things I would -- when I was in
19    the area I'd stop by that needed his approval and he
20    would reiterate, "No, you can't see me.  You need to
21    set an appointment.  I'm busy."                            11:03:29
22         "Okay."
23         And I think -- he did have a meeting one time
24    with everybody and he said, "No more appointments" --
25    or "No more walk-in.  It's still an open-door policy,

1    but nobody can just walk into my office.  You have to

2    make an appointment with Ms. Davila, Sylvia -- Sylvia

3    Davila."

4            Sorry.

5       Q    So in that communication, Mr. Lafferty

6    distinguished between an open-door policy and just a

7    walk-in?

8       A    What do you mean by "distinguished"?                    11:03:59

9       Q    I thought in the testimony you just gave you

10   attributed to Mr. Lafferty, "It's still an open-door

11   policy but you can't just walk in.  You need an

12   appointment."

13      A    Correct.

14      Q    Do you have an understanding of what the

15   difference was between open-door policy but no

16   walk-ins, how those two things went together?

17      A    Yes.  In my opinion that was kind of a

18   contradiction in terms.  If you make an appointment,

19   that's not an open-door policy.  That is you need to    11:04:26

20   make an appointment.  It was kind of -- you know, it's

21   inconsistent with one another.

22            And then open-door policy, what I'd always

23   known it to be, Grover Trask, Rod Pacheco, they were

24   the D.A.s and they had open-door policies.  You could

25   just walk into their office, knock on the door.  As

65                              Volume I

1    long as they weren't in a meeting or something, you

2    could see them any time you wanted.  You didn't need

3    to set a schedule or check the schedule, make an

4    appointment in advance, like you did with Mr. Lafferty

5    and Mr. Zellerbach.

6        Q    How about Ms. Fransdal?  What was your          11:04:59

7    interaction with her like in terms of if you had a

8    question, could you walk into her office any time?

9        A    If she was there.  But she was never there;

10   she was always gone.

11       Q    And what do you mean by "she was always

12   gone"?

13       A    She was not in the office, not in her office.

14   I don't know where she was.

15            She was most of the time either in Riverside

16   or they had manager retreats that they would go on or

17   there's fraternal organizations, the District

18   Attorneys Association where all the chiefs and the      11:05:29

19   A.D.A.s and the supervisors get to go to, so they

20   would go to those meetings.

21            There was meetings -- there was also meetings

22   in downtown Riverside frequently, almost every day, or

23   there were meetings almost every day in Indio, too,

24   which made her unavailable and all the supervisors

25   pretty much unavailable.

```
 1              Excuse me.
 2         MS. KOLE:  I'm going to change gears here a little    11:06:01
 3    bit.  I think I'll have some more questions on that,
 4    but I'm going to move to something else.
 5              I'd like to ask the court reporter to mark       11:06:29
 6    this document titled "Plaintiff Christopher Ross'
 7    Responses to Defendant County of Riverside's Special
 8    Interrogatories, Set One," as Exhibit 1.
 9         THE WITNESS:  Thank you.
10                   (The document referred to above
11                   was subsequently marked Defendant's
12                   Exhibit 1 for identification by the
13                   Certified Shorthand Reporter and is
14                   attached hereto.)
15    BY MS. KOLE:
16         Q    Mr. Ross, I'm going to ask you for some help
17    with some of the responses --
18         A    Sure.
19         Q    -- in here.                                      11:07:00
20              First, I'd like to give you an opportunity to
21    take a look at the document and see if you recognize
22    it.
23         A    Yes, I do.
24         Q    And if you would turn to the
25    second-to-the-last page.  It's the one that's got
```

1  "Page 9" at the bottom, and at the top it has

2  "Verification" in the middle.

3      A    Yes.

4      Q    Is this your signature on this page?

5      A    It is.                                    11:07:29

6      Q    Okay.  I'd like to direct your attention to

7  page 3, line 15, --

8      A    Uh-huh.

9      Q    -- where it says, "Response to Special

10 Interrogatories Number 6."

11     A    Yes.

12     Q    And there's a listings of some doctors'

13 names, and there's the title and the last name.

14     A    Yes.

15     Q    I'm going to ask you in order for the first

16 names of these doctors, so we'll start with          11:07:59

17 Dr. Tatini, T-a-t-i-n-i.

18          Do you know that doctor's first name?

19     A    I do not know that doctor or any of these

20 doctors' first names.

21     Q    Okay.  For the record, the other doctors'

22 names are Dr. Vargas, V-a-r-g-a-s.

23          The next one is Dr. Dunkel-Driver,

24 D-u-n-k-e-l hyphen Driver, capital D-r-i-v-e-r.

25          The next name is Dr. Ross, R-o-s-s.        11:08:26

1          The next one is Dr. Bogle, B-o-g-l-e.

2          And the last one is Dr. Chang, C-h-a-n-g.

3          I'm just reading that into the record.

4          Is it correct, Mr. Ross, that you do not know

5     the first names of any of those doctors?

6      A     Yes, that is correct.

7      Q     With regard to Dr. Tatini, do you know what          11:08:59

8     that doctor's designation is in terms of the type of

9     practice that he or she has?

10     A     She -- that would be Dr. Tatini, T-a-t-i-n-i,

11    she is a board certified internal medicine specialist,

12    medical doctor.

13         And all of these physicians, I know them to

14    work for the Mayo Clinic in the Scottsdale, Arizona,

15    campus.  Whether they had private practices or not, I     11:09:28

16    don't know.

17     Q     Is -- you're referring to this medical

18    institution as the Mayo Clinic.  Does it have a more

19    formal name?

20     A     That's it, Mayo Clinic.

21         And they call them campuses, so they have the

22    Rochester campus, Scottsdale campus, and I believe

23    they have a campus in Florida.  I don't know what

24    campus it's called.

25     Q     And did you see all of these doctors referred .    11:09:59

1    to in Special Interrogatory Number 6 at the Mayo

2    Clinic campus in Scottsdale, Arizona?

3        A    Yes, with the exception of Dr. Bogle.  I

4    don't recall that name off the top of my head.

5            There were -- I saw a lot of doctors there,

6    and there were a lot of doctors who reviewed tests and

7    whatnot, so I'm sure I did, but at this point in time

8    I can't remember.  That name just doesn't stick out to        11:10:29

9    me.

10       Q    Okay.  I'm going to go back and go through

11   them one at a time.

12       A    Sure.

13       Q    Dr. Vargas.

14       A    Yes.

15       Q    Do you know what kind of specialty or

16   practice Dr. Vargas has?

17       A    He was a neurologist.  He worked for the Mayo

18   Clinic in their Neurology Department.  He specialized,

19   I believe, in concussions or trauma, brain trauma.

20       Q    Do you recall if you had a visit or were        11:10:59

21   examined by Dr. Vargas as opposed to Dr. Vargas being

22   a name you saw on perhaps a record review?

23       A    I actually had visits with him.  I was

24   examined by him.  I had testing conducted at his

25   request -- or his order.  I'm sorry.

1    Q    And same question with regard to Dr. Tatini.

2  Was that a doctor that you saw personally for an

3  office-type visit?

4    A    Dr. Tatini, I saw her personally.  She was          11:11:27

5  assigned my consulting physician is what the Mayo

6  Clinic calls it.  She was the one who went through all

7  my patient history, interviewed me, and she did the

8  initial -- they do initial chest x-ray, EKG and blood

9  work -- and then she assigns the patient or me out to

10  different specialists who she thinks I need to see.

11    Q    So she's kind of the one who's managing all         11:11:58

12  of the treatment?

13    A    Yes, that would be a good way to put it, a

14  managing physician.

15    Q    With regard to Dr. Dunkel-Driver, do you know

16  what his or her specialty or area of practice is?

17    A    Yes.  She was a neurologist.

18    Q    And did you see her for an office visit?

19    A    Yes, I did.

20    Q    And with regard to Dr. Ross, do you know what      11:12:30

21  his or her specialty or practice was?

22    A    It's a he -- no relation, by the way -- and I

23  think he was a neurologist as well.  He did

24  neurological testing on me.

25         They'd stick needles into your skin and jolt

1    you with electricity and -- it sounds worse than it

2    is -- but it was to test for neurological trauma and

3    damage to muscles.

4        Q    It does not sound pleasant.

5        A    No, it was not.                                    11:12:59

6        Q    So you saw Dr. Ross with an office visit or

7    testing?

8        A    Correct.

9        Q    And then with regard to Dr. Bogle, at this

10   time do you remember whether Dr. Bogle is a he or a

11   she?

12       A    I do not.  However, I have a vague kind of

13   recollection in my mind that it is a female.  I think

14   she's a Ph.D.  She was the one who did the testing on

15   me -- it took about five hours -- for -- to diagnose

16   brain trauma.  She was -- I was referred to her from    11:13:28

17   Dr. Driver-Dunkel -- or Dunkel-Driver.  Pardon me.

18   I think that's who she is.

19       Q    And you believe Dr. Bogle is also at the Mayo

20   Clinic in Scottsdale?

21       A    Yes, that's correct.

22       Q    And do you know what Dr. Bogle's specialty is

23   or -- I'm sorry -- her practice.

24       A    What she practiced, it had to do with

25   concussions, what they call post-trauma concussion

1   syndrome.   Neurology is what she specialized in, but          11:13:59
2   traumatic injuries, identifying traumatic injuries to
3   the brain.
4        Q    And then with regard to Dr. Chang, do you
5   know what his or her specialty was?
6        A    She.  And she was -- I think she was a
7   rheumatologist.
8        Q    And did you see Dr. Chang personally for an       11:14:27
9   office visit or testing?
10        A    Yes, I did.
11        Q    The question -- the Special Interrogatory
12   Number 6 says:
13            Identify all healthcare providers from
14        whom you have received medical treatment
15        related to ALS  -- I'm abbreviating that --
16        from February 1, 2013, to June 12, 2014.       11:14:55
17            And are you able to recall what the dates
18   were you saw Dr. Tatini?
19        A    I can give you a range, but the actual dates,
20   no.
21        Q    And what is your range for Dr. Tatini?
22        A    Dr. Tatini would have been, to my best
23   recollection, July maybe of 2013 through November of       11:15:22
24   2013.
25        Q    Did you -- How many trips did you make to the

```
 1    Mayo Clinic campus in Scottsdale in that time period,

 2    July to November, 2013?

 3         A    Multiple.  I can't remember, to be honest.

 4    I'm sorry.  I'd have to check the records.

 5         Q    And when you say "check records," what are

 6    you referring to?

 7         A    The medical records from the Mayo Clinic.        11:15:55

 8         Q    And do you have those medical records in your

 9    possession?

10         A    No, I do not.

11         Q    Do you have a date book or calendar when you

12    wrote down your travel to Scottsdale, Arizona, to go

13    to the Mayo Clinic?

14         A    No.  However, if you check emails, whenever I

15    went, I got permission from my supervisors to go,

16    David Greenberg and Tricia Fransdal.

17         Q    Do you have in your possession copies of        11:16:29

18    those emails?

19         A    No, I do not.

20         Q    Did you have those emails in your possession

21    at any time in the last year?

22         A    Yes.

23         Q    But you no longer have them?

24         A    Not with me.  When you say in my possession,

25    not with me today, no, I do not
```

1      Q    Do you have possession of those emails at

2  your home?

3      A    Yes.

4      Q    Did you take a look through those emails in          11:17:10

5  preparation for coming to your deposition today to

6  kind of familiarize yourself with the dates you went

7  to the Mayo Clinic?

8      A    No, I did not.

9      Q    Do you recall taking a vacation to Montreal          11:17:35

10 in 2013?

11     A    Never went.  I was going to, but I never

12 went.

13     Q    And was that in conjunction with going to

14 Minnesota?

15     A    Yes.

16     Q    Did you go to Minnesota?

17     A    I did.

18     Q    Do you recall what month in 2013 you went to

19 Minnesota?

20     A    Excuse me.                                            11:17:58

21          No, I don't.  I -- estimating, not completely

22 speculating, I think it was in August, maybe

23 September, but I'm not sure.  I can't be positive on

24 that.

25     Q    Do you recall on your visits to the Mayo

```
 1   Clinic in 2013 also going to other locations as part
 2   of maybe a partial vacation attached to the travel for
 3   medical reasons?                                            11:18:30
 4        A    Yes.  My dad lives in Arizona, and for the
 5   weekends I would go up and stay with my dad.  He had a
 6   stroke several years back.  He's not doing well, so --
 7   he's about 78 years old, so I like to check in on him
 8   'cause I don't -- it gave me an opportunity.  He's
 9   maybe an hour and a half north of Scottsdale.  He's in
10   a little mountain town.
11        Q    Other than visiting your father when you were
12   in Arizona, do you recall kind of a combination travel   11:18:57
13   to the Mayo Clinic and then maybe to another location
14   where you were taking a few vacation days?
15        A    No.
16        Q    I'm going to move up the page a little bit to   11:19:28
17   Special Interrogatory Number 5.
18        A    Okay.
19        Q    And that question asks:
20             Identify all dates you received medical
21        treatment from Eli Baron from February 1,
22        2013, to June 12, 2014.
23             And the response to that interrogatory is:
24        May 24 and June 5, 2013.
25             Do you believe those are correct dates?
```

1       A    I think so.

2       Q    And how did you determine those were the          11:19:58

3  correct dates for visits to Dr. Baron?

4       A    I don't recall what I looked at.  I think it

5  was a bill, I think, is what I looked at, and it was

6  an estimation is what it was based upon a bill.

7            I had to see him once for an evaluation, then

8  he sent me out a few days later to have MRIs done of

9  my spine, and then he needed a few days to review the

10  MRIs, and then I had a follow-up visit with him.  So I    11:20:27

11  saw him twice, but I had a total of three visits to

12  the Cedars-Sinai Hospital.

13       Q    And do you know what Dr. Baron's specialty or

14  practice is?

15       A    He's a neurosurgeon.

16       Q    And do you have in your possession at home

17  these bills that you referred to when you provided

18  these answers?

19       A    I don't know.  To be honest, I don't know if    11:21:05

20  I checked online to find it or if I actually had the

21  bill.  I think I looked online, and I think I did an

22  estimate.

23       Q    Do you have in your possession at home any

24  documents from insurance companies like a explanation

25  of benefits that might provide some dates that you saw

```
 1    different medical doctors?                          11:21:28

 2         A    No.

 3         Q    How about any receipts from co-pays?  Do you

 4    have any of those in your possession at home?

 5         A    No, not that I'm aware of.  I don't -- I

 6    don't think I do.  The Mayo Clinic, as I recall, I

 7    don't remember them ever giving me a receipt.  They

 8    may have, but I don't think I kept it.              11:21:57

 9         Q    How about notice of HIPAA rights?  Sometimes

10    providers when you to go a medical provider have you

11    fill out paperwork and then give you a copy of what

12    your privacy rights are with regard to the practice.

13    Did you save any of those?

14         A    Off my top of my head, I don't recall ever

15    being given that paperwork.  I'm sure they probably

16    did, but, no, I don't -- I don't have any of that as

17    far as I know.  I'm not sentimental with regards to   11:22:26

18    paperwork like that.  Sorry.  Maybe I should be.

19         Q    Did you receive any written reports from the

20    doctors that you saw giving you any results of their

21    findings?

22         A    No.  No, I didn't.

23              Well, I take that back.  Pardon me.

24              I did with regards to Dr. Tatini.

25              And when you say "doctors," I presume you    11:22:58
```

```
 1    mean all the Mayo Clinic and Dr. Eli Baron from

 2    Cedars-Sinai collectively.  Is that right?

 3        Q    Yes, unless there's some other ones on here,

 4    and I'll get to those later.

 5        A    No, there's no others.

 6             And I did for -- what did I have?  I had a

 7    diagnosis of sacroiliitis by Dr. Tatini,

 8    s-a-c-r-o-i-l-i-i-t-i-s -- two i's -- inflammation of      11:23:22

 9    the spine, the sacro -- sacrum and ileum spine.

10             And I had to have -- the insurance company

11    didn't want to pay for an MRI, as I recall.  They

12    went, "Well, we're not authorizing that."  So I had to

13    get a letter from Dr. Tatini stating medical necessity

14    for the MRI.  So I had a letter from her.  She wrote

15    to the insurance company and I got a copy of it, I

16    think.  I don't know if I still have it.                    11:23:58

17        Q    Did you look for that letter to respond to

18    defendant's request for production of documents?

19        A    Yes.

20        Q    And were you able to find that letter?

21        A    No.  Everything I was able to find, I turned

22    over, so --

23        Q    So you saw quite a few doctors.  Would you

24    agree with that?

25        A    Yes.                                               11:24:29
```

1        Q    When you moved from one doctor to another,
2    did you have to provide subsequent doctors with what
3    had been done before so they could move on with
4    testing other areas?
5        A    No.
6        Q    They did that on their own?
7        A    I presume.
8        Q    Okay.
9        A    I don't know.  They didn't -- they didn't
10   tell me, so -- but --
11       Q    They didn't say, "What are you here for?"
12   or --
13       A    No, no, none of that.
14       Q    You didn't have to go through --
15       A    No.
16       Q    -- a long list?
17       A    The Mayo Clinic is very good and very
18   efficient.  I was impressed.                          11:24:59
19       Q    When was the last time you've been to the
20   Mayo Clinic with regard to seeking medical treatment,
21   I'll say, through the end of 2013?
22       A    I want to say -- and I'm going off memory
23   here 'cause I don't know the exact dates -- but I want
24   to say October, 2013.                                 11:25:26
25       Q    Have you continued medical treatment with the

1    Mayo Clinic in the calendar year 2014?

2        A    No.

3        Q    Did you feel that you were done seeking

4    services at the medical clinic?

5        A    Yes.

6        Q    Had they provided with -- you with the

7    information that you felt that you needed?

8        A    Yes.                                    11:25:56

9        Q    Did they -- did the Mayo Clinic give you any

10   sort of diagnosis in October of 2013?

11       A    I don't know when they gave me a diagnosis.

12   I presume you're -- you want to know what diagnosis

13   they did give me, if any; is that correct?

14       Q    Well, first I want to know when they gave you

15   a diagnosis if they did.

16       A    I don't remember.  It would have been --

17   there were multiple diagnoses for different conditions  11:26:29

18   and different things, but the main one in question was

19   to rule out the neurological disorders, so I presume

20   we'll start with that unless you want me to go into

21   anything else.

22       Q    That's fine.

23       A    Okay.  They -- they -- what did they diagnose

24   me with?  Post-traumatic concussion syndrome from

25   explosives and head injuries in the military service

1    overseas, Middle East, and that was about it that they          11:26:56

2    diagnosed me with.

3            They did rule out Lou Gehrig's disease or

4    ALS, muscular dystrophy, and multiple sclerosis.

5            And I will -- that jogs my memory.

6            Dr. Chang, she told me -- she said, "You have

7    something.  Your blood results don't lie."

8            There was an enzyme or a protein or a couple

9    of them in my blood that were high, and she said, "You          11:27:29

10   have something, but I can't clinically diagnose you

11   with it."

12           She says, "It's some sort of autoimmune

13   disorder, but clinically you have no signs or

14   symptoms."  So she said, "I can't diagnose you with

15   it.  She said, "Just monitor your -- monitor yourself,

16   and if you have any other problems, come back to see

17   us."

18       Q    And in 2014 you didn't feel that you had any

19   other problems that you felt like you needed to go               11:27:59

20   back to the Mayo Clinic?

21       A    No, nothing that they hadn't already seen or

22   were aware of.  Nothing got any worse or any better.

23   It stayed the same.

24       Q    From any of the doctors at Mayo Clinic, did

25   they provide you verbally with some restrictions on

```
 1   things in your life whether at work or outside of work
 2   they suggested that you not do?
 3       A    No, but they did say, "Reduce your stress          11:28:28
 4   load at work and in your life in general."
 5            They said, "Have your work do whatever they
 6   need to do to reduce your stress."
 7       A    I said, "Okay."
 8       Q    Do you recall who gave you that
 9   instruction?
10       A    Multiple doctors.  I don't remember their
11   names.
12            Dr. Tatini was one of them as the consulting
13   physician, or the managing physician, I guess, we'll
14   call her.
15            And I think probably Dr. Bogle, if she is the    11:29:00
16   Ph.D. that I'm thinking of, she did.
17            Dr. Vargas, he did.
18            Dr. Dunkel-Driver she did.
19            And I'm pretty sure Dr. Chang did.
20            And I think there were other doctors who did
21   as well.
22       Q    And -- I'm sorry -- did you say you were
23   to -- they suggested you reduce your stress load at
24   work and also outside of work, just generally reduce
25   your stress?                                              11:29:29
```

1    A    They just said generally.  They said at work.

2  They didn't think there was anything outside of work

3  that was stressful for me, in their opinion.  They

4  just said at work.

5    Q    Did you verbally inform Dr. Tatini your job

6  responsibilities?

7    A    Yes.

8    Q    Did you provide her with a job description, a    11:29:57

9  written job description?

10    A    I'm trying to think.

11         No, I don't think -- I don't think I did.  It

12  was all verbal, as I recall.

13    Q    Did you describe for Dr. Tatini the nature of

14  your responsibilities at work?

15    A    What do you mean by "nature"?

16    Q    The things you did on a day-by-day basis.

17    A    Yes.

18    Q    Did you provide your assessment to Dr. Tatini    11:30:34

19  about how stressful your job was?

20    A    Yes.

21    Q    And do you recall what that assessment was

22  that you provided to her?

23    A    Yes.  The main stress of the job came from

24  the surprise meetings from management, from

25  Ms.  Fransdal, Mr. Lafferty.  It also came with the

```
 1    interaction.  It was hostile, wasn't nice.  That was          11:30:59
 2    the main stress from work.
 3              Also, not knowing where I was going to go or
 4    be -- be transferred to during the testing.  I did
 5    make a request to be transferred initially to
 6    Ms. Fransdal, and she said, "No.  When you find out
 7    that you can't continue with your job, if it gets to
 8    that point, then we'll worry about your cases and          11:31:29
 9    transferring you."
10              I said, "Okay."
11              That created some stress because now I had
12    cases set for trial with defense attorneys, and in the
13    criminal specter the prosecutor does not determine
14    when it goes trial; it's all on the defense because of
15    their appellate remedies.  So when they say they're
16    ready to go to trial, you better be ready.  When they
17    say they're not ready, you're not going.
18              So now I had to go work the defense attorneys
19    and let them know that I had medical testing to do and
20    would they be kind enough to transfer -- or pardon          11:32:00
21    me -- continue the cases.
22              And all of them agreed whole-heartedly, very
23    accommodating.  So that reduced a lot of my stress.  I
24    didn't have to worry about being in Arizona, you know,
25    for medical testing and preparing for murder trials.
```

```
 1        Q    So this was the description you provided to

 2    Dr. Tatini as your day-to-day-basis responsibilities?

 3        MR. WEAVER:  Objection.  Misstates his testimony.          11:32:29

 4         You can still answer the question.

 5    THE WITNESS:  Oh, I'm sorry.

 6         I'm sorry.  I was waiting for your response,

 7    your ruling.

 8    MR. WEAVER:  We don't get rulings here, --

 9    THE WITNESS:  Okay.

10    MR. WEAVER:  -- just make objections.

11    THE WITNESS:  Oh.  I think we kind of had the two

12    questions put together.

13         I think your first question, if I understand

14    you correctly, was did I go ahead and provide her

15    with, you know, a day-to-day description of my job

16    duties.

17         And the other one was, okay, well, what were          11:32:59

18    my day-to-day job duties, and then it led into what

19    was the stress that I had to encounter.

20    BY MS. KOLE:

21        Q    Okay.  So I'm going to back up a little bit

22    and make sure I understand what you're telling me.

23        A    Right.

24        Q    You did tell Dr. Tatini what your day-to-day

25    responsibilities were at work?  And by that I just
```

```
 1     mean, you know, what your job entailed on a
 2     day-to-day --
 3         A    Yes.
 4         Q    -- basis.
 5              And did you also provide an assessment to
 6     her:
 7              Well, this is what I do and I consider
 8         it really stressful, not so stressful, kind
 9         of in between.                                    11:33:29
10              Did you kind of say to her, "My job's really
11     stressful," something of that nature?
12         A    No.  As I recall what I did tell her was very
13     stressful was I was getting a lot of flack for going
14     and getting medical treatment at the Mayo Clinic from
15     Mr. Fransdal and Mr. Lafferty.  They were giving me
16     problems, and they kept -- every time I'd come back,
17     "What's wrong with you?"  "What's your diagnosis?"
18     "When are you going to know?"  "How come you don't
19     know?"
20              It was almost, you know, like an
21     interrogation.
22              "I don't know."  They -- doctors don't tell
23     you what's wrong until they're sure, and when they're   11:33:57
24     sure, then they tell you, and if they're not sure,
25     they never tell you.
```

1          For instance, the autoimmune disorder, I

2     guarantee you, all doctors have five differential

3     diagnoses that they do, at least three, preferably

4     five, but they don't tell the patient because then it

5     becomes subjective and the patient starts going,

6     "Yeah, yeah, that's what's wrong with me."

7          So to keep it objective, they won't tell you

8     until they're sure clinically based on their

9     evaluation.

10          So they never told me what was wrong with

11    regards to the underlying autoimmune disorder, and

12    that became a problem for Mr. Lafferty and                11:34:27

13    Mr. Greenberg and Ms. Fransdal.  So that did cause

14    problems, and, yes, I did inform Ms. -- pardon me --

15    Dr. Tatini that, yes, it was stressful at work, I was

16    getting problems.

17     Q    How about the actual work you were doing at

18    the County of Riverside, the going to hearings,

19    preparing your cases for trial, did you tell

20    Dr. Tatini that any of that work was stressful?          11:34:57

21     A    Yes.

22     Q    Okay.  So what did you tell Dr. Tatini in

23    terms of your work responsibilities being stressful?

24     A    That it was stressful.

25     Q    All of it?  Everything you did?

                          88                    Volume I

```
 1        A    I just said it was stressful.

 2             They don't understand when they're doctors

 3   and not lawyers, so when I'd start to try and explain

 4   something, you know, their eyes glaze over and,

 5   they -- Okay.  Keep it simple.  You don't have to

 6   explain a 1538.5 or, you know, you got to do an NGI

 7   trial or a penalty phase or you have to do a 402          11:35:28

 8   motion or points and authorities.  They don't

 9   understand that, so --

10        Q    So you did not grade for Dr. Tatini, like,

11   you know:

12             Some days I sit in my office and I'm

13        reading investigation reports.  That's not so

14        stressful.  But other days I have to go into

15        court and this is happening and that's much

16        more stressful for me.

17             You didn't make that kind of distinction for

18   the doctor?

19        A    I think -- that's a good question.  I think I

20   did but not articulated to the point like you're

21   saying.

22             I think that I did tell her that my job         11:35:57

23   varied, that some days were stressful, some days

24   weren't.  When I was in trial, it was stressful.  When

25   I wasn't in trial, typically the job duties itself
```

```
 1    were not that stressful.

 2            Showing up making courtroom appearances,

 3    those aren't stressful.

 4            Doing a preliminary hearing, not stressful.

 5            Doing a motion, not stressful.

 6            You get into, you know, a death penalty

 7    trial, yes, they get stressful.  It's a lot of

 8    pressure from the judge, a lot of deadlines, things of

 9    that nature.  That just comes with the job.  That        11:36:29

10    stress and pressure I can handle and I'm used to, but

11    the -- what happened to me, what my supervisors

12    started doing, that stress nobody should have to go

13    through 'cause there's no standard, you don't know

14    what to expect, you don't know what you're doing

15    wrong, if anything.  You don't know when it's going to

16    stop or what they're going to do to you.  That

17    would -- that I did explain to the doctor and did

18    distinguish.

19        Q    So you felt at that point when you were

20    talking to Dr. Tatini in 2013 that the actual          11:36:58

21    responsibilities you had to do with your job, although

22    some of them were very stressful, --

23        A    Uh-huh.

24        Q    -- that type of stress you could handle?

25        A    Right.
```

1        Q    And it was the supervisors -- and I'm going

2   to use your word here -- that giving you flack for

3   seeking medical treatment, --

4        A    Right.

5        Q    -- that was what was causing the additional

6   stress for you?

7        A    Correct.

8        Q    More stress than you felt you could handle?

9        A    The unreasonable stress, I would call it,          11:37:29

10  yes.

11            You're an attorney, and everybody in any job

12  you do, there's stress and pressure.  We all have it.

13  And trial becomes particularly stressful, however.

14       MS. KOLE:  Chris, do you mind if we go off the

15  record for a moment?

16       MR. WEAVER:  No, no problem.

17       VIDEOGRAPHER:  The time is 11:37 a.m., and we're

18  off the record.

19            (Whereupon a discussion was held

20            off the record.)

21                 (Lunch recess)                                 12:56:00

22       VIDEOGRAPHER:  This marks the beginning of media         12:57:10

23  Number 2 in the continuing deposition of Christopher

24  Ross.

25            Today's date is December 9, 2014.  The time is

                              91                    Volume I

1    12:57 p.m, and we're back on the record.

2    BY MS. KOLE:

3        Q    Mr. Ross, I wanted to go back to Exhibit          12:57:28

4    Number 1 which is the -- your responses to defendant

5    County of Riverside's special interrogatories, --

6        A    Sure.

7        Q    -- set one.  And I'd like to direct your

8    attention to page 4.

9        A    Yeah.  I'm there.

10       Q    And that would be special interrogatory

11   Number 10 --

12       A    Okay.

13       Q    -- and response to special interrogatory

14   Number 10, and that's at line 9.

15       A    Yes.

16       Q    There are quite a few additional doctors

17   listed there, so I'm going to take them in order and

18   ask for -- if you have any more identifying             12:57:58

19   information about them.

20       A    Okay.

21       Q    Okay.  Dr. Baron.  Do you know Dr. Baron's

22   first name?

23       A    Eli, E-l-i.

24       Q    And do you know Dr. Baron's specialty?

25       A    Neurosurgeon.  Neuro -- it's -- he is a

```
 1    neurosurgeon, a neurologist who specializes in

 2    surgery.

 3         Q    And do you know what clinic or hospital he's

 4    affiliated with?

 5         A    Cedars-Sinai.

 6         Q    And that's in Los Angeles?

 7         A    Yes, it is.                                    12:58:29

 8         Q    Okay.  We already discussed the second

 9    doctor, Tatini, and Dr. Ross.

10              And the fourth one is Dr. Chivers or

11    Chyvers [phonetic], C-h-i-v-e-r-s.  Do you know that

12    doctor's first name?

13         A    No, I don't.

14         Q    And is that a male or a female?

15         A    I don't recall.

16         Q    And the specialty of that doctor?

17         A    Don't recall.

18         Q    And the facility?

19         A    Mayo Clinic.

20         Q    And would that, again, be the Mayo Clinic in

21    Scottsdale?                                              12:59:00

22         A    Yes, it is.

23         Q    Do you recall if that's a physician you saw

24    personally?

25         A    I don't recall.  I'm sorry.
```

1      Q    And the next one is Dr. Butters.   Do you

2   recall Dr. Butters' first name.

3      A    No, I don't recall his first name.

4      Q    And is that a female or a male?

5      A    Male.

6      Q    And "Butters" is spelled B-u-t-t-e-r-s.

7      A    Yes.

8      Q    And what facility is Dr. Butters associated

9   with?

10     A    Mayo Clinic, Arizona.                          12:59:29

11     Q    And Dr. Butters' specialty or --

12     A    Physical medicine.   It may be physical

13  medicine and joint -- I don't know -- some sort of

14  joint specialty like as in the skeletal joint system.

15     Q    Do you recall if you had an office visit with

16  Dr. Butters?

17     A    I did.

18     Q    Then the next one is Dr. Jameson,              13:00:02

19  J-a-m-e-s-o-n.   What is Dr. Jameson's first name?

20     A    I don't know.

21     Q    And was Dr. -- is Dr. Jameson a male or

22  female?

23     A    I don't recall.

24     Q    And what clinic is Dr. Jameson associated

25  with?

```
 1      A    Mayo Clinic, Scottsdale, Arizona.

 2      Q    And do you know Dr. Jameson's specialty?

 3      A    No.                                            13:00:30

 4      Q    Do you recall if you saw Dr. Jameson for an

 5  office visit?

 6      A    I don't recall.

 7      Q    Do you recall where you got Dr. Jameson's

 8  name in order to provide it for this response to

 9  interrogatories?

10      A    Again, I think I got all the names on a bill,

11  a billing statement, as I recall.

12      Q    Is that the same billing statement you

13  testified about earlier that you believe you looked at   13:00:58

14  online?

15      A    I don't recall which one.  That was about, I

16  think, Dr. Baron, so that would have been different.

17  No, that's Cedars-Sinai.  This is Mayo.  And I think

18  for these I think what I did is I looked online is

19  what I did at the Mayo website.

20      Q    Do you recall when you were looking online at

21  the Mayo website in order to answer this

22  interrogatory, fill in the names, do you recall that,

23  doing that?  Do you remember doing that?            13:01:29

24      A    Vaguely.  I think that's how I did it, to the

25  best of my recollection.  I don't have an independent
```

1    recollection of actually doing it, but I have some --

2    I don't know -- vague impression that's how I did it.

3    I don't specifically remember sitting down at the

4    computer looking at it.  I'm sorry.

5        Q    Do you recall one way or another whether it's

6    possible for you to print out the online billing

7    you're reviewing?

8        A    I don't know.  If you want, I can try.          13:01:56

9        Q    I would like that, and I can discuss that

10   with your counsel, --

11       A    Okay.

12       Q    -- if it's possible for you to provide those

13   records.

14       A    Sure.

15       Q    And I don't need to know amounts or anything

16   like that.  I'm just trying to collect the universe of

17   doctors that you saw and where they're located at so

18   defendant can send out subpoenas in an efficient

19   way?

20       A    I -- I -- it's all right there.  They're all    13:02:30

21   at the Mayo Clinic, Arizona, all of them.  With the

22   exception of Dr. Baron, every doctor I saw was there.

23   And I did sign a release for those medical records a

24   few months back for you.

25       Q    Yeah.  And I'll let your counsel discuss with

                        96                    Volume I

```
 1    you --
 2         A    Okay.
 3         Q    -- what has occurred with that.
 4              Dr. Schiff, do you know Dr. -- it's
 5    S-c-h-i-f-f.  Do you know Dr. Schiff's first name?
 6         A    No, I'm sorry, I don't.
 7         Q    And Dr. Schiff's specialty?                     13:03:00
 8         A    I don't know.
 9         Q    And what facility Dr. Schiff is associated
10    with?
11         A    Mayo Clinic, Arizona.
12         Q    And then the next one, Dunkel-Driver, we've
13    already discussed, and so we'll move on to Dr. Young,
14    Y-o-n -- I'm sorry, I'll start again -- Y-o-u-n-g.
15              Do you know Dr. Young's first name.           13:03:30
16         A    No, I'm sorry, I do not.
17         Q    Do you know Dr. Young's specialty?
18         A    No, I do not.
19         Q    And what clinic or facility is Dr. Young
20    associated with?
21         A    Mayo Clinic, Arizona, Scottsdale.
22         Q    The next doctor listed is Dr. Chang who we've
23    previously discussed and so we'll move on to the next
24    one which is Dr. Lewis, L-e-w-i-s.
25              Do you know Dr. Lewis's first name?
```

```
 1        A     No.  I'm sorry.
 2        Q     Do you know whether Dr. Lewis is male or          13:03:58
 3   female?
 4        A     No, I don't.
 5        Q     And do you know Dr. Lewis's specialty?
 6        A     No, I do not.
 7        Q     And which clinic or facility is Dr. Lewis
 8   associated with?
 9        A     Mayo Clinic, Arizona.
10        Q     The next doctor is Vargas, V-a-r-g-a-s, and I
11   don't recall if that was a doctor we previously
12   discussed.
13        A     I believe it is.
14        Q     It is?  Okay.
15        A     We can go over it again.  No problem.
16        Q     Is Dr. Vargas a male or female?
17        A     Male.                                            13:04:30
18        Q     And specialty?
19        A     Neurology.  He does post-trauma concussion
20   syndrome, trauma to the brain.
21        Q     And that's a doctor you recall having an
22   office visit with?
23        A     Yes.
24        Q     And he is associated with the Mayo Clinic?
25        A     Yes.
```

```
 1        Q    The next one is Dr. Parish, P-a-r-i-s-h.

 2             Is Dr. Parish a male or female?

 3        A    I don't recall.

 4        Q    And do you recall Dr. Parish's first name?        13:04:57

 5        A    No.  I'm sorry.

 6        Q    And Dr. Parish's specialty?

 7        A    I don't know.

 8        Q    And Dr. Parish is associated with the Mayo

 9   Clinic?

10        A    Yes.

11        Q    Do you recall having an office visit with

12   Dr. Parish?

13        A    No.

14        Q    The next doctor is Pittelkow,

15   P-i-t-t-e-l-k-o-w.

16             Do you know if Dr. Pittelkow is a male or

17   female?

18        A    No, I do not.

19        Q    And this doctor's first name?

20        A    I'm sorry, I don't know.

21        Q    And this doctor's specialty?                       13:05:29

22        A    I don't know.

23        Q    And this doctor's associated with the Mayo

24   Clinic in Arizona?

25        A    Yes, I believe so.
```

```
 1        Q    Do you recall having an office visit with

 2   that doctor?

 3        A    No.

 4        Q    The next doctor is Wethe or Weethe [phonetic]

 5   spelled W-e-t-h-e.

 6             Do you know if this doctor is male or

 7   female?

 8        A    I do not.

 9        Q    And do you know this doctor's first name?

10        A    No, I do not.

11        Q    And do you know this doctor's specialty?

12        A    No, I do not.

13        Q    And is this doctor associated with the Mayo      13:05:59

14   Clinic in Arizona?

15        A    I believe so, yes.

16        Q    You think it -- this doctor could be

17   associated with a different facility?

18        A    Not that -- not -- no, I don't think so.  By

19   default.  That's why I say these doctors are from the

20   Mayo Clinic because the only doctor who I saw at

21   Cedars-Sinai was Dr. Eli Baron.  And some of these

22   doctors we've just covered, I've explained to you I do

23   recall an office visit; however, the rest of the         13:06:28

24   doctors who I don't recall, they would have had to

25   have come from the Mayo.  It's the only two places I
```

```
 1   went.
 2       Q    Okay.  And the next doctor is Karlin,
 3   K-a-r-l-i-n.
 4            Do you know if Dr. Karlin's male or female?
 5       A    No, I don't.  I'm sorry.
 6       Q    And do you know Dr. Karlin's first name?
 7       A    No.
 8       Q    And Dr. Karlin's specialty?
 9       A    I don't know.  I'm sorry.
10       Q    And Dr. Karlin, you believe, is associated
11   with the Mayo Clinic?
12       A    Yes.
13       Q    The next doctor is Dr. Hu, and it's spelled
14   H-u.  Do you know Dr. Hu's gender?                        13:07:00
15       A    No, I don't.
16       Q    And do you know Dr. Hu's specialty?
17       A    No.  I'm sorry.
18       Q    Is Dr. Hu associated with the Mayo Clinic?
19       A    Yes.
20       Q    Do you recall an office visit with Dr. Hu?
21       A    No, I do not.
22       Q    The last doctor is named Smith, common
23   spelling.
24            Do you know Dr. Smith's gender?
25       A    No, I do not.
```

1      Q    And do you know Dr. Smith's specialty?

2      A    No, I do not.                                          13:07:29

3      Q    Is Dr. Smith associated with the Mayo

4    Clinic?

5      A    Yes, I believe so.

6      Q    Do you recall an office visit with

7    Dr. Smith?

8      A    No, I do not.

9      Q    Are you familiar with the causes of action in    13:08:06

10   your complaint against the County?

11     A    Vaguely.  I can't say -- if you asked me to

12   name them, I couldn't.

13     Q    Are you aware of the cause of action

14   regarding disclosing a violation of state or federal

15   law and retaliation as a result of that?                     13:08:26

16     A    What do you mean by "aware"?

17          I've seen the complaint, so in that sense,

18   yes, I could say I'm aware.

19     Q    Are -- is that an issue that you believe is

20   in your complaint; it's one of your complaints against

21   the County?

22     MR. WEAVER:  Objection.  Calls for a legal

23   conclusion.

24     THE WITNESS:  I'll defer to my attorney on that as

25   far as I don't know civil law.  I'm sorry.                    13:08:59

```
 1           I mean factually I can tell you what happened.
 2    Whether or not something meets the legal standard,
 3    that's -- I have to rely on my civil attorney for
 4    that.
 5    BY MS. KOLE:
 6       Q    Okay.  I wasn't asking for your legal
 7    opinion, but I'll try to ask a better question.  It's
 8    okay.
 9       A    You're doing fine.
10       Q    That makes more sense.
11            Do you believe that you disclosed a violation
12    of state or federal law to your employer?
13       A    I don't understand that.  I disclosed a            13:09:27
14    violation of state or federal law?
15       Q    Yes.
16       A    I don't know.
17       Q    Okay.  Do you believe you provided some
18    information to somebody at the County of Riverside
19    that may have been a violation of law that then caused
20    them to retaliate against you?
21       A    Oh, yes.  That I do, yes.
22       Q    Okay.  So what was it that you told them that
23    you believed may be a violation of state or federal
24    law?
25       A    The Roger Parker case, for one thing.             13:09:58
```

```
1              There was a murder case.  He was an
2    African-American gentleman.  He was in custody for
3    almost four years, I believe, maybe even four years.
4    And that's kind of what started all the harassment and
5    the retaliation.  He was innocent.  The prosecutor had
6    the case before I did.  She said, "I'm not prosecuting
7    it.  The man's innocent."  That was Ms. Di Maria, D-i
8    M-a-r-i-a, two words.  First name Lisa, L-i-s-a.          13:10:25
9              And then she gave the case to Mr. Lafferty,
10   Roger Parker, and then he called me in in 2011
11   probably -- I'm just estimating -- midway through the
12   year, maybe July, August, somewhere in there, and he
13   reassigned the case to me and conveyed that
14   Ms. Di Maria thought that the man was innocent and the
15   case was then mine to evaluate and to try.
16       MR. WEAVER:  Chris, go bite-size chunks.  Let       13:10:59
17   her --
18       THE WITNESS:  Sorry.
19       MR. WEAVER:  Let her follow up with questions.
20   BY MS. KOLE:
21       Q    What do you recall with regard to the
22   circumstances of the reassignment of the case to you
23   and Ms. Di Maria's caseload?
24       MR. WEAVER:  Objection.  Compound.
25       MS. KOLE:  I can try and break that up.
```

```
 1        THE WITNESS:  Let's just do that.  One at a
 2   time --
 3        MS. KOLE:  Okay.
 4        THE WITNESS:  -- would be easiest.
 5   BY MS. KOLE:
 6        Q    I believe you just testified that the Parker    13:11:29
 7   case was reassigned to you from Ms. Di Maria; is that
 8   correct?
 9        A    Correct.
10        Q    Do you recall anything with regard to
11   Ms. Di Maria's caseload happening at that time when it
12   was reassigned to you?
13        A    I understood her cases to have two -- to have
14   two murders, so two cases.
15        Q    Were any of your cases reassigned to           13:11:58
16   Ms. Di Maria at that time?
17        A    I think, yes.  Around that same time maybe --
18   I think, yes, right around that time I had to give her
19   Hahn and Werntz.  It was a co-defendant case.  It was
20   a death penalty case.
21        Q    Did you understand it to be a trade of cases
22   between yourself and Ms. Di Maria?
23        A    No.  I actually gave -- I was told to give     13:12:28
24   her a case, I think, quite a while before I got the
25   Parker case, several months before, as I recall.  I
```

1    can't tell you the exact date.  It's been a long time.

2    I'm sorry.

3         Q    Did you have any understanding about whether

4    she was in trial at the time that you were assigned

5    the Parker case?  Or let me -- I'll try that question

6    again.

7              Do you have any understanding about whether

8    Ms. Di Maria was anticipating being in trial shortly

9    after you were reassigned the Parker case?                    13:12:59

10        A    No, she was not, to my knowledge.  The case

11   was -- if I may add, it wasn't reassigned because she

12   was unavailable for trial.  It was reassigned because

13   she expressly stated, "The man's innocent.  He did not

14   do it."  And she refused to prosecute the case.

15        Q    And how did you become aware of that

16   information?

17        A    Sean Lafferty conveyed it to me.  Tricia

18   Fransdal conveyed it to me.  And Lisa Di Maria herself      13:13:27

19   conveyed it to me.

20        Q    Was this in a conversation where all three of

21   them were present?

22        A    No, separate conversations.

23        Q    I believe you testified that Mr. Lafferty

24   asked you for your opinion of the case; is that

25   correct?

```
 1       A    Yes, that -- I don't know if I -- that is          13:13:59
 2    correct.  I don't know if I just stated that, but,
 3    yes, that is correct.
 4       Q    And did Mr. Lafferty want to know whether you
 5    thought Mr. Parker was innocent?
 6       A    No.
 7       Q    When Mr. Lafferty asked you for your opinion
 8    of the case, what did you believe he was asking you
 9    for?
10       A    May I explain a little bit the circumstances
11    of that conversation?
12       Q    Certainly.
13       A    It was in his office when he assigned me the
14    case.  I don't recall -- I was in there for a          13:14:28
15    different reason, and then he brought the case up, and
16    he said, "Ms. Di Maria thinks the guy's innocent," and
17    he rolled his eyes, and he went [indicating], "You
18    know Lisa."
19            I said, "Okay.  And what exactly do you want
20    me to do with the case?"
21            He said, "Well, I want you to evaluate the
22    case."
23            And I said, "Evaluate it?  How do you want me
24    to evaluate it, for what purpose?"
25            "Well, give us your opinion of whether you
```

```
 1    think, you know, we can prove that the guy is, you
 2    know, guilty of murder."                                      13:15:00
 3           And I said, "Okay.  And once I do that, then
 4    what do you want me to do?  Do you want me to give the
 5    case back, or do I keep the case for trial?"
 6           And he said, "No.  You'll keep the case for
 7    trial."
 8           I said, "Okay.  So, for clarification, I'm
 9    being reassigned this case then, I'm not just
10    evaluating it as an external opinion.  You're actually
11    reassigning the case to me?"
12           And he said, "Yes."
13           So that's when I was assigned the case.
14       Q   And in that conversation did Mr. Lafferty say
15    that you're supposed to give two cases to               13:15:30
16    Ms. Di Maria?
17       A   No.  That was -- those were -- not at all,
18    no.  And that wasn't two cases; that was one case.
19    That was Hahn and Werntz.  It was a co-defendant.  We
20    considered that one case.  It's the same trial even
21    though there's co-defendants.  I had given that to her
22    a long time before that, as I recall.  It's been a
23    long time.  Maybe even after.  Pardon me.  That's been  13:15:54
24    a while.
25           If you check the case notes, it will say in
```

```
 1    the file itself when it was transferred.  That's the

 2    easiest thing to do for accuracy.

 3         Q    And was there something about the Parker case

 4    that you believe may have been a violation of state or

 5    federal law?

 6         A    Oh, yes.

 7         Q    And what is that?

 8         A    The man didn't do it.  He didn't commit that

 9    crime at all.  We didn't even have probable cause to        13:16:30

10    believe he committed that crime.  DNA tests exonerated

11    him, multiple DNA tests.  I found admissions by a

12    roommate who was initially a suspect but ruled out

13    just arbitrarily by the police officers, and I

14    actually had recorded jail callings from that

15    individual speaking to his sister and another

16    individual admitting to the killing.  And then I also

17    had DNA which exonerated the defendant.

18              And you can't hold somebody in jail.  You        13:17:00

19    can't arrest somebody pursuant, you know, to the

20    Fifth, Sixth and Eighth Amendment.  You can't -- I'm

21    sorry.

22         Q    What did you believe to be the violation of

23    state or federal law?

24         A    Arresting the man without probable cause and

25    not dismissing the case when I requested to dismiss it
```

1    when -- as soon as we found out the DNA was not him,

2    that case should have been dismissed.

3         Q    And who did you inform that you believed                    13:17:27

4    there was a violation of state and federal law with

5    regard to the Parker case?

6         A    I'm sorry.  I don't mean to be nitpicky.

7    You're saying I informed them that there was a

8    violation of state law.  I didn't actually go -- and

9    those were not my words -- I didn't tell Mr. Lafferty,

10   "Sean, there's a violation of state and federal law

11   here."  I didn't do that.  I informed him, "You need

12   to dismiss this case.  The evidence exonerates him.

13   The evidence proves somebody else did it at minimum."

14          And when we initially started off, my concern

15   was can I prove the case.  And so I told him, "We                     13:17:59

16   can't prove the case.  I agree with Lisa's assessment.

17   We can't prove it.  Lisa thinks the man is innocent.

18   I'm not going to say he's innocent.  That's not my

19   job.  My job is to tell you whether or not I can prove

20   at least beyond a reasonable doubt or even probable

21   cause to believe he committed the crime.  I don't

22   think we have either."

23          And then as further testing and further

24   investigation went on, then I found the actual                       13:18:28

25   recorded jail calls of the roommate to Mr. Parker at

1    the residence where the murder occurred.  The victim

2    had his head cut off and a knife stabbed through this

3    scull and his head.

4         Gruesome.  Sorry.

5      Q    So you did not inform Mr. Lafferty that you

6    believed state or federal law was being violated?

7      MR. WEAVER:  Objection.  Misstates his

8    testimony.

9      THE WITNESS:  Expressly like you're stating it,

10   no, I did not say, "There is a violation of federal or     13:19:00

11   state law here," no, but did I inform him, "We need

12   probable cause to hold him.  We don't have probable

13   cause.  The only way we can file the information is if

14   we can prove beyond a reasonable doubt or have a good

15   faith belief that we can prove the case beyond a

16   reasonable doubt, and there is no way in my opinion

17   that any jury could find this man guilty proven beyond

18   a reasonable doubt, so we're going to have to dismiss

19   the case."

20   BY MS. KOLE:

21      Q    And was that also the state of affairs before    13:19:28

22   you got the Parker case from Lisa Di Maria?

23      A    I don't know.  I -- before I got it from

24   Lisa Di Maria, I didn't know anything about the case.

25      Q    When you got the case, at some point you

1    determined that -- you believed that the defendant was

2    innocent or -- I'm sorry -- you said you couldn't

3    determine that he was innocent but you could determine

4    that you didn't have probable cause and you could not

5    prove the case.

6            Is that -- am I getting that right?

7        A    Close.

8            I said it's not my job to determine whether          13:19:58

9    he's innocent or not.  My job was to determine whether

10   or not we could prove the case beyond a reasonable

11   doubt, number one, and, number two, whether we had

12   probable cause to file the case.

13           You have to understand in the criminal realm

14   it's unheard of that a case is filed without probable

15   cause.  That just does not happen.  And --

16       Q    So that had already been done before you got

17   the case then?

18       A    Correct.

19       Q    So prior to you receiving the case, there was

20   also a potential violation of state or federal law in        13:20:28

21   the sense of an information for someone that the state

22   did not have probable cause for?

23       A    Potentially, but in that case, as I recall,

24   the defendant -- he made an admission, but he was in

25   custody for 24 hours without sleep, without food, and

1    he kept denying anything.  He waived his Miranda

2    rights.  He denied having done anything for 24 hours.

3            The police go to release him, they hand

4    him his -- they walk in the room, they hand him his          13:20:59

5    clothing, and he says, "What are you doing?"

6            They said, "You can leave.  You're free to

7    leave."

8            And he says, "Okay.  I'll go back home."

9            And they said, "No.  Your roommate," who is

10   the individual I'm referring to who made the admission

11   who I discovered later, he had conveyed to the police,

12   "I don't want that guy back in my house.  He's kicked

13   out of my house.  He's not coming back."

14           So the defendant at this point says, "What?

15   I don't have a place to go?  Let me stay here."

16           And they said, "No, you can't stay here          13:21:28

17   unless you give us reason to detain you."

18           And he says, "Well, I'm not staying on the

19   streets.  That's a mean place.  People could beat me

20   up.  And I have nowhere to go.  Keep me in jail."

21           "You give us a reason to keep you in jail,

22   we'll keep you here."

23           This went on for some time, and he said, "I

24   didn't do anything."

25           "Well, that's up to you.  If you want to stay

1    here, you got to give us reason."

2            So it went on and on.

3            Eventually they told him -- they led him in

4    questions, "So did you do this?"

5            And he said, "Yeah, I did that."

6            "Did you do this?"

7            "Yeah, I did that."                              13:22:00

8            "Well, tell us how you did that."

9            Well, his statement of what happened was

10   completely contradictory to the forensic evidence.

11   For instance, he says he hit the individual in the

12   head with a pot, okay, from the kitchen.

13           Well, it turns out when they did the autopsy

14   and took the x-ray, no, it was a kitchen knife that

15   was driven into his skull from the top to the bottom,

16   and his head was cut off, the victim.   They removed

17   the knife, so you couldn't tell.   The brains were

18   coming out of the head, so the police officers when

19   they showed up made the conclusion -- looked at it and   13:22:28

20   said, "Ah, he was hit on the top of the head," and

21   when they said "pot" during the interview, meaning the

22   police officers, to Mr. Parker, the reason they

23   thought it was a pot, they meant a clay flower pot by

24   front of the door that was broken.   It was about

25   two-and-a-half-feet tall.   It was a rather large

```
 1    flower pot with a palm tree in it.
 2         Q    Do you mind if I --
 3         A    Go ahead.  I'm sorry.
 4         MS. KOLE:   Okay.  I think we've gotten a little
 5    away from the question.
 6              Pat, are you able to go back and pick up the        13:22:58
 7    question.  It's so far back, I can't get it.
 8                   (Whereupon the pending question
 9                   was read by the reporter as follows:
10                   "QUESTION:  So prior to you                     13:20:24
11                   receiving the case, there was also a
12                   potential violation of state or                13:20:29
13                   federal law in the sense of an
14                   information for someone that the
15                   state did not have probable cause
16                   for?")
17         THE WITNESS:  To answer that question, no, it            13:23:28
18    wouldn't be an information.  An information would             13:23:29
19    be -- come after the probable cause hearing.  It would
20    have been a complaint.
21              Again, if you want me to explain whether
22    there was a potential violation of law, I have to go
23    into the facts of the case and I have to explain to
24    you the difference.
25              We did subsequent DNA testing.  Based upon
```

```
 1    the admission, that's a judgment call.  Technically,
 2    the man admitted to completing the crime.  So at that
 3    point in time when that's all the information that was
 4    had, everyone thought, oh, the guy admitted it.
 5           Lisa Di Maria went through the case and said,     13:23:59
 6    "No, that admission is not good.  It was coerced."
 7           The man had a really low I.Q., very low I.Q.,
 8    and he was suggestible.
 9           So then the case was transferred to me.  I
10    reviewed it, did follow-up DNA testing, scrutinized
11    the examination.
12           I came to the same conclusion on the
13    examination.  Once that DNA test came back, at that
14    point in time is when I thought, yes, there definitely
15    was not even probable cause to file the case.           13:24:27
16    BY MS. KOLE:
17       Q    Did you form an opinion as to when
18    Ms. Di Maria had the case and she concluded the
19    defendant was innocent, that there was a potential
20    violation of state and federal law at that time prior
21    to you getting the case?
22       A    I had no knowledge of the case, so, no, I did
23    not.  I didn't even know the case existed prior to it
24    being transferred to me.
25       Q    After you got the case and after you did the
```

```
 1    DNA testing that led you to the conclusions you drew,     13:24:59
 2    did you form an opinion as to whether when
 3    Ms. Di Maria had the case prior to you there also
 4    existed a potential violation of state and federal law
 5    because of a potential coerced confession?
 6         A    That's kind of a lot into one.
 7         Q    Too much?
 8         A    Yeah.
 9         Q    At any time did you form an opinion that when
10    Ms. Di Maria had the Parker case that there also          13:25:28
11    existed a potential violation of state or federal
12    law?
13         A    A potential, yes.
14         Q    And when did you form that opinion?
15         A    After I reviewed the case and reviewed the
16    interview specifically.
17         Q    And is it your belief that adverse employment   13:25:59
18    actions were taken against you because of your
19    conclusions about the Parker case?
20         A    Oh, yes.
21         Q    And what were all your conclusions about the
22    Parker case that lead ultimately to the adverse
23    employment actions?
24         A    Number one, agreeing with Ms. Di Maria that
25    the man was innocent.
```

```
 1              Initially I came to the conclusion that I      13:26:28
 2    can't prove that the man committed the crime.  That's
 3    all I have to worry about.  I don't have to go the
 4    extra step.  That's not our job.  Is there evidence to
 5    prove beyond a reasonable doubt that the man committed
 6    the crime?  If there's not, we're forced by law not to
 7    file that case or to dismiss the case if it is filed.
 8    The standard to file is probable cause.  It appeared
 9    that, yes, technically there may have been probable
10    cause; but once I reviewed that statement in that
11    interview, I thought it was coerced.  So I thought,     13:26:58
12    yes, there is potential there.
13              Now, the adverse reaction I got from
14    Mr. Lafferty --
15        Q    Just a second.  Before you go on to that, --
16        A    Okay.
17        Q    -- I need to ask you about --
18        A    Uh-huh.
19        Q    -- if those are all the conclusions you came
20    to that led to the adverse employment actions.
21        A    The main -- well, could you be more specific.
22    All the conclusion with regards to what?
23        Q    With regard to the violation of state or
24    federal law associated with the Parker case.
25        A    That there was no probable cause and that     13:27:28
```

 1    there was -- you couldn't prove the case beyond a

 2    reasonable doubt and that the man was innocent, yes.

 3        Q    Okay.  And then at some point you told that

 4    to Mr. Lafferty?

 5        A    Yes.

 6        Q    And do you recall the first time you told him

 7    that?

 8        A    I got the case, I think, in July -- I'm

 9    having to think.  Memory banks.

10             As I recall, it would have probably been

11    in -- it was before 2012, so I'm going to say

12    December.  That's my best estimate.                    13:27:58

13        Q    December of which year?

14        A    2011, I believe.

15        Q    Excuse me.

16             So you think it took about six months from

17    July to December before you came to the conclusion

18    that there was no probable cause?

19        A    I think at that point in time I came to the

20    conclusion that we couldn't prove the case beyond a

21    reasonable doubt and that probable cause was

22    questionable.

23             Technically I thought it may have existed    13:28:28

24    because you still do have an admission, and trying to

25    prove that it was coerced, that's an individual

                            119                    Volume I

```
 1    opinion.  And in my opinion and in Ms. Di Maria's,

 2    yes, it was coerced and it was inconsistent with the

 3    forensic evidence.  So at that point I thought, yes,

 4    we may not even have probable cause here but we

 5    definitely can't prove it beyond a reasonable doubt.

 6         Q    But in December of 2011 that was the first

 7    time you told Mr. Lafferty at least the first

 8    conclusion that you couldn't prove the case beyond a        13:28:59

 9    reasonable doubt?

10         A    As I recall, yes.

11         Q    And was that an in-person conversation with

12    Mr. Lafferty.

13         A    There were several conversations I had on

14    this in person with him, and I believe, yes, it was

15    initially -- it was probably before December, maybe

16    early December, maybe November, and then his

17    response -- he was upset at that.  He did not want to       13:29:29

18    hear that.  And his response was, "Write me a memo."

19    Then I wrote a memo.

20         Q    Let me ask you about Mr. Lafferty's reaction,

21    the upset.

22         A    Okay.

23         Q    What do you mean by that?

24         A    Not happy, meaning angry, meaning hostile,

25    displeasant.  Physically you could see by the look on
```

| | | |
|---|---|---|
| 1 | his face, tone of his voice, body gesture, posturing, | 13:29:58 |
| 2 | interruptive.  In my speech he'd interrupt me and | |
| 3 | voice his opinion, which was usually not the way he | |
| 4 | was.  Usually he would let you finish, was calm.  But | |
| 5 | you can tell.  Like Dr. Jekyll and Mr. Hyde, when he's | |
| 6 | upset, you'll know it.  So that's what I mean.  It was | |
| 7 | the look on his face | 13:30:23 |
| 8 |     Q    You referred to a body gesture.  What body | |
| 9 | gesture do you recall him making? | |
| 10 |     A    I can demonstrate.  Kind of hard there. | |
| 11 | Okay. | |
| 12 |     Q    Well, that's the beauty of video.  You can | |
| 13 | demonstrate for us what the body gesture was. | |
| 14 |     A    Yeah, I'd probably say the look in the eyes | |
| 15 | becomes one of anger, and that's just the common | |
| 16 | sense, you know, layperson approach to it.  You can | |
| 17 | tell when someone's angry by the look in their eyes. | |
| 18 | It becomes very serious, the countenance in the face | 13:30:58 |
| 19 | or just the look of seriousness, and then -- | |
| 20 |     Q    Are you speaking now with regard to -- | |
| 21 |     A    Mr. Lafferty. | |
| 22 |     Q    -- Mr. Lafferty on that date? | |
| 23 |     A    Correct. | |
| 24 |     Q    Okay. | |
| 25 |     A    Sarcasm in his voice, his tone of voice, how | |

```
 1    fast he speaks.
 2             The position of the body, sits back with his
 3    arm, and then almost sarcastically, "Oh, so you think
 4    the guy didn't do it?  Well, why don't you just write
 5    a memo on that."
 6             "Okay.  You want me to write a memo on it.
 7    All right.  Fine.  I'll go write a memo on it."          13:31:30
 8             And then I wrote a memo on that in December,
 9    and I had another conversation with him -- I've had
10    several -- and his extent was -- I don't know why but
11    he really wanted to push this case.  He -- he knew, at
12    least according to what he told me, this guy was
13    guilty, he did it.
14             I said, "Sean, have you reviewed the
15    evidence?  Did you look at my memo?"
16             And then he said, "Well, you know, you
17    make -- you made comments in your memo about the        13:32:00
18    interview.  Why don't you go ahead and detail me
19    specific statements in the interview that you think
20    were coerced or gave you reason to believe that this
21    guy wasn't telling the truth."
22             So then I had to sit down and I had to go
23    through the entire transcript for however long it was,
24    hours of testimony, and I had to pick out the things
25    that were inconsistent with the forensic evidence and
```

1    detail a memorandum on that.  Then I provided that to          13:32:28

2    him at a later date.

3        Q    Do you remember -- excuse me.

4             Do you remember when that was?

5        A    That I don't.  I'm -- I'm -- no, I don't.  It

6    would have been, I think, in 2012 sometime, but I will

7    say this one thing before I forget, forget this stuff

8    in my mind.  I'm sorry.

9             But one thing he did say was, "I know he did

10   it.  I know he did it."

11            "Sean, how do you know he did it?"

12            "Because he had a physical reaction when he     13:32:58

13   showed up to the scene."

14            "Okay.  And what is the physical reaction?"

15            "Oh, I can't remember what it was, but I read

16   it in the file.  I remember."

17            "Okay.  Would you like me to give you the

18   file and look at it."

19            "No.  I have to look at that later."

20            "Okay."

21            So then eventually I ended up giving him the

22   file and he began looking at it.  Then we had another

23   conversation in his office, just he and I, and he said

24   this guy, he knew, did it because the guy had a

25   physical reaction, and he said he'd spoken with          13:33:29

```
 1   Mr. Zellerbach downtown and other people downtown,
 2   which would be Mr. Van Wagenen, and he said the guy
 3   had a physical reaction and downtown agreeing with him
 4   that that was evidence of the guy's guilt.
 5          I said, "What is the physical reaction?"
 6          "He got sick when the police brought him back
 7   to the scene for a walk-through on the crime.  He
 8   actually started dry-heaving as though he was
 9   nauseous."
10          And I said, "Well, how does that equate to        13:33:56
11   guilt?  There could be a lot of reasons.  Number one,
12   he walked into his house and saw somebody with their
13   brains coming out of their head and their head cut
14   off.  That's enough to make anybody sick.  There was
15   blood spatter all over the wall.  The man's blood was
16   all over the couch and the floor.  How was having a
17   physical reaction an admission to guilt?"
18      Q   So you and Mr. Lafferty had a difference of
19   opinion as to the relevance of the physical
20   reaction?
21      A   Absolutely.
22          I said -- I asked him, "Please articulate for     13:34:28
23   me how am I going to articulate or specify to a jury
24   that that is guilt?"
25      Q   Is it -- do you believe that you and
```

1    Mr. Lafferty having a difference of opinion and

2    discussions about the Parker case, is that something

3    that led to adverse employment action against you?

4          A    Oh, yes.

5          Q    And -- okay.

6          A    Because there was adverse reaction during

7    those -- during those interactions or conversations.          13:34:55

8          I mean he can get -- he gets really angry,

9    like a flame.  I mean he flames on when no one is

10   around.  He gets mad.  I mean he gets mad.  You know,

11   I fear him getting violent.  You can get a sense of

12   that.  That's not something you can articulate.  It's

13   just body posture, the look in somebody's eyes and

14   their face and how they start acting and their tone of

15   voice and what they start saying.  I didn't want to

16   provoke him.

17         In one of his emails -- I sent him an email

18   finally when further testing was done and said          13:35:29

19   outright, "You just need to dismiss this case.  I've

20   written three of these memorandums right now.  I've

21   tested more evidence than we've ever tested in a case.

22   Why are you still harping on this?  This guy's

23   innocent.  Lisa's absolutely right.  Dismiss this

24   case.  The guy's been sitting in jail for how long?"

25         He got mad on that.  His response was -- he was

```
 1    very upset, and I was, "Oh, no, I've..." --
 2         Q    Can I go back to --
 3         A    Sure.
 4         Q    -- the adverse employment actions.
 5              You said that they happened in connection        13:35:58
 6    with your discussions with him; is that right?
 7         A    Yes.
 8         Q    Okay.  So your first discussion with
 9    Mr. Lafferty that may have been in late 2011, what was
10    the adverse employment action that happened after that
11    first discussion with Mr. Lafferty about the Parker
12    case?
13         A    You're using the legal conclusions.  Could
14    you define "adverse reaction" for me just so I know
15    what to say?  What does the law say it is?
16         Q    I actually was going off what you said.
17              You said when you were talking to
18    Mr. Lafferty --
19         A    Uh-huh.
20         Q    -- there were adverse employment actions        13:36:29
21    right then.
22         A    Yes.
23         Q    So I'm asking you factually what happened no
24    matter what the law says.
25         MR. WEAVER:  Objection.  Misstates his testimony.
```

1    He never testified right then.

2    BY MS. KOLE:

3        Q    Maybe I misunderstood you.

4             Do you recall that testimony?

5        A    No.  I remember -- well, see, here's the

6    thing.  You were leading up to -- you kept using that

7    term, and I paraphrased the term that you used in a

8    question.

9        Q    Okay.  Then let me ask it this way:

10            In late 2011, November or December, when you

11   were having your first discussion with Mr. Lafferty        13:36:58

12   about the Parker case, did you believe in -- close in

13   time with that something happened in your employment

14   situation that you believed was negative that was

15   caused by that first conversation?

16       A    Yes.

17       Q    And what -- factually what was that?

18       A    That was the reaction that I've been

19   explaining.  Every time I spoke with the man on the

20   subject, it was like touching a sore spot on a dog.

21   He would -- he'd get hostile, his tone of voice, his    13:37:26

22   physical posture, the look on his face, his

23   commentary, very sarcastic, snide.

24       Q    So the negative thing that happened was that

25   when you were having the discussion he was angry and

```
 1    hostile toward you?
 2         A    Yes.
 3         Q    Okay.  And was there anything else negative
 4    that happened with regard to your job in time with
 5    your first conversation with Mr. Lafferty?
 6         A    I'd have to think on that one.  That's been
 7    so long ago.
 8              Off the top of my head I can't tell you that      13:38:02
 9    I can remember anything.
10         Q    Okay.  Were you demoted after that first
11    conversation with Mr. Lafferty at the end of 2011?
12         A    No, I was not.
13         Q    Did you lose any pay after that first
14    conversation with Mr. Lafferty in 2011?
15         A    No, but I'll tell you what did happen.
16              If you look at my personnel file, just about
17    every month I'd be an employee -- through Grover Trask
18    and Rod Pacheco I received employee-of-the-month
19    awards for winning trials and other performance on the     13:38:28
20    job.  That all stopped once -- once I had this
21    disagreement with Mr. Lafferty.
22              For instance, I had a death penalty case.  A
23    death penalty case -- they don't run very many of
24    those a year in the state of California.  There's very
25    few people that do them.  And when you get a
```

1    conviction on those, those are very serious, and

2    that's one thing that, yes, you do get an award for.

3    I think it took a year for me to get an

4    employee-of-the-month award for it.  And I don't mean          13:38:59

5    to say, "Oh, I want my employee-of-the-month award."

6    I'm not saying that.  But this is just an example of

7    the change in how I was treated.

8           And then when I received the award in front

9    of all the other people, I -- instead of -- usually

10   the D.A. stands up and says:

11          We're going to give this award to

12       so-and-so.  Here are the facts of the case, a

13       very difficult case.  This is how we overcame

14       these odds.  It was, you know, a great job

15       win, lose or draw.  Congratulations.  Good

16       job.

17          I got -- Mr. Zellerbach says in front of all          13:39:29

18   the people present for this meeting, "We're giving

19   this case -- or this award to Mr. Ross, Chris, because

20   he's anal.  Everybody knows how anal he is."

21          And the man stood up in front of the

22   employee -- we have a banquet every year, awards

23   banquet.  It's been videotaped.  You should --

24   somebody at the office will have it.  They videotape

25   it.  He gets up there and he gives my investigator an

1    award for he did a really good job investigating the          13:39:58

2    case for me on a death penalty case, and rather than

3    saying, "This is for such a great job that

4    Investigator Dougan did," you know, "everybody applaud

5    him," he says, "We're giving this because Chris is

6    anal.  He's anal retentive.  Everybody knows how anal

7    retentive he is."

8            These are the sort of things that I got.  I

9    got little commentaries.  And --

10       Q    Can I ask you --

11       A    Sure.

12       Q    -- the first conversation with --

13       A    Uh-huh.

14       Q    -- Mr. Lafferty was in November or December

15   of 2011?

16       A    Correct.

17       Q    When did this employee-of-the-month "He's        13:40:27

18   anal" incident occur?

19       A    I think that happened almost a year later.

20   That was in 2012, or at least six months later.

21   Sometime in 2012.

22       Q    And you believed a delay in giving you the

23   employee-of-the-month award was due do your

24   discussions of the Parker case with Mr. Lafferty?

25       A    In part.  Not just my discussions but my

1    opinion on the case.                                          13:40:58

2         Q    Because you didn't agree with him?

3         A    Correct.  Absolutely.

4         Q    Was that the first time you hadn't agreed

5    with Mr. Lafferty?

6         A    That's a vague question.  I don't know.

7              As far as something professionally, I think,

8    yes.

9         Q    You had always agreed on cases that --

10   whether cases should be prosecuted previously with

11   Mr. Lafferty?

12        A    Yes, but please don't -- let's not paint the

13   wrong picture.

14             When you're assigned a case, you don't take     13:41:29

15   it to Mr. Lafferty and say, "Okay.  I think this case

16   is good."  You don't do that.  It's already been --

17   it's already been vetted by an investigator with the

18   law enforcement agency and a filing deputy, and then

19   the case goes to you.  And it's -- for murders, they

20   get reviewed.  They go through a review board to

21   establish that there is probable cause at a minimum to

22   file the case, and realistically you're looking at can

23   you prove the case beyond a reasonable doubt before

24   it's filed based upon the evidence, so --                  13:41:58

25        Q    That had already been done in the Parker case

1    then?

2         A    Oh, yes.   There was already a staffing by

3    Ms. Di Maria, if I recall correctly.

4         After it had been filed and she had the case

5    for a while, I believe she had a -- excuse me -- she

6    had a staffing to dismiss the case prior to me getting

7    the case.

8         Q    So Ms. Di Maria also disagreed with

9    Mr. Lafferty on whether the Parker case should

10   proceed?

11        A    I don't know.   I wasn't present for the                    13:42:29

12   conversation.   You'd have to ask her.

13        Mr. Lafferty just told me -- I'm telling you

14   what Mr. Lafferty told me and what Ms. Di Maria told

15   me.

16        Mr. Lafferty told me, you know, "Lisa Di

17   Maria thinks that the guy's innocent," and then he

18   rolled his eyes [indicating] and he said, "You know

19   Lisa."

20        Q    So did you interpret from that that

21   Mr. Lafferty disagreed with Ms. Di Maria's position

22   about the Parker case?

23        A    Yes.

24        Q    In addition to receiving the                              13:43:08

25   employee-of-the-month award later --

132                         Volume I

1          A     Uh-huh.

2          Q     -- than had occurred previously, were there

3    any other negative consequences to you from your

4    disagreement with Mr. Lafferty over the Parker case?

5          A     That, again, kind of misstates what I'm

6    saying.

7                It wasn't that they gave it to me later.          13:43:27

8    That's not the problem.   It was what they said --

9    Mr. Zellerbach said in front of everybody to me.

10   That's unheard of.   That is -- I've never heard of

11   anybody -- any derogatory statements made in these

12   sort of meetings.   They're not for that.   They're the

13   opposite.   And then the look he gave me when he said

14   it.   He just -- literally, I was off to his side, he's

15   facing everybody, and he's telling everyone how anal I

16   am.   And then he just turns and he gets this smirk on

17   his face, and he stops and he smirks and he looks at     13:43:58

18   me.

19                I turned and I looked at Mr. Lafferty who was

20   behind him.   Mr. Lafferty just had this look like,

21   "Oh, no" on his face, and he rolled his eyes and went

22   "Oh," and he even put his hand up to his face and he

23   turned away as if to me to indicate he realized that

24   was extremely inappropriate and should not have been

25   said.

1          Afterward -- I walked up to Mr. Lafferty

2     afterward and I said, "What was that commentary

3     about?"

4          And he said, "You know, I have to apologize

5     for him.  That was wrong.  He shouldn't have said

6     that.  But I think he thinks he's funny.  That's          13:44:29

7     what it is.  He really thinks he's funny."

8          I said, "There was nothing funny about

9     that."

10          He said, "I know, but I think in his mind he

11     does."

12          I said, "Well, I don't agree with that."

13          I think it was pretty obvious because he kept

14     repeating it, like, maybe three, maybe four, times

15     throughout this meeting.

16     Q    So Mr. Lafferty thought that was a bad thing

17     to say to you?

18     A    Yes.

19          Well, he said that he thought it was.

20     Whether in fact he did think it, I don't know, but

21     that's what he told me.                                    13:44:59

22     Q    Okay.  So what negative things did

23     Mr. Lafferty do to you because you disagreed with him

24     about probable cause for the Parker case?

25          MR. WEAVER:  Objection.  Vague as to time.

```
 1   BY MS. KOLE:
 2       Q    Are you aware of anything negative that
 3   Mr. Lafferty did toward your employment because of
 4   your disagreement with him over how the Parker case
 5   should be handled?
 6       A    Oh, yes, absolutely.
 7       Q    Okay.
 8       A    Before I go on, back to that one statement,
 9   you need to interview or depo Sylvia Davila.  She was       13:45:26
10   present.  Talk to her and ask her what she thought
11   about that commentary that Mr. Zellerbach made to me.
12           She afterward approached me and said, "I
13   can't believe he did that.  That was the rudest
14   thing I've heard in my life.  I can't believe he
15   said that."
16           So it wasn't just my individual perception.
17   There were other people including Mr. Lafferty who
18   thought that was inappropriate.
19           And, now, back to --
20       Q    If you want to talk about Mr. Zellerbach now,
21   we can do that.
22           Are there other things you believe
23   that Mr. Zellerbach did to you --
24       A    Uh-huh.                                            13:46:00
25       Q    -- that were negative towards your employment
```

```
 1    that were a result of your disagreement with
 2    Mr. Lafferty about the Parker case?
 3         A    Yes, and not only Mr. Lafferty,
 4    Mr. Zellerbach.  Mr. Lafferty doesn't make the
 5    decision without consulting first with Mr. Zellerbach,
 6    so it's a -- Mr. Lafferty is a representative of
 7    Mr. Zellerbach.  They get together and they decide a
 8    decision on a case.  So it's a collective decision
 9    even though Mr. Zellerbach has the final say-so.
10         Q    Did you have any conversations with
11    Mr. Zellerbach about the Parker case?               13:46:30
12         A    I'm trying to think on that one.
13              I think it may have been momentary, nothing
14    official.  I may have had one, maybe two, but I think
15    brief conversations.
16         Q    Do you recall the substance of those
17    conversations?
18         A    Had to do further testing, didn't think -- as
19    it stood, it didn't appear as though we could prove  13:47:00
20    beyond a reasonable doubt that the man committed the
21    crime.
22         Q    Is that what you said?
23         A    No.  I'm summarizing.  In substance, like you
24    said.  You asked for the substance of what was said,
25    not specifically what I said.  I don't recall
```

1    specifically what I said.  There were so many
2    conversations.
3        Q    What you were summarizing, was that your part
4    of the conversation or Mr. Zellerbach's part of the
5    conversation?
6        A    My part of the conversation.
7        Q    Okay.  What was Mr. Zellerbach's part of
8    conversation?
9        A    No response.                                    13:47:28
10       Q    No words uttered at all?
11       A    I don't recall that he made any response.
12            I recall Mr. Lafferty interjecting and
13   saying, "We'll talk about that, Chris."
14       Q    So this was a meeting between -- or a
15   conversation between Mr. Zellerbach, Mr. Lafferty and
16   yourself?
17       A    No.  I believe it started out a conversation
18   between Mr. Zellerbach and myself, and Mr. Lafferty
19   was present in the room and interjected.  I think that  13:47:57
20   was in Mr. Lafferty's office when Mr. Zellerbach was
21   present out in Indio for some sort of incident or
22   event.
23       Q    Maybe we should go back to Mr. Lafferty
24   first --
25       A    I agree.

                          137                      Volume I

1      Q    -- because that's where -- would you say you
2  had more than five conversations with Mr. Lafferty
3  about the Parker case and whether there was probable
4  cause to proceed?
5      A    Yes.
6      Q    Would you say you had more than ten                    13:48:28
7  conversations?
8      A    Possibly.  I can't say for certain, but I
9  think so, yes.
10     Q    Do you think you had less than twenty
11 conversations with Mr. Lafferty about the Parker
12 case?
13     A    Yes.
14     Q    And you also sent him written communications
15 about the Parker case?
16     A    Yes.
17     Q    At some period -- after some period of time
18 the Parker case was reassigned to someone else; is
19 that correct?
20     A    When I was demoted into filings, that's when   13:48:56
21 the case was taken from me.  As far as I know, it
22 wasn't reassigned to anybody.  It was taken from me.
23 And that's -- that was in 2013, right around September
24 of 2013, maybe October, right in there.  And that's
25 after we'd found the admissions and the jail calls

1   from Mr. Parker's roommate who, on those jail calls,

2   admitting to murdering the victim in the case in                    13:49:31

3   question.

4       Q    So do you believe you had the case for about

5   two years?

6       A    Just over two years.  Right around --

7   approximately two years, yes.

8       Q    Do you recall sending emails telling other

9   people that were inquiring of you in the office that

10  it wasn't your case, you just made appearances on

11  it?

12      A    Correct.

13           At one point in time Tricia Fransdal said,

14  "Give me the case back," after one of my memos stating    13:49:58

15  that this case is not -- or this case is -- the guy's

16  innocent.

17           Tricia Fransdal said, "Fine.  Give me the

18  case."

19           I said, "Okay.  I'll bring you the discovery.

20  I'll bring it to you."

21           And she responded, "No.  You're going to hang

22  on to the case."

23           "Well, what do you mean?  Are you taking the

24  case from me or do I retain the case?"

25           "Well, you're going to retain the case and

```
 1    you're going to make appearances and you're going to
 2    handle the case, but it's assigned to me."
 3         "Okay."                                              13:50:29
 4         And then after that -- that makes no sense at
 5    all.  You technically don't have the case but make all
 6    the appearances, get it ready for prelim, get it ready
 7    for trial, and actually take it to preliminary
 8    hearing, that means in fact that case is yours.
 9         So at that point in time when there was a
10    response, I think -- we get -- used to get emails
11    from -- who was it? -- Probation and Victim Witness
12    people for restitution because Probation had to draft   13:50:58
13    a probation report for all cases, so they want to know
14    what -- they keep you apprised of what the restitution
15    is in the case so if the case pleads out, you can tell
16    the court this is the restitution amount and the court
17    can order that the defendant pay restitution to the
18    victim's family in whatever the amount is.  So I think
19    that is the only question or -- pardon me -- email
20    that I recall responding it's not my case because
21    technically I think right around there it recently had  13:51:28
22    just been taken from me, and then I started
23    approaching Tricia on the case, and she didn't want to
24    deal with it, and she said, you know, "Well, go ahead
25    and respond to it.  You take care of it."
```

1       At that point in time -- I mean when someone
2   says that, it's your case, so --
3       Q    Do you have an opinion on when your
4   responsibility for the Parker case ended?
5       A    Yes.  It would have been, I think, October,
6   2013.  That was right after -- once I'd found those          13:51:59
7   voice admissions from Mr. Parkers's roommate, I was in
8   contact with Mr. Lafferty and Ms. Fransdal, and
9   Ms. Fransdal said, "Deal with Sean Lafferty.  I
10  don't" -- you know -- "I want nothing to do with the
11  case."
12          "Okay.  Fine."
13          So I started dealing with Mr. Lafferty,
14  and on those -- on those jail calls, once he got
15  them, he said -- I asked him -- I said, you know,
16  "Do you want" -- "What do you want me to do with the
17  case?"
18          And at that point he said -- you know, I          13:52:29
19  said, "Do you want mean to reassign it" when I had
20  been sent down to filings, and he said, "No, no, no.
21  Give me the case.  I'll take care of it."
22          I asked him if he wanted me to turn over
23  the -- you know, the discovery.
24          He told me, no, he didn't want me to turn
25  over the discovery, which -- that's a big no-no.

1   That is a "go" preceded by "no" overall which makes it

2   a no-go.

3        THE REPORTER:  I'm sorry?  That is a --

4        THE WITNESS:  -- go, g-o, preceded by a no, n-o,

5   which makes it a no-go.

6             A little service lingo there coming out.

7             You have an absolute duty to turn over all        13:52:59

8   your discovery, particularly anything that is even

9   implicitly exculpatory, could prove his innocence.

10             When another person says, "I killed this guy,

11   ha, ha, ha.  I cut his head off, ha, ha, ha," you need

12   to turn that over.

13             Mr. Lafferty told my investigator not to turn

14   that discovery over.  He was in disbelief, Gordon

15   Govier, G-o-v-i-e-r.

16             Mr. Lafferty also --                              13:53:28

17   BY MS. KOLE:

18        Q    Did you send yourself --

19        A    And --

20        Q    I'm sorry.

21        THE REPORTER:  Excuse me.  Can we slow this down a

22   little bit.

23        THE WITNESS:  Sorry.

24   BY MS. KOLE:

25        Q    Did you send yourself from your work email to

                           142                    Volume I

1    your cross227 email copies of your memos to

2    Mr. Lafferty?

3        A    Some of them, and some of the emails I did,

4    yes.

5        Q    Do you recall when you did that?

6        A    No, I don't.

7        Q    Do you have them in your possession?  And I        13:53:59

8    don't mean here personally with you; I mean at your

9    home or another area that you consider within your

10   control.

11       A    Yes.

12       Q    And why did you send those to yourself?

13       A    Because it was wrong what he was doing.  I

14   could see the harassment coming.  I could see they

15   were setting me up to fire me, and I was scared, and I

16   thought, oh, this isn't right; I need to hang on to

17   some sort of evidence.

18            I had certain people, Dave Greenberg, say,        13:54:28

19   "No, you never said that to me.  Did you get it in

20   writing?"

21            "Dave, you told me you weren't going to

22   assign me to any other cases."

23            "I don't remember saying that.  You didn't

24   put it in writing; it didn't happen."

25            "Do you want me to put this in writing?"

```
 1              "Yep.  You're going to have to."
 2              And once I started putting things in writing,
 3      that's when things started getting really nasty for
 4      me.
 5         Q    I'm talking specifically about the Parker
 6      case.
 7         A    Uh-huh.
 8         Q    Do you know when you sent those, your memos,
 9      to your home email address?                              13:54:58
10         A    No, I don't.
11         Q    And did you also email to yourself the
12      transcripts from the jail conversations you've
13      been --
14         A    Yes.
15         Q    -- describing?
16              And you still have those?
17         A    Yes, I do.
18              You have -- all the stuff you have.  I've
19      turned it all over.  I've turned it all over to my
20      attorneys who turned it over to you, so you know
21      exactly what I have.                                     13:55:25
22         MS. KOLE:  I need to take a little break.
23              All right, Chris?
24         MR. WEAVER:  Sure.
25         MS. KOLE:  Thank you.
```

```
 1          VIDEOGRAPHER:   The time is 1:55 p.m. and we are
 2     off the record.                                            13:55:40
 3                          (Recess)
 4          VIDEOGRAPHER:   The time is 2:05 p.m. and we are      14:04:58
 5     back on the record.
 6     BY MS. KOLE:
 7          Q    Mr. Ross, do you believe that you were
 8     harassed by any employee or supervisor of the County
 9     of Riverside?
10          A    In what time period?                             14:05:28
11          Q    Any time period that you believe is relevant
12     to your lawsuit.
13          A    Yes.
14          Q    And who do you believe harassed you?
15          A    Directly or indirectly?
16          Q    In all ways.
17          A    Oh, I think Sean Lafferty.
18               I think Tricia Fransdal, Jeff Van Wagenen
19     or Jeffrey Van Wagenen, Paul Zellerbach, Dave            14:05:59
20     Greenberg.
21          Q    And so those are the named defendants in your
22     lawsuit?
23          A    Yes.
24          Q    Is there anyone else that -- another employee
25     of the County of Riverside that you believe harassed
```

1    you?

2        A    I have suspicions, but right now it would be

3    speculative until more information comes forward, so

4    I'm going to say at this point in time, no.                    14:06:26

5            Oh, yes, there are other people, too.  I

6    forgot.

7            Human Resources.  Who was the -- Rene Goldman

8    I think is who it was, the supervisor of Vanessa

9    Ignacio, and I guess you could say Vanessa herself as

10   well.  It's my understanding that she was acting under

11   the direction of Rene Goldman.                                 14:06:53

12       Q    When did the harassment by David Greenberg

13   begin?

14       A    Let me think.

15           That would be 2013.  I would say that was       14:07:25

16   probably September, maybe late August.

17       Q    And what did the harassment consist of at

18   that time in late August or September of 2013 by

19   Mr. Greenberg?

20       A    It continued through until the conclusion of

21   my administrative leave.

22       Q    I asked you something a little bit different.   14:07:59

23   I asked you what did the harassment consist of at that

24   time in late August or September of 2013 by

25   Mr. Greenberg.

```
 1      A    It -- I would say it's cumulative and it
 2   started this way.  And I have to -- I'm sorry -- I
 3   have to kind of put it all together so it makes
 4   sense.
 5           But I -- in August, I believe -- maybe it
 6   was -- no, it was before that.  Maybe it was in
 7   July -- or maybe June -- when I disclosed to
 8   Ms. Fransdal -- it would have been in June -- so when      14:08:29
 9   I disclosed to Ms. Fransdal the problems or the
10   potential problems neurologically with myself, about a
11   week or two later -- that would have been in maybe mid
12   June so maybe a week after that, maybe two, somewhere
13   in there -- Dave Greenberg called me on the phone, and
14   he asked me, "Is there anything I can do to
15   accommodate you?  Do you want to go to filings?  Is
16   there anything you want to do?"
17           And I said, "No, not at this point, because      14:08:57
18   I've taken care of my cases with the defense attorneys
19   and they've continued them beyond the first of the
20   year for trial dates, so my caseload's fine.  At this
21   point in time I don't need to be transferred."
22           He said, "Okay, fine."
23           I said, "Just do me a favor.  Don't give me
24   any new cases.  I don't need the stress of having new
25   cases or anything of that nature."
```

```
 1            He said, "Not a problem.  You got it.  You
 2    won't get any new cases."
 3            So then in September -- I don't remember the
 4    date -- probably mid September, I'd say around the      14:09:28
 5    15th, somewhere around there -- I get called into
 6    Ms. Fransdal's office and I get assigned a three
 7    co-defendant case that is a special circumstance
 8    homicide, three co-defendants killed an individual,
 9    and it hasn't yet been staffed for death yet, none of
10    the discovery's been turned over in three years,
11    there's been multiple motions and whatnot, orders to   14:09:57
12    compel, things like that, and so after I got that
13    case I immediately emailed Dave Greenberg and said,
14    "Dave, you said I wouldn't get any new cases.  Why is
15    Tricia Fransdal giving me her case that was assigned
16    to her."
17            And he said, "Come by my office and we'll
18    speak tomorrow."
19            So I came by his office the next day.  We
20    spoke, and that's when he said, "I never told you
21    that."
22            I said, "I beg your pardon?  On the phone you
23    told me I would get no new cases."
24            And he said, "Well, let me put it to you this   14:10:29
25    way:  Did you get it in writing?"
```

1          And I said, "What are you talking about?  No.
2     We don't need to put things in writing."
3          And he said, "Well, I'm sorry.  That's the
4     way things are now.  You have to put things in
5     writing.  Otherwise, it didn't happen."
6          I said, "Do you want me to put this in
7     writing?"
8          And he said, "Well, you're going to have to.
9     Otherwise, there's nothing I can do."
10         So at that point when I put it in writing,
11    everything that had transpired, that's when I started        14:10:56
12    receiving meetings:  "You need to come into the office
13    with Sean Lafferty and me."
14         And Greenberg was present for these meetings,
15    Tricia Fransdal and Sean Lafferty, and they were
16    hostile, angry.  Honestly, they were abusive.  They
17    were verbally abusive.
18    Q     What did Mr. Greenberg say at the meetings        14:11:30
19    that was verbally abusive to you?
20    A     Well, Sean Lafferty -- Dave Greenberg himself
21    didn't say anything, per se, that was verbally
22    abusive.
23         When they have meetings, understand, it's
24    collectively there's one person who is in charge and
25    they speak on behalf of the group.

```
 1              It's -- think of it this way:  At a table
 2      like this, I sit on one side, they sit directly across
 3      from me, like a panel or a review board.                    14:11:58
 4          Q    Did Mr. Greenberg intimidate you in those
 5      meetings?
 6          A    No.
 7          Q    So if I understand what you're telling me
 8      correctly, they harassment by Mr. Greenberg was
 9      promising you no new cases in about July of 2013 and
10      then telling you in September of 2013 that he never
11      told you that?                                              14:12:29
12          A    No.  No, no, no, no, no.
13              Doctrine of complicity, knowledge and intent
14      to act.
15              They all collectively got together, and they
16      decided to make all these decisions and to call me
17      into these meetings, text me, and say, "You're late
18      for a meeting in five minutes.  You need to get in
19      here now," text me at 5:00, 5:15 in the afternoon and
20      say, "You have a meeting tomorrow at 8:30 in the
21      morning" or at nine o'clock.
22              That's never been the way meetings have been
23      done, particularly with Mr. Lafferty.
24              And then when they don't tell you what the         14:13:00
25      meeting's about, something is amiss there.  Something
```

1    is wrong.  It's fishy.

2          And so what would happen was typically you

3    schedule a meeting -- Sylvia Davila calls you up and

4    says:

5          Sean wants to meet with you.  This is

6        what it's about.  What day is good for you?

7        He's available on A, B and C date.

8          These meetings started happening as

9    harassment, here again.  I mean it was every day

10   waking up going, "Great.  I wonder if I have a

11   meeting where they're going to yell and scream at me

12   again."

13       Q    Okay.  Backing up a little bit, you did not          14:13:26

14   think then that in July of 2013 when Mr. Greenberg

15   promised you no new cases and then in September of

16   2013 when he said he never told you that, you did not

17   think that was harassment?

18       A    Well, what it -- well, that's kind of a hard

19   question.  You're boxing me into something and I

20   really don't want to answer it, say yes or no, because

21   it can't be answered yes or no.  It contributed to it,

22   yes.  It directly led to it, the meetings that

23   happened afterward, and the response, yes.                     14:13:57

24          Dave said to me after I typed up the email of

25   our conversation and sent it to him, he called me and

1   he -- or he talked to me in the hallway -- or in his

2   office and said, "Well, you put it in writing.  You

3   started it.  So I have to go up to Sean Lafferty with

4   it now.  We're going to have to deal with it and take

5   care of it."

6          And then I get called into the meeting with

7   Sean Lafferty and Dave Greenberg and Tricia Fransdal.

8   So I would say yes.  But I have to have an explanation

9   for it.  Otherwise -- I'm sorry.  I don't mean to

10  be -- you know, I don't mean to be disruptive or          14:14:29

11  noncooperative but --

12     Q    No.  I -- and that's helpful for you to

13  qualify it like that; you don't think those things in

14  a vacuum that he said to you were necessarily

15  harassment but they led to something that you believed

16  was?  Is that a more fair assessment?

17     A    I wouldn't say in a vacuum.  I would say

18  collectively.  You know, think of it as pieces of a

19  puzzle.  They're all pieces of the puzzle.  You have

20  to put them all together.  So, yes.  I would say that,

21  yes, that in itself resulted in harassment that was      14:15:00

22  part of it.  They're part and parcel.  You can't

23  remove what was said in a phone conversation and then,

24  of course, the email that I gave him and then his

25  response, and then him going to the chain of command

1    on it and reporting to Sean and then Tricia and then

2    calling me in and harassing me in the meetings and

3    their subsequent conduct, so I think it's all one and

4    the same.

5        Q    Okay.  So we've got a phone conversation in        14:15:28

6    approximately July of 2013 --

7        A    June.

8        Q    -- in June of 2013 where Mr. Greenberg asks

9    if there's anything he can do for you, and you --

10       A    Right.

11       Q    -- request no new cases.

12       A    Right.

13       Q    And in September of 2013 Mr. -- you get new

14   cases and you go to Mr. Greenberg and he says, "I

15   never told you that" and "You need to put it in

16   writing."

17            And then the writings led to the meetings

18   you're referring to with the larger group?

19       A    You're paraphrasing it not exactly like I        14:15:58

20   said it --

21       Q    Okay.

22       A    -- but I mean it's close, what you have down.

23   But you left out the fact that in the phone

24   conversation he agreed and said, "Agreed, absolutely,

25   you will get no new cases.  That's not a problem."

1        Q    Okay.

2        A    And then in the phone -- or in the

3    face-to-face conversation when I confronted him after

4    receiving one new case with three co-defendants, not

5    several cases, just one, at that point in time -- I

6    later on got two more cases, as I recall, one or                    14:16:26

7    two more -- two more, I think.  One or two.  I can't

8    remember.  But as far as that case is concerned, three

9    co-defendants, one case.

10       Q    Did you consider the assigning of the

11   additional cases part of the harassment?

12       A    Yes, I did.

13       Q    And you also considered the meetings with

14   Mr. Greenberg, Tricia Fransdal and Sean Lafferty as

15   also part of the harassment

16       A    Yes.

17       Q    Is there anything else you considered part of

18   the harassment?                                                     14:16:59

19       A    There's ancillary conduct that went along

20   with that.  It was just on a day-to-day basis.

21            For instance, when I was called to -- when I

22   was called to a meeting with Sean Lafferty, his tone

23   of voice.  I'm at my desk working, typing and

24   reviewing filings, and in once instance in late 2013,

25   and he calls me and says, "Where are you?"

1              "I beg your pardon, Sean.  I'm at my desk          14:17:28

2       doing -- you know, I'm working."

3              And he says, "You're six minutes late for a

4       meeting.  You better get up here right now.  Why

5       aren't you here?  Don't you check your emails?"

6              Well, who checks their emails at the end of

7       the day after you've gone home now and then you show

8       up, you know, the next day at work and you start

9       working, things like that.  You know, an email is sent

10      when you're not there, or the tone of voice, and,

11      yeah, he would yell at me on the phone.

12             I've had him -- you know, I did have another

13      confrontation with him.  I beg your pardon.  I forgot          14:17:59

14      all about that.

15             After the Parker case I had a case I went out

16      to on trial with -- it was a death penalty case.

17             What was the name of that guy?

18             I don't remember, but remember the case where

19      I got the award late for the employee-of-the-month,

20      that case I had to try to get a courtroom assigned.

21      It was difficult.  There was another coworker -- there

22      was one courtroom available.  He wanted the courtroom

23      for the trial because the trials last several months,          14:18:28

24      and I said, "That's fine."

25             My boss, Otis Sterling, said, "Check with

```
 1    Manny Bustamante and check to make sure, you know,
 2    Manny's not going to trial."
 3            I checked with Manny and said:  Manny, my
 4    trial date is X date.  You know.  "Otis wants your
 5    case to go first.  Are you going to go to trial?"
 6            And he said, "No, I'm fine.  I'm not going to
 7    trial on those dates, but we'll wait and see.  Let's
 8    just go into the courtroom, and if the judge --
 9    whoever the judge sends out I'm fine with."
10            So after I went into court on a TRC and got        14:18:58
11    sent out to go to trial, Sean Lafferty did call me in
12    to a meeting was what he did, and he called me in
13    there with Otis and said -- I didn't know what it was
14    about -- "I just need you to come up here and talk to
15    me."  And Otis was there, my supervisor, and he
16    said -- he asked me what happened, which I
17    just explained to you, and then he said, "You didn't
18    say that."
19            I said, "I beg your pardon?"
20            And he said, "Oh, well, let me rephrase that.    14:19:29
21    That's not -- that's not what Manny says that you
22    said."
23            And I said, "Well, what seems to be the
24    problem.  I'm a little bit, you know, unaware of that
25    I did anything wrong."
```

 1          And he says, "Well, next time -- you know, I
 2    like people aggressive, trying to get out to trial,
 3    but, you know, Manny was -- you know, said that you
 4    took his courtroom from him."
 5          I'm, "Okay.  That's up to the judge, not up          14:19:59
 6    to me.  You know.  Sorry.  I don't control that.
 7    Neither does Manny.  It's not his courtroom.  It's
 8    Superior Court.  Whoever they send out, they send
 9    out."
10      Q    This is when Otis was your supervisor?
11      A    Yes, it was.
12      Q    So what year was that?
13      A    I think it was two thousand -- it was in 2011
14    or '12.  I can't remember which.
15          But what ends up happening is Otis leaves,
16    and as I'm leaving I'm talking to Sean Lafferty, and
17    he says -- I said, "Sean, you know, here's what          14:20:28
18    happened."
19          And he says, "Walk with me.  I've got
20    somewhere I have to go."
21          And we're walking, and I said, "You know, I
22    went to Manny and I talked to him," and he stopped me
23    and he got -- this is the first time I watched him get
24    almost violent mad with me.  He was real close to me,
25    and he said, "Stop it.  Enough."

```
 1          And -- what did he say?  I mean he got -- he
 2    was in my face.  I was taken aback.  I was, like,
 3    "Whoa.  Where did this Dr. Jekyll and Mr. Hyde come
 4    from?"
 5          Behind the desk when somebody else is present
 6    he sits with his legs crossed and he's very calm and     14:21:00
 7    his voice is very sooting, "I understand."
 8          But the minute nobody else is there, I mean
 9    it was like the look on his face, showing his teeth,
10    you know, furrowed brow, very menacing and
11    intimidating.  He was right up in my face, and he made
12    no doubt about it, you know, told me, "Stop it.  I
13    don't want to hear it."
14          And he made some comment -- I don't remember
15    the details -- I stopped in my track.  I thought if I
16    piss this guy off, he's going to hit me, and I didn't     14:21:28
17    want that.  And he got that way whenever people
18    weren't around with me.  So -- and then he left and I
19    left, and that was the end of that.
20          That was the first time he became harassing
21    to me in a threatening type of way.
22       Q    And was that because of your -- you believe
23    that was because of your disagreement with him about
24    the Parker case?
25       A    I -- I -- I don't know what caused it.
```

```
 1    Again, I'm just telling you the first discrimin -- or

 2    harassment that I got from him.

 3         Q    And did you believe he was harassing you        14:21:59

 4    because of a protected characteristic of yours such as

 5    being a man?

 6         A    You know, that's kind of a legal conclusion.

 7    I'll leave that to you and counsel.

 8         Q    I'm just asking you factually what was your

 9    understanding of why he was harassing you.

10         MR. WEAVER:  Objection.  Calls for speculation.

11         MS. KOLE:  If you have one.

12         THE WITNESS:  No.  I -- at that point I was

13    worried about him, you know, physically, you know,

14    hitting me, to be honest.  The last thing I was

15    thinking about is, "Gee, why is he doing this?  Is      14:22:28

16    this because of a suspect classification."  That's the

17    last thing on your mind when you're in a physical

18    confrontation.  He was inches from my face.

19    BY MS. KOLE:

20         Q    Did you have the Parker case at that time?

21         A    Yes, I did.

22         Q    Did you think he was acting that way towards

23    you because you disagreed with him about probable

24    cause on the Parker case?

25         A    Again, at that point in time the farthest
```

1   thing on my mind was why he was doing it.  What was on

2   my mind was get out of this situation.  He's obviously

3   upset.  Don't provoke the man.  He has a very short

4   temper.  Just stay away from him.  Danger, Will                    14:23:00

5   Robinson, danger.

6       Q    Okay.  And did you file a complaint with

7   Human Resources about that interaction with

8   Mr. Lafferty?

9       A    No.

10      Q    Did you speak to your supervisor about that

11  interaction with Mr. Lafferty?

12      A    No, because my supervisor obviously went to

13  Mr. Lafferty about me getting sent out to trial, and

14  this was that same meeting where my supervisor,                    14:23:28

15  Mr. Sterling, was present.  I thought, well, they'd

16  obviously got together, spoken with Mr. Bustamante

17  outside my presence, contrived this meeting, knew

18  exactly what they were going to say, and that's the

19  first time I've ever in my -- the history of the

20  district attorney's office in my presence or to my

21  knowledge in L.A. and Riverside where anyone is ever

22  punished for showing up at the courtroom and

23  saying:

24          "Mr. Ross," you know, "on this case are you

25  ready?"

```
 1            "I'm ready, your Honor."

 2            "Okay.  I'm going to send you out to this        14:23:58

 3     department."

 4            I was in disbelief as to why that had

 5     happened and what had happened.

 6       Q    Did -- and so Mr. Sterling was conspiring

 7     against you with Mr. Lafferty?

 8       A    I didn't say he was conspiring against me.  I

 9     said they got together and they discussed what

10     Mr. Bustamante's complaint was, and they had discussed

11     what they were going to say to me in that conversation

12     or in that meeting.

13       Q    Did Mr. Bustamante file a complaint against      14:24:29

14     you for taking the courtroom?

15       A    I have no idea.  Not that I'm aware of.

16       Q    And did you speak to anyone at County Human

17     Resources about this event where you felt that

18     Mr. Lafferty might become physically violent towards

19     you?

20       A    No.  That would be foolish to do that, the

21     repercussions of that and then they apprise him of

22     what happened, that somebody complained on you, and

23     then it gets worse.

24       Q    We were discussing harassment that             14:24:58

25     Mr. Greenberg committed toward you, and I believe we
```

```
 1    got through the conversations in the meetings, and

 2    then you said there was some ancillary conduct, and

 3    you described the interaction with Mr. Lafferty.  But

 4    was there any ancillary contact that had to do with

 5    Mr. Greenberg that you considered harassing?

 6         A    In the meetings I would say --                    14:25:24

 7              Bless you.

 8         MR. WEAVER:  Thank you.

 9         THE WITNESS:  You're welcome.

10              I would say in the meetings, again, it was a

11    team effort against me.  So, yes, I would say the fact

12    that he was there with knowledge of the purpose and

13    the intent to aid, abet, encourage and facilitate

14    Mr. Lafferty's conduct in those meetings, yes, I would

15    say that that would make him harassing.  I construed

16    that to be harassing.                                       14:25:59

17    BY MS. KOLE:

18         Q    I think maybe your using some criminal law

19    language with me.  You said, "Aid, abet, encourage and

20    facilitate"?

21         A    Yes.

22         Q    What do you mean by that?

23         A    By which one?  Which one of those

24    terminologies?

25         Q    Let starts with "aid," if you like.
```

1        A    Okay.  To help somebody out.  To support

2    them, to back them up.  You know what they're there

3    for.  You know what their intentions are, and you are

4    there with the intention to help them or assist them

5    in some sort of way.                                        14:26:28

6        Q    So you believe Mr. Greenberg was aiding

7    someone in the meetings?

8        A    Mr. Lafferty.  Absolutely.  He absolutely

9    was.

10           Those meetings -- they have meetings, meaning

11   management, executive management, the A.D.A.s, your

12   supervisor and the chief.  Mr. Greenberg was a chief

13   deputy district attorney.  They have meetings.  Before

14   they even call you in, they discuss what the potential

15   courses of conduct or action they're going to engage

16   in, what -- what sort of conduct they think that they

17   should -- that they should do and what they think they    14:26:59

18   should do against a particular employee.

19       Q    And you also used the word "abet"?

20       A    Yes.

21       Q    And what -- you believe that Mr. Greenberg

22   was abetting someone in the meeting?

23       A    Yes, abetting, facilitating, encouraging, I

24   think, Mr. Lafferty.

25       Q    Okay.  And what does "abetting" mean to you

1    as you're using it in that sentence?

2        A    It's very similar to aiding.  Aiding would be

3    something where, for instance, when they get together,

4    distinguishing it now -- when somebody aids somebody,          14:27:29

5    getting together and having the meeting and deciding

6    to call me in would be aiding somebody, there to

7    support somebody as the meeting's taking place, I

8    would say that is abetting somebody.

9        Q    And is that another synonym for "facilitate"?

10       A    A little bit different, but, yes, they

11   overlap.  All those words overlap.

12           Facilitation is allowing something to happen,

13   in my mind, how did he encourage it or allow it to

14   happen -- not just encourage but allow it to happen.        14:27:57

15       Q    Do you recall anything specific that

16   Mr. Greenberg said to you in the meetings that you

17   considered harassing?

18       A    I'm sorry.  Could you repeat that.

19       Q    Yeah.

20           What I'm getting at is that you told me that

21   Mr. Greenberg's presence in the meetings was aiding,

22   abetting, facilitating and encouraging Mr. Lafferty,

23   and I'm asking if there's anything that

24   Mr. Greenberg -- you recall him saying in the meetings

25   that you considered harassing of you.

```
 1       A     No, but Mr. Lafferty -- it wasn't just his in

 2   presence; it was the knowledge and the fact that they

 3   had meetings and discussed my emails and the course of       14:28:30

 4   conduct, and the fact that they were going to have

 5   these meetings to deal with me.

 6       Q     And --

 7       A     Pardon me a second.

 8             And not only that.  He wasn't just present,

 9   but he agreed to be present for the specific intended

10   purpose, you know, of having that meeting and, you

11   know, admonishing me.

12       Q     What knowledge do you have of prior meetings

13   that Mr. Greenberg had with Mr. Lafferty?                     14:28:56

14       A     Besides the fact that having worked there and

15   having known that that's the way the meetings work,

16   I'd show up early to these meeting and they were in

17   there with the doors closed talking about the future

18   meeting that they were going to have in the next few

19   moments with me, not only that, but Mr. Lafferty even

20   stated in front of Mr. Greenberg and in front of

21   Ms. Fransdal that they had been discussing the matter

22   amongst themselves and they'd come to a conclusion or        14:29:27

23   decision, and then, of course, he would voice what

24   that opinion and decision is.

25             He also stated that he'd spoken with downtown
```

1    about the matter with Mr. Zellerbach and

2    Mr. Van Wagenen.

3        Q    And did you consider it to be harassing of

4    you that Mr. Lafferty and Mr. Greenberg and

5    Ms. Fransdal discussed the issues surrounding your          14:29:52

6    employment?

7        A    In and of itself, no.

8        Q    Was there anything else that Mr. Greenberg

9    did that you considered to be harassing of you?

10       A    Yes, the fact that he lied and said he didn't

11   say that, that he didn't make the statement about not

12   giving me any new cases.

13            More over, he told me -- he said, "I will      14:30:26

14   take that case from Tricia."  He said, "I agree with

15   you.  She's just trying to get rid of her cases and

16   dump it onto you.  I'll take care of that."

17            And then, of course, I have this meeting a

18   couple days later and it's flipped one hundred and,

19   you know, eighty degrees against me.  So, yes, I

20   considered that to be harassing as well.

21            If you say something, you make a mistake or

22   you have a disagreement because your boss tells you,

23   "Hey, we can't do that," then just say it.  You don't

24   lie and say, "I never said that.  You didn't put it in      14:30:57

25   writing."  You don't do that.  You just turn around

                          166                    Volume I

1    and say, "I'm sorry, but Mr. Lafferty has a different

2    opinion.  After talking with Mr. Zellerbach, Chris, we

3    have to give you more cases."  But don't lie about it.

4    That -- it's just disappointing, but, anyway -- I'm

5    sorry.  I'm just rambling.

6        Q    Is there anything else that you believe

7    Mr. Greenberg did that was harassing of you?

8        A    Off the top of my head right now, no, not

9    that I can think of besides, you know, all these        14:31:25

10   meetings and the conduct that Mr. Lafferty and

11   Mr. Fransdal and everybody took part on.

12       Q    Is -- did Mr. Greenberg discriminate against

13   you in any way?

14       A    Please define "discriminate" for me.  That's

15   a legal term.  I think -- again, I don't mean to be

16   nitpicky -- but I don't think you should be asking me

17   if somebody discriminated against me if there's a

18   legal definition for me.  Isn't that kind of a legal   14:31:59

19   argument that you make and a court decides?

20           I'll be happy to tell you all the facts, and

21   I think that's what we're here -- that's ultimately

22   for a jury to decide, whether somebody discriminated

23   against me, not my opinion.

24       Q    Do you believe that Mr. Greenberg has any

25   responsibility for any conduct by the County of

```
 1    Riverside that you consider inappropriate toward

 2    you?

 3         A    Yes.

 4         Q    And which conduct is that?

 5         A    What I've just explained.                    14:32:29

 6         Q    Okay.  Is there anything else, or is that

 7    it?

 8         A    That's kind of vague.

 9              At this point in time I -- I've -- I would

10    say from what we've discussed that's it, but the

11    problem is saying that, this took place over time, you

12    know, from 2011 to 2013, who can remember all the

13    details.  Honestly, if you would have given me a list

14    of the questions before we came, just like you did for

15    this document right here, 1, and had given me a chance  14:32:58

16    to research it and think about it, I could -- I could

17    do it.  My memory could be a lot more refreshed, and

18    it could be a lot more productive for you, but off the

19    top of my head -- that's the problem with doing these

20    things off the top of your head.  You're limited to

21    your memory at that specific point.  So I'm going to

22    say no, but that doesn't mean there's not anything

23    else that I won't think of later, "Oh, yeah, I forgot

24    all about that."

25              Or later on in this depo you might say
```

```
 1    something and I might go, "Oh, yeah, that triggered a
 2    memory."
 3         Q    Do you believe you were demoted?                    14:33:30
 4         A    Oh, yes.
 5         Q    Do you believe that was a discriminatory
 6    act?
 7         A    What do you mean by "discriminatory"?
 8         Q    Okay.  Are you alleging in this lawsuit that
 9    the County discriminated against you?
10         MR. WEAVER:  Objection.  Calls for a legal
11    conclusion.
12         THE WITNESS:  I'll defer to my counsel on that.
13         MS. KOLE:  I'd like to ask the court reporter to
14    mark this document as Exhibit 2.
15              (The document referred to above
16              was subsequently marked Defendant's
17              Exhibit 2 for identification by the
18              Certified Shorthand Reporter and is
19              attached hereto.)
20    BY MS. KOLE:
21         Q    Mr. Ross, if you would take a look at          14:34:06
22    Exhibit 2 and let me know if you recognize it.
23              Take as much time as you need.                  14:34:11
24         A    I do.
25         Q    And what do you believe this to be?
```

```
 1      A    It says on it, "Complaint for Retaliation and
 2   Disability Discrimination, Demand for Jury Trial."
 3           I believe it to be a document that was
 4   produced by my attorney in my case.
 5      Q    Is this the complaint that you filed in court      14:35:01
 6   against the County of Riverside and the individually
 7   named defendants?
 8      A    I didn't file a case in court.  It would have
 9   been done by my attorney, more specifically.
10           Let's look at the proof of service on the
11   back.  There should be more if it was filed.  This one
12   does not -- I don't see a proof of service right now,
13   but that doesn't mean it's not here.
14           Pardon me.  It appears to have my attorney's      14:35:22
15   signature on it.  I wasn't present when this was done,
16   but I'm going to say yes.  That's my inference based
17   upon what I see here.
18      Q    So you authorized your attorney to file a
19   complaint on your behalf against the County of
20   Riverside and these named defendants?
21      A    Is there an attorney-client privilege?
22           As long as we're not getting into
23   attorney-client privilege, what I said to my attorney    14:35:59
24   and what I didn't say.  I think that's protected, you
25   know, Evidence Code Section 900 through 965.
```

```
 1        MR. WEAVER:  You can say whether I filed this on
 2   your behalf.
 3        THE WITNESS:  Okay.  Yes.
 4   BY MS. KOLE:
 5        Q    And this is the complaint filed on your
 6   behalf?
 7        A    Yes.
 8        Q    Is it your understanding that you believe you
 9   were discriminated against by the County of
10   Riverside?
11        MR. WEAVER:  Objection.  Calls for a legal
12   conclusion.
13        THE WITNESS:  And could you define
14   "discrimination" for me.
15   BY MS. KOLE:
16        Q    Did you authorize your attorney to file a          14:36:30
17   complaint on your behalf that's titled "Complaint for
18   Retaliation and Disability Discrimination"?
19        A    I'm sorry, Counsel.  I think I just answered
20   that two times for you.
21             Yes.  And, again --
22        Q    And is it your understanding that your
23   complaint alleges that you were discriminated against
24   by the County of Riverside?
25        A    Could you -- and this a civil complaint.  I'm     14:36:59
```

1    not familiar with it.  If you could please just show

2    me the causes of action, it answers -- it will answer

3    the question for us.  What page and line number,

4    please?

5         Q    That's all right.  I'll ask the questions.

6         A    Okay.

7         Q    Do you believe Jeff Van Wagenen discriminated

8    against you?

9         A    So I can adequately answer the question, what

10   do you mean by "discriminate"?

11        Q    Do you believe Jeff Van Wagenen harassed

12   you?

13        A    What do you mean by "harassed"?

14        Q    I mean the same thing I did when I asked the

15   question about David Greenberg harassing you.

16        A    Okay.  And just please give me a definition          14:37:29

17   so we're on the same sheet of music.

18        Q    You can use the same definition you used when

19   you answered the question about David Greenberg.

20        A    Again, what I'd like to know is what your

21   definition is so we can be on the same sheet of music.

22   I don't want something misconveyed or misconstrued

23   later on at a future date, and you -- for you to say,

24   "Oh, you said," or, you know, "In your deposition you

25   said."  I'm just trying to clarify it for you so

```
 1    there's no ambiguity.
 2         Q    Is there anything that you believe              14:37:58
 3    Mr. Van Wagenen did to you that was inappropriate?
 4         A    Yes.
 5         Q    And what is that?
 6         A    These meetings that all took place with
 7    Mr. Lafferty and Mr. Greenberg and Ms. Fransdal in
 8    addition to my demotion to the filings department,
 9    those were all at the approval and direction of
10    Mr. Van Wagenen and, of course, with Mr. Zellerbach
11    as well.
12             More over, when I was on administrative       14:38:29
13    leave, I got a phone call from -- was it -- was it --
14    not Martha Herrera -- Rene Goldman, I think, is who it
15    was -- and she stated to me that I needed to come down
16    to Riverside immediately for a meeting with
17    Mr. Van Wagenen and Mr. Lafferty.
18             And I said, "About what?"
19             And she said, "It's about you need to waive
20    your HIPAA rights and give us your medical records."    14:38:59
21             And I said, "Hmmm.  I can't make that today."
22    It's -- it was about 1:30 or two o'clock in the
23    afternoon and I was in Indio.
24             I said, "No, I'm sorry.  Is there any way we
25    can find out if we can do it tomorrow?"
```

```
1              And she said, "I'll call you back."
2              That did not seem right to me.
3              As it turns out, I went through my union
4    representative and found out that it was a meeting of
5    all the A.D.A.s who were going to be there as well as
6    Rene Goldman, and it was going to be recorded and          14:39:26
7    there were going to be documents produced, and it was
8    a little more encompassing and inclusive of me waiving
9    my medical record rights or HIPAA rights and
10   disclosing my medical records.
11             Mr. Van Wagenen told my union representative,
12   Sean Lafferty, if I didn't waive my rights and give up
13   my medical records that I would be disciplined for
14   insubordination by the County of Riverside.
15             Mr. -- Mr. Fimbres, Anthony Fimbres, asked at    14:39:56
16   my request -- asked Mr. Van Wagenen, "Who told you
17   this, and what is the authority for this?"
18             And he said, "The County of Riverside.  I
19   called the County of Riverside H.R. Department" -- he
20   wouldn't give a name -- and he said, "That's what they
21   said."
22             I sent an email back to Ms. Goldman and said,
23   "Who's going to be at the meeting, when is it, I want
24   any documents that are going to be reviewed so I can
25   review them prior to this meeting tomorrow, and who     14:40:29
```

```
 1   told you we're going to have this meeting?"
 2          Of course, I didn't get an immediate response
 3   which is why I had to go through my union
 4   representative.
 5          And it turns out that it was Mr. -- my
 6   understanding is it was Mr. Van Wagenen's idea to
 7   state that I have to waive my HIPAA rights and turn
 8   over my medical records or else I would be disciplined
 9   for insubordination and possibly fired for not turning
10   over my medical records.  So I found that to be very     14:40:58
11   discriminatory --
12      Q    Is there anything else --
13      A    -- or harassing.
14      Q    -- that Mr. Van Wagenen did to you that was
15   harassing?
16      A    Yes.  He was the one that approved all these
17   meetings and all the conduct that they did.  That was
18   from -- Mr. Lafferty himself told me that.
19      Q    When did Mr. Lafferty tell you that
20   Mr. Van Wagenen had approved all the meetings?
21      A    During every meeting with the exception of
22   one, I believe.
23      Q    Did he volunteer that information?
24      A    Yes, he did.
25          I think -- now, it depends on which meeting.    14:41:30
```

1          I think on one of those meetings I asked,

2    "Did you talk to downtown, and did you talk to

3    Mr. Van Wagenen or Mr. Zellerbach?" and he affirmed

4    and said that he had, he'd spoken with both.

5          Q    Is there anything else that Mr. Van Wagenen

6    did that was harassing?

7          A    Off the top of my head I can't say there was,

8    no.

9          Q    You mentioned that with regard to

10   Mr. Van Wagenen --

11         A    Uh-huh.

12         Q    -- that one of the harassing acts he took was

13   your demotion to filings.                              14:41:59

14         A    Yes.

15         Q    Was that also an action that Mr. Greenberg

16   took?

17         A    Yes.

18         Q    And was that also an action that

19   Mr. Zellerbach took?

20         A    Yes.

21         Q    Was that also an action that Ms. Fransdal

22   took?

23         A    Yes.

24         Q    And was that also an action that Sean

25   Lafferty took?

1      A    Yes.

2      Q    And was that also an action that Rene Goldman

3   took?

4      A    No.  That I'm aware of, no.

5      Q    And was that also an action that Vanessa

6   Ignacio took?

7      A    No.

8      Q    And why do you call the filings position a            14:42:30

9   demotion?  What makes you think of it that way?

10      A    Anybody in the district attorney's office

11   knows that people are put in filings who can't do

12   their job as an attorney, they can't cut it.  So what

13   they do is they put them in filings and, as

14   Ms. Fransdal told me herself, "We put people in

15   filings and preliminary hearings until they get so

16   upset that they -- and frustrated that they quit."       14:43:00

17           It's based on my experience and my

18   interaction.

19      Q    When did Ms. Fransdal tell you that they put

20   people in filings and prelims until they get so

21   frustrated they quit?

22      A    Well, she told it to me on three different

23   occasions in her office.  I don't recall the dates.

24   It would have been from maybe 2012 until 2013.          14:43:23

25      Q    Was there a particular employee she was

1    referring to when she said that?

2        A    Not that I recall, no.

3        Q    Who else was present when she said that?

4        A    Just myself.

5        Q    On the first time she said that to you, had

6    you come to see her in her office?

7        A    Yes, I had.

8        Q    And do you recall what the purpose was that          14:43:55

9    you had come to see her in her office?

10        A    I believe, as I recall, the purpose of seeing

11    her was regarding cases.  Certain things need approval

12    by supervisors, and you need advice on how to proceed

13    with a case.  So it was -- it would have been for

14    something along those lines.

15        Q    Do you recall that conversation, or are you

16    just assuming that was it?

17        A    I'm sorry?

18        Q    Do you recall that conversation specifically,          14:44:28

19    or just -- or are you just assuming that's why you

20    were in her office on the first occasion when she told

21    you, "We put people in filings and prelims until they

22    get so upset they quit"?

23        A    No.  I remember it was -- it had to do with

24    handling cases.  That's typically about the only

25    reason, unless she called me into her office.  That's

1   the only reason I would go into her office.

2       Q    Okay.  And on the second occasion had she

3   called you into the office?

4       A    No.  I believe I went to see her for -- for          14:44:56

5   advice on a case.

6       Q    Do you recall what case you were seeking

7   advice on?

8       A    No.  And it -- I'm sorry.  Please go ahead.

9       Q    On the third occasion that you were in her

10  office when she told you why they put people in

11  filings and prelims, what brought you to her office on

12  that occasion?

13      A    You know, I'm going to have to redact my

14  answer, come to think of it, on the second meeting.

15           One of the things I talked to her -- there

16  were multiple things, but one of the things I was

17  talking to her about was the Parker case, and then it        14:45:30

18  led into discussions of, you know, cases and caseloads

19  and people doing their job and whatnot.

20           And on the third time -- I'm trying to think

21  of what it was about.  It had -- I don't recall the

22  specifics.  I'd be speculating.  I'm sorry.              14:45:55

23      Q    Did Mr. Lafferty ever tell you that he put

24  people in filings or prelims until they got so upset

25  that they quit?

```
 1      A    No.

 2      Q    Did Mr. Van Wagenen ever tell you that?

 3      A    No.

 4      Q    Did Mr. Zellerbach ever tell you that?

 5      A    No.

 6      Q    Did Mr. Greenberg ever tell you that?

 7      A    No.

 8      Q    Did Ms. Goldman ever tell you that?

 9      A    No.

10      Q    Did Ms. Ignacio ever tell you that?

11      A    Ms. Hernandez, Ignacio Hernandez, no.

12      Q    When Ms. Fransdal told you that, "We put          14:46:29

13  people in filings or prelims so -- until they get so

14  upset they quit," did she say who was responsible for

15  making the assignment to filings?

16      A    Zellerbach.  She did say that specifically.

17           And she also on one occasion mentioned

18  Mr. Lafferty, mentioned that Mr. Lafferty concurs with

19  her opinion that people who are nonproductive could go

20  into prelims or filings or some sort of position that    14:46:59

21  was uncomfortable until they quit.

22      Q    And did Ms. Fransdal tell you that Zellerbach

23  said that specifically on the first occasion you heard

24  that from her?

25      A    No.  The first occasion, to my memory, was
```

1    just her statement that was her belief.                    14:47:28

2        Q    Was she referring to herself assigning people

3    to filings?

4        A    No.  She was talking -- she said, "We'll

5    just send them into prelims or to filings until they

6    quit."

7        Q    So it was an undefined "we"?

8        A    Correct.  Yes.

9        Q    And at what point -- in which of these

10   meetings did she mention Mr. Zellerbach was the "we"

11   sending people into filings?

12       A    I think the second meeting.

13       Q    And was that also the meeting where she said

14   that Mr. Lafferty agrees that prelims and filings are   14:48:00

15   the right place for nonproductive people?

16       A    Well, again, it wasn't -- she didn't say that

17   Mr. Zellerbach said that was the right place for

18   nonproductive people.  It was, "We'll put them there

19   until they quit."  And she said that that was -- on

20   the third meeting, she said that that was Mr. --

21   Mr. Lafferty's -- you know, he agreed.  That was his

22   opinion as well.

23            And I'm paraphrasing because I can't remember

24   the exact terminology she used.                            14:48:28

25       Q    Were you aware of any assistant district

```
 1    attorney in Indio being transferred to filings?
 2         A    At what point in time?
 3         Q    Any time while you were an employee there.
 4         A    Oh, yes.
 5         Q    And who do you recall the first one being
 6    transferred to filings?
 7         A    The first one -- I don't know who was first.
 8    I know several people who were transferred to filings.
 9         Q    And who were those people?
10         A    Oh, Christie Hester.  And then Kevin Shek.       14:48:58
11    Aileen Alvarez requested it.  She -- poor thing, she
12    had cancer, and then she came back to work part time,
13    so she requested to go to filings.
14              Interestingly enough, Ms. Fransdal said that
15    the rest of them are all worthless.  Aileen's the only    14:49:28
16    one that actually produces.  And I don't recall which
17    meeting that was in.
18         Q    Ms. Fransdal said that Christie Hester was
19    worthless?
20         A    She said that -- no, that Aileen Alvarez was
21    the only one that worked, and the rest of them in
22    filings were all worthless.  So that would be Christie
23    Hester, and that would be Kevin Shek, and that would
24    be Doug Ghee.
25         Q    Did Mr. Greenberg tell you that Christie       14:49:55
```

1    Hester, Doug Ghee, and Kevin Shek were worthless?

2         A    No.

3         Q    Did Mr. Greenberg tell you that Aileen

4    Alvarez was a good producer working in filings or

5    prelims?

6         A    No.  It was only Ms. Fransdal.  However,

7    Mr. Lafferty did say -- pardon me.

8              When I came back -- I think it was on the          14:50:29

9    17th or 18th of November -- when I had to come in to

10   get my good cause statement to return to work, he did

11   shake my hand and say, "Chris, I just can't wait to

12   get you back to work.  Oh, God, these" --

13             I said, "What's the matter?"

14             He said, "All these other people, they're

15   just -- I'm pulling my hair out with them."

16             I said, "You mean they're not -- not meeting

17   their deadlines for filings?"

18             And he said, "Yeah, you could say that.  I

19   just can't wait to get you back to work."

20             So I mean that's implicit, but it's along

21   those lines but nothing exact.                               14:50:59

22        Q    At that point on November 17, 2013, had you

23   decided you were never going back to work?

24        A    On which date?  November 17?

25        Q    On November 17, 2013, when Mr. Lafferty said

                        183                    Volume I

```
 1    he couldn't wait to get you back to work.

 2         A    No.

 3         Q    You wanted to come back at that point?

 4         A    At that point, yes.

 5         Q    Were there any -- we had started this line of      14:51:28

 6    questioning with harassing acts by Jeff Van Wagenen.

 7              Were there -- are there any other by

 8    Mr. Van Wagenen that you can recall today?

 9         A    Well, you'd have to talk to Mr. Nolan, Pete

10    Nolan.  He was a union ombudsman.

11              You'd have to talk to, again, Anthony

12    Fimbres.  He was a union representative for me.  And

13    John Aki was also a union representative.                   14:51:57

14              In January, I think it was, of 2014 when I

15    had this surprise meeting that was called where all

16    the A.D.A.s were going to be there, that's when I

17    started asking my union to make some inquiries and,

18    you know, be present for -- for the meeting, and

19    several of those people in my understand spoke to

20    Mr. Van Wagenen.  I think it was John Aki, A-k-i, and    14:52:26

21    I think it was -- well, I know it was John Aki and

22    Anthony Fimbres, F-i-m-b-r-e-s, and Pete Nolan may or

23    may not have, N-o-l-a-n.

24         Q    Did you tell John Aki in the fall or the end

25    of the year in 2013 that there was nothing wrong with
```

```
 1   you and that you could do your job?

 2        A    Yes.

 3        Q    When did you tell him that?

 4        A    I think it was in October when the Mayo          14:52:56

 5   Clinic diagnosed what was wrong with me and had ruled

 6   out the ALS and the muscular dystrophy and the

 7   multiple sclerosis.

 8        Q    Did you tell Mr. Lafferty at that time that

 9   there was nothing wrong with you and you could do your

10   job, you didn't need any restrictions?

11        A    Yes.

12        Q    When did you tell him that?

13        A    One of the meetings.  I think when he -- I

14   think initially at the end of September, the last week

15   of September, we had a meeting.  That's where he told    14:53:29

16   me I was a nonproductive member of the homicide unit

17   and I was a burden and I couldn't take new cases and

18   things of that nature, and at that point in time I

19   said, "Why don't we" -- and I couldn't go to trial the

20   next 90 days so he couldn't keep me in the homicide

21   unit, and I said, "I'm going to be done in the next 60

22   at the most, you know, and we'll know one way or

23   another.  Why don't you just keep me where I'm at?"

24             And he said, "No.  You're a nonproductive

25   member for the reasons that I just said.  I'm
```

1    transferring you down to" -- he said, "Nope.  You're a        14:53:57

2    nonproductive member of the homicide unit for the

3    reasons I just said, and I'm going to transfer you

4    down to filings."

5         MS. KOLE:  Okay.  You mind if we take a break?

6         MR. WEAVER:  No, not at all.

7         VIDEOGRAPHER:  This marks the conclusion of media

8    Number 2 in the continuing deposition of Christopher

9    Ross.

10        Today's date is December 9, 2014.  The time is

11   2:54 p.m. and we're off the record.                           14:54:28

12              (Whereupon a discussion was held

13               off the record.)                                  15:14:14

14                        (Recess)

15        VIDEOGRAPHER:  This marks the beginning of media         15:14:33

16   Number 3 in the continuing deposition of Christopher

17   Ross.

18        Today's date is December 9, 2014.  The time is

19   3:14 p.m. and we're back on the record.

20        MS. KOLE:  I'd like to ask the court reporter to

21   mark for identification a three-page document.  The

22   first page is an email from Christopher Ross to Sean

23   Lafferty sent Friday, September 27, 2013, with an             15:14:58

24   attachment titled "Transfer meeting.doc" and there's a

25   two-page attachment meeting that -- I'm sorry -- a

```
 1    two-page attachment with a date of September 27, 2013.
 2                    (The document referred to above
 3               was subsequently marked Defendant's
 4               Exhibit 3 for identification by the
 5               Certified Shorthand Reporter and is
 6               attached hereto.)                          15:15:32
 7    BY MS. KOLE:
 8         Q    Mr. Ross, do you recognize --
 9         MR. WEAVER:  I'm sorry.  I was just going to ask
10    is there a reason we're not going to use one that's   15:15:57
11    Bates-stamped?
12         MS. KOLE:  Can we go off the record a minute?
13         MR. WEAVER:  Sure.
14         VIDEOGRAPHER:  The time is 3:16 p.m. and we're off
15    the record.
16                    (Whereupon a discussion was held
17               off the record.)                            15:16:48
18         VIDEOGRAPHER:  The time is 3:16 p.m. and we're
19    back on the record.
20    BY MS. KOLE:
21         Q    Mr. Ross, did you have a chance to look at
22    Exhibit 3?
23         A    I did.
24         Q    Do you recognize the first page?             15:16:58
25         A    Yes.
```

1    Q    And what do you recognize this to be?

2    A    I recognize this to be an email.  It looks

3  likes a memorialized form of an email that I had sent.

4    Q    And do you recall drafting this email?

5    A    Yes.

6    Q    And do you recall sending it?

7    A    Yes.

8    Q    And the recipient is Sean Lafferty?

9    A    And others:  David Greenberg, John Aki, and

10  Tony Fimbres -- or Anthony -- Antonio Fimbres.          15:17:30

11    Q    And Tricia Fransdal and David Greenberg?

12    A    Yes.

13    Q    And the subject line is "Rotation Meeting on

14  September 26."  Do you recall that rotation meeting?

15    A    Yes, I do.

16    Q    And the attachment is -- do you also recall

17  pages 2 and 3, the attachment to the email?

18    A    Yes, I do.

19    Q    And you say in the email:

20         Attached is a document expressing my              15:18:01

21      thoughts on my situation after I've had time

22      to reflect.

23         Is the attachment -- is that correct?  Does

24  the document express your thoughts about the transfer

25  meeting on September 26?

```
 1      A    It did at the time, yes, the time it was
 2  made.
 3      Q    At the time of the transfer meeting on
 4  September 26, 2013, is that when you told Mr. Lafferty
 5  that there was nothing wrong with you and you could do      15:18:29
 6  your full duties?
 7      A    I don't think so, no.  At that point in time
 8  I had said, "We're going to be done in November.  By
 9  November we'll know one way or another if I'm able to
10  return or if I'm not able to return."
11      Q    Were you anticipating that you might not be
12  able to return to your job at all?
13      A    Yes.
14      Q    On September 26, 2013, did you believe you      15:18:57
15  were doing your full duties?
16      A    On what date again?  I'm sorry.
17      Q    September 26, 2013.
18      A    Full duties with regards to -- to what?
19      Q    Your position at the County of Riverside.
20      A    I don't know how to answer that.
21           I'd handled my cases.  I continued them
22  out -- I can tell you that -- so that they didn't
23  conflict with my medical appointments and so that they      15:19:28
24  weren't going to go to trial within the next 90 days,
25  so by January 1, 2014, they weren't going to go to
```

```
 1    trial.
 2        Q    Did you consider not taking new cases a
 3    reduction in your duties?
 4        A    No.  No, because -- well, I'll just say no.
 5        Q    On September 27, 2013, were you still          15:20:00
 6    requesting to stay in your assignment, in your current
 7    assignment, but not have any new cases assigned to
 8    you?
 9        A    Yes.
10        MS. KOLE:  I'd like to ask the court reporter to
11    mark this next document as Exhibit 4 for
12    identification, and it's titled -- it's a one-page     15:20:28
13    document titled District Attorney's Office, Riverside
14    County, Memorandum dated September 16, 2013.
15                   (The document referred to above
16                   was subsequently marked Defendant's
17                   Exhibit 4 for identification by the
18                   Certified Shorthand Reporter and is
19                   attached hereto.)                        15:21:02
20    BY MS. KOLE:
21        Q    Do you recognize this document, Mr. Ross?
22        A    I do.
23        Q    And what is this document?
24        A    This is a District Attorney's Office,
25    Riverside County, Memorandum dated September 16, 2013. 15:21:29
```

```
 1      Q    And is the subject "Rotation Request"?

 2      A    Yes, it is.

 3      Q    Were you asked to fill out this form?

 4      A    Yes, I was.

 5      Q    Who asked you to fill it out?

 6      A    I believe Sylvia Davila.

 7      Q    Do you know if she asked you to fill this out

 8  on behalf of a manager in the office?

 9      A    No, I do not.  However, I can tell you as a        15:21:56

10  normal course of business that these rotation

11  memorandums, I think -- I think every six months we

12  have to fill one out because that's when they consider

13  rotating people.  She's the one that handles all the

14  administrative duties associated with that, so it's a

15  scheduled, I guess, operation that has to -- that she

16  has to do.

17      Q    So this was a memorandum that you had seen

18  several times then during the course of your

19  employment?

20      A    This, I don't know if it was -- I don't know,      15:22:29

21  not this exact memo, but there were transfer memos and

22  I don't know if it was exactly like that.  I don't

23  remember.  But I do know that a portion of it is the

24  same.

25           You're always asked what assignment you'd had
```

 1   previously in your career, who your supervisor was,

 2   and I -- and they ask where you want to go.

 3        Q    Is this your handwriting on the form?

 4        A    It is.

 5        Q    Did you make a request for a move?

 6        A    In this one here?  I put, "Move to something          15:22:57

 7   with no stress, no quotas, no deadlines, no pressure."

 8        Q    Did you have something in mind that fit those

 9   requirements?

10        A    No, I did not.

11        Q    Did you believe your assignment at the time

12   you filled it out fit those requirements?

13        A    You mean at the time -- at the time I filled

14   this out on the 30th, I'd already been informed I was

15   going to filings, so I'd been informed that "You are

16   officially being reassigned to filings."  So at the           15:23:30

17   time I filled this out, no, I didn't think it met

18   those requirements.

19             Filings had a quota system on them of -- we

20   had to file a minimum of 15 cases a day, which is one

21   every 45 minutes, three hundred to three hundred and,

22   I think, thirty or forty a month is what the quota was

23   on it.  If not, you would get what's called a PIP

24   action or a Personal Improvement Program.  You'd get

25   written up and you'd get admonished is what would

                         192                    Volume I

1    happen.                                                          15:23:59

2         Q    Did you think the filings assignment had more

3    stress associated with it than your --

4         A    Uh-huh.

5         Q    -- assignment immediately prior to that?

6         A    Yes.  At this point in time, yes, because I

7    was still going to medical treatment at the Mayo

8    Clinic and I could not meet the deadlines.  They knew

9    I couldn't meet the deadlines.  I'd told them

10   expressly on the 26th in the meeting, "I can't meet

11   these deadlines.  I am going to be gone seeking

12   treatment at the Mayo Clinic for a week at a time, and

13   there's no way I can make that up."                             15:24:30

14        So that's -- that's why I thought, no,

15   filings was not the place to move me.  That is not a

16   place with no stress.  Quite the contrary.  Just about

17   everybody in filings had been written up for not

18   meeting their deadlines that I knew of.

19        Q    And what assignment had you had prior to

20   being transferred to filings?

21        A    Homicides.

22        Q    And you believed that homicide was a lower

23   stress position for you?

24        A    No.  I believe based upon -- not in the

25   abstract like that.  I believe as I had manipulated my   15:25:00

```
 1    cases in conferring with the defense attorneys and
 2    continued them out so that from this point in time,
 3    let's say, around the 30th of September until
 4    January 1st, I was not going to have to go to trial or
 5    I wasn't going to have to go to preliminary hearing or
 6    I wasn't going to have to do any motions, so as
 7    applied, yes, it was less stressful, but generally
 8    when in trial, no, it's not.                              15:25:29
 9        Q    And does that also include the modification
10    of not having any new cases assigned to you?
11        A    Does what?  I'm sorry.  When you say "Does
12    that include," what does that mean?
13        Q    I asked you if you believed your homicide
14    assignment was less stressful than filings.
15        A    Okay.
16        Q    And you said, no, not in the abstract, but it
17    was as you -- in the way you had manipulated your
18    cases it was less stressful.
19             And I asked you if that also included the     15:25:58
20    modification of not having new cases signed to you.
21        A    Okay.  And I'm just asking what does that
22    mean when you say, "Does that include"?  What do you
23    mean, "Does that include?"  I'm just confused.  I'm
24    sorry.
25        Q    Okay.  I'll start again.
```

1          Did you believe the homicide position as it
2     was for you prior to September 30, 2013, you had been
3     able to modify it or manipulate it in such a way that
4     it would have less stress for you than rotating to          15:26:27
5     filings?
6          A    Yes.
7          Q    And were the two main modifications or
8     manipulations the continuation of cases and no new
9     cases being assigned to you?
10         A    Yes.
11         Q    Were there any other modifications or
12    manipulations you had been able to do to your homicide
13    position that reduced the stress?
14         A    Not that I'm aware of other than -- the only
15    thing I might add to that was while I was gone in
16    Arizona I had people stand in for me on cases if they        15:26:57
17    had TRC dates, trial readiness conferences dates.
18         Q    So other attorneys covering hearings for you
19    while you were at medical appointments?
20         A    Here and there, yes.  I think there were a
21    couple times.
22         Q    And is it correct that Mr. Lafferty did not      15:27:30
23    agree with you that that was a reasonable modification
24    to the homicide position?
25         A    I'm just thinking about that a second.

```
 1              Is it clear that Mr. Lafferty didn't agree

 2      that what was a modification or a reasonable

 3      modification to the homicide unit?  You mean

 4      assignment of new cases?

 5         Q    No assignment of new cases, people standing

 6      in for you to covering hearings while you went to

 7      medical appointments, and continuing the dates out on     15:27:59

 8      the cases you had so that there would be no immediate

 9      deadlines.

10         A    I can tell you what he said.  I think that's

11      best rather than my, you know, speculation or

12      interpretation on the twenty whatever it is.

13         Q    Why don't I ask you this way:

14              Did Mr. Lafferty say to you that he did not

15      agree that that was a reasonable modification of your

16      homicide position, that they could continue?          15:28:25

17         A    Well, you could say that.

18              What he said was -- again, it might just be

19      best if I tell you what he said.  Would you like me to

20      do that?  It might answer your questions --

21         Q    Sure.

22         A    -- a little better.

23         Q    Sure.

24         A    He said, "You're a nonproductive member of

25      the homicide unit because, number one, you can't
```

```
 1    accept any new cases."
 2            "Number two, you can't go to trial within the
 3    next 60 days."
 4            There was a third thing he said, too, that I
 5    can't remember off the top my head.
 6            And I asked him, "Well, I'm not going to          15:28:59
 7    trial on my cases in the next 60 days or 90 days
 8    anyway."
 9            And he said, "It doesn't matter."
10            And I said, "Well" -- and he said -- oh, he
11    said he had two cases to reassign that he wanted to
12    give to me and now that I wasn't here, I was seeking
13    medical treatment in Arizona, he had no one to give
14    them to.  And I asked him about several people, one
15    being John Aki who had recently been transferred from
16    Riverside to Indio, and he said, "No, John Aki is not   15:29:30
17    available.  We have other things for him to do."
18            And then I said, "Okay.  Well, there's other
19    people you can give these two new cases to."
20            And he said, "No, there's not.  You're
21    nonproductive."
22            I asked him, "Well, in the next 90 days do
23    you expect these new people to go to trial with my
24    cases?"
25            And he said, "No."
```

1           And I said, "Well, then, how am I any more

2     nonproductive than anyone who's going to take my

3     cases?"

4           And he said, "It doesn't matter.  You're

5     being transferred to filings."

6           "Okay."

7     Q     And those conversations occurred in the          15:30:01

8     September 26, 2013, meeting?

9     A     Yes.

10    Q     Were there any accommodations you asked for

11    in the September 26, 2013, meeting?

12    A     Yes.  I asked to stay in the homicide unit

13    without any new cases assigned and just let me handle   15:30:29

14    my caseload.  I had it under control.  Don't move me.

15    Don't reassign me.  And I told him -- we had a

16    discussion about filings.  He said he thought it would

17    be less stressful for me given my condition, and I

18    said, "No, you have a -- you have a deadline there

19    that I can't meet because I will be away for given

20    periods of time seeking medical treatment."

21          And he said, "There is no deadline for

22    filings."

23          And I said, "Yes, there is.  It's 300 a         15:31:00

24    month."

25          And he said, "No, it's, you know, more like

```
 1   15 a day," which, you know, five days in a workweek,
 2   that comes out to 300.
 3           So, anyway, he said, "Well, it doesn't
 4   matter."  You know.  "You're -- we think it's best for
 5   you to go to filings."
 6           And I went, "Okay."
 7   Q     At that point around the end of September
 8   were you planning to move to filings?
 9   A     Yes.  I didn't want to move, but, yes, I was        15:31:28
10   planning to move, after the meeting, after he told me.
11   However, I will say this.  He did call me in in a
12   later meeting and tell me, well, he'd considered it,
13   my response that I wrote in an email to him after the
14   meeting, and he said, "No, we still think it's best
15   that you go to filings."
16   Q     I'm going to go back to the questions about        15:31:53
17   particular acts of harassment by the individuals you
18   indicated you believed harassed you.
19   A     Sure.
20   Q     I'd like to go back to Rene Goldman.  And
21   what did she do that you believed was harassing to
22   you?
23   A     I had a meeting on -- I'm going to get these
24   dates confused.  It was in October.  I had two
25   meetings regarding myself in October.  One, I think,    15:32:26
```

```
 1    was the 10th, and this was with Sean Lafferty and
 2    Tricia Fransdal and David Greenberg, somewhere around
 3    the 10th -- don't quote me on the date -- but
 4    somewhere around there I was told that I needed to go
 5    out on FMLA.  I was called in by Sean Lafferty.  He
 6    exploded on me in front of everybody, stood up, never
 7    sat down, slammed his hand on the desk and said, "You
 8    want to put it in writing?  Well, here you go.  You're
 9    going out on an FMLA, and here's the paperwork.  And
10    don't ask me how to fill it out because I don't know.      15:32:59
11    Call H.R. and find out from them."
12             I said, "Is there anything else?"
13             He said, "No, that's it"
14             So, "Okay."  I was happy to get out of that
15    one.  So I got out of that room, went back down, and I
16    called H.R.  I think it was Ignacio who I called.  I'm
17    not quite sure on that, but I think that's who I
18    called, and I said, "Hey" -- actually, pardon me.  She
19    called me the next day.  This is -- I'm getting a
20    little confused.
21             She calls me the next day and says, "Hey, I
22    understand, Chris" from, you know, her boss, who is       15:33:28
23    Rene Goldman -- "that you want to go out on FMLA."
24             I said, "No, I don't.  I was told I have to
25    go out on FMLA by Sean Lafferty."
```

1           And she said, "No, you don't have to."

2           And I said, "Did you tell Sean that I have to

3     go out on FMLA, Sean Lafferty?"

4           And she said, "No.  She said, "My boss, Rene

5     Goldman, just came over and said that you wanted to go

6     out on FMLA."

7           I said, "Okay."  I said, "Do I have to?  I

8     don't want to.  Do I have to go out?"

9           She said, "Are you going to be gone 10 days        15:33:58

10    in a row -- workdays in a row or more?"

11          I said -- I counted them out in my future

12    medical appointments and said, "No, I'm not."

13          And she said, "Then you don't have to.

14    You're not required to go out on FMLA.  Do you want to

15    go out on it?"

16          I said, "No."

17          And she said, "Well, then you're fine.

18    There's nothing we need to do."

19          So then what happens is a few days after

20    that, maybe -- I don't know -- four or five days

21    later, I get called in again by Sean Lafferty, and at

22    this point in time he says, "Well, you're going to

23    have to provide a medical doctor's note because you've        15:34:29

24    told us that, you know, you have a medical condition.

25    You need to get a doctor's note so you can come back

```
 1   to work."
 2          So at that point in time I went and talked to
 3   John Aki, and I said, "Hey, do I need a doctor's
 4   note?"
 5          And he said, "No, you don't need a doctor's
 6   note.  You were never administratively put on leave."
 7          He's our union representative, our head union
 8   representative.
 9          And so I said, "Okay."
10          And then I went down and I called -- I think
11   it was Ignacio again -- and I said, "Do I need a              15:34:58
12   doctor's note to come back to work?"
13          And she said, "No, you don't need one.
14   You're getting to go out on FMLA.  It's not required."
15          And then I think it was later on, maybe a
16   week or two after that, I got called in by Sean
17   Lafferty, and that was a mean, nasty meeting by him.
18   And he said, "You have to have a doctor's note.  I'm
19   putting you on administrative leave.  Your MOU -- your
20   union contract says that, you know, you need to have a       15:35:26
21   doctor's note."
22          And he only took a portion of the document,
23   and he put it in front of me, and I said, "Okay.
24   Well, where's the rest of it?"
25          And he said, you know, "It doesn't matter.
```

```
 1    That's the relevant portion."
 2            But it wasn't even the entire code section of
 3    the MOU.  So that meeting got really mean, really
 4    nasty, and at that point in time I went and got the
 5    union rep, Mr. Fimbres, who interceded.
 6            At the conclusion of that meeting I went and
 7    called Ignacio again, and she said -- I think she sent    15:35:57
 8    me an email that said something to the effect of --
 9    what did it say?
10            She said, "You don't need one.  I told you
11    you don't need a doctor's note.  However, a
12    supervisor" -- or not a supervisor -- but "a section
13    supervisor can require that you have a doctor's note
14    before you come back and preclude you from coming back
15    to work."
16            So that's pretty much the sequence of events
17    and what happened.
18       Q    And the question I had asked you that             15:36:30
19    preceded that answer was how Rene Goldman had harassed
20    you.
21            Is there anything else that Ms. Goldman did
22    that you considered harassing?
23       A    Yes.  I think I answered it earlier, though.
24    That was on the meeting -- the last straw in this case
25    was when I was on administrative leave and in January
```

```
 1    of 2014 Rene calls me up and says, "You have a meeting
 2    in 30 minutes.  You need to be down here."
 3              Indio is 90 miles or 80 miles, I think,
 4    rather, from Riverside.  I can't get there in 30
 5    minutes, and, you know, "Can we do this tomorrow?"          15:36:59
 6              "Okay.  I'll request it and see what
 7    happens."
 8              And then she writes me back, you know, and
 9    says, "Yeah, tomorrow's fine."
10              And I asked, "What's it about?  Contact my
11    union rep."
12              So she sends -- she contacted my union rep
13    who contacted me, and, she said, "Well, I'm going to
14    be at this meeting and all the A.D.A.s are going to be
15    there and it's about you waiving your HIPAA rights."
16              And, like my union rep said, "There doesn't
17    need to be a meeting on that.  We've already asked
18    you.  You said no.  And we are victims.  When we need    15:37:30
19    medical reports, we don't have them fill out forms.
20    They -- you know, they either -- or have a meeting on
21    it.  They just waive it and sign it or they don't.
22    And if they don't, we don't get the records.  It's
23    federally protected."
24              But I think her conduct in that, telling me
25    that I had to give up my records and, you know,
```

```
 1    forcing me to come to the meeting -- trying to force
 2    me to come to the meeting, not being forthcoming who
 3    was going to be there, what it was going to be about,
 4    documentation that was going to presented, it was an        15:37:59
 5    ambush is basically what it was, so in that sense I
 6    think, yes, that was harassing.
 7         Q    Is there any other conduct that Ms. Goldman
 8    engaged in that you believe to be harassing?
 9         A    Yes.  Ignacio -- I think it was -- Ignacio
10    Hernandez, I think, is her name, and then I think
11    there was Vanessa -- I can't remember Vanessa's last
12    name, but I think it was Ignacio -- she -- when she
13    said what the conversation had about FMLA and having a      15:38:30
14    doctor's note and coming back, I sent her an email and
15    said -- because Mr. Lafferty said in this meeting on
16    November 5th or 6th or 7th or whenever it was, the
17    first week in November, he said, "I talked to Ignacio
18    and I saw that email that you sent her," and he made
19    some comments about that, and so -- and he told
20    me that -- no, he had talked to her and what I was
21    conveying to him was a lie, wasn't true at all.             15:38:58
22              So I went right back down to her and that's
23    why I sent the email:
24              Did you, in fact, talk to Sean, and
25         didn't you -- isn't it a fact that you told
```

1        me A, B, C and D.

2             You guys have the email.  You can look at the

3   email for specifics.

4             And she never responded.

5             And then I asked her, "Who told you to say

6   this?  Who did you talk to after you talked to me, and

7   when did you talk to them?"

8             Never answered me.

9             So I think that her boss -- like, you know,

10  she told me her boss is Rene Goldman -- and so, again,      15:39:26

11  Rene takes orders directly from Jeff Van Wagenen

12  and -- who takes order from Mr. Zellerbach or

13  Lafferty, so in that way, yes, I think she was acting

14  in a harassing manner with that instance as well.

15       Q    Rene was?

16       A    Yes.

17       Q    Is there anything else that Ms. Goldman did

18  that you believe was harassing?

19       A    No, not at this point in time.

20       Q    Is there anything else that Vanessa Ignacio

21  did that you believe was harassing to you?

22       A    Other than what I've explained, no.            15:39:58

23       Q    Do you believe that Tricia Fransdal acted in

24  a way that was harassing to you?

25       A    Oh, yes.

1      Q     And what did Ms. Fransdal do?

2      A     Present at the meetings, complicit in the

3  meetings, her trying to give that case to me when she

4  knows that I'm in the middle of seeking medical

5  treatment in whatever it was, July, August, September,

6  October of 2013.                                              15:40:27

7         When I initially saw her and disclosed to her

8  in June, "Hey, look, here's what they think

9  tentatively is wrong.  I need to go seek treatment to

10  rule this out.  If they're correct and I do have ALS,

11  I can't continue the job.  You know that."

12         I mean, she said, "That's horrible."

13         And I said, "So do you really want me on the

14  cases right now?"  "Do you want to put me in filings"

15  is what I initially said, and, I said, "and take my

16  cases from me?"

17         And she said, "No."  She said, "If we find

18  out later on that you can't do the job, then we'll

19  worry about it.  You still need to take your cases."     15:40:58

20         That's when I manipulated my schedule and, of

21  course, later on through inquiry of people who were in

22  filings, they were the ones who told me about the --

23  "Oh, no, you do not want to go to filings.  There's a

24  quota system is what it is and nobody can meet it, and

25  when you don't meet it, they put you on a Personal

```
 1    Improvement Program, which is a reprimand.
 2              So I went, "Hmm, good thing I wasn't sent
 3    down to filings."
 4              And so I changed my -- you know, accommodated
 5    my schedule so I could go to the Mayo Clinic.                15:41:29
 6         Q    Who told you in filings about the quota
 7    system?
 8         A    Kevin Shek, Christie Hester.  A. C. Hester, I
 9    believe, too.  That's Christie's wife -- or husband.
10    Husband and wife.  I'm sorry.
11         Q    Other than Kevin Shek, A. C. Hester and
12    Christie Hester, did anyone else in filings tell you
13    about the quota situation?
14         A    Yes, Tricia Fransdal.                              15:41:56
15         Q    Did anybody else in filings warn you about
16    not being able to meet quotas?
17         A    I think Aileen Alvarez did.  I think she
18    warned me that it was hard, it was difficult.  And I
19    want to say other people who were in filings who got
20    transferred may be Michael Tripp, T-r-i-p-p.  I think     15:42:24
21    that's all I can remember.
22         Q    Was there anything else that Ms. Fransdal did
23    towards you that was harassing?
24         A    Oh, yes.  In her meetings just -- on the
25    Parker case, when I had meetings with the Parker's
```

```
 1    case -- or the Parker case with her telling her that

 2    the guy didn't -- you know, the guy -- we can't prove

 3    he did it or he was innocent as it later turned out --

 4    just her tone of voice, her reaction.  There was no          15:42:57

 5    intercourse.  There was no dialogue

 6         Q    When you say "her tone of voice," could you

 7    describe what was wrong with her tone of voice?

 8         A    Became very short, very curt, very fast,

 9    rude, sarcastic.

10             And then I'd also add when she started --

11    also, when she calls me in and gives me a case that

12    Mr. Zellerbach personally assigned her, she transfers       15:43:28

13    that to me, that doesn't happen.  If the D.A. gives

14    you a case, you don't go and transfer it to another

15    deputy.  That was the Lidy, Moor and Macbeth, I think.

16    Lidy, L-i-d-y, Moor, M-o-o-r, Macbeth, like the

17    Shakespeare play, M-c-B-e-t-h.  M-c-B-e-t-h.

18         Q    Was there anything else that Ms. Fransdal did

19    to you that you believed to be harassing?                   15:44:00

20         A    Yes.  It took place in the meetings that I've

21    earlier described with Mr. -- it was Mr. Lafferty and

22    Mr. Greenberg.

23             And also she was -- it was her opinion to

24    send me down to filings or her decision to send me in

25    filings.
```

```
 1       Q    Did she tell you it was her decision?

 2       A    Yes.  She -- well, not her complete decision

 3   but her -- you know, she agreed that's where I needed

 4   to go.

 5       Q    Did she tell you that she agreed you needed          15:44:29

 6   to go to filings?

 7       A    Yes.  I don't know if that is the exact words

 8   she used, but she said, "We're going to reassign you

 9   to filings."

10       Q    What about putting you on unpaid leave for a

11   fitness-for-duty exam?  Was that something you believe

12   Ms. Fransdal did?

13       A    Yes.  I think she was intentionally not there    15:44:58

14   on purpose.  She knew it was going to happen.  And

15   when I came back on the 17th to receive my good-cause

16   notice, I was laid off -- or put on administrative

17   leave on, I think, the 6th or the 7th, somewhere in

18   there.  I had to come back on the 17th.  Sean Lafferty

19   emailed me and said I had a -- he now had the

20   good-cause statement that was requested of him on the

21   7th, and he couldn't produce it.  He didn't know what

22   the good cause was.  But he said, "If you come back at     15:45:27

23   the end of the day, I'll have it for you after lunch."

24            Mr. Fimbres and myself came back.  He didn't

25   have it.  Said, "I don't know -- I don't know what the
```

```
 1    good cause is.  I'll have to wait and get it from
 2    downtown from Mr. Zellerbach and Mr. Van Wagenen.  I
 3    should have it for you on Monday."
 4            And Mr. Fimbres -- I said, "Well, I'm not
 5    going to be at work, and the terms and conditions say
 6    I can't come anywhere near County property so how am I
 7    supposed to come back into work and get this."
 8            And he said, "Well, Mr. Fimbres can get it
 9    for you."
10            I said, "That's fine."
11            Mr. Fimbres went in there on, I think,          15:45:54
12    Monday, I think the following Monday, and it was not
13    available.  And so then I finally got it on the 17th.
14    Mr. Lafferty emailed me on the 17th of November and
15    said -- so about 10 days later -- and said, "Come on
16    in and get it."
17            Ms. Fransdal wouldn't even look me in the
18    eye.  I looked at her and she looked down, covering --
19    you know, in her office, and she was sitting at her
20    desk, and I was right outside it asking for
21    directions.  We were in a new building now and I was    15:46:28
22    asking for directions of one of the secretaries, I
23    think, "How do I get to Sean Lafferty's office?"
24       Q    So was the harassment not looking you in the
25    eye?
```

```
 1        A    No.   The harassment was the transferring me
 2   to the different -- to filings when you knew I
 3   couldn't make that deadline, knew darn well I couldn't
 4   do 15 a day, especially when I'm going to be gone for
 5   five or seven days at a time.
 6             And then the standard operating procedure --      15:46:55
 7   sorry -- is to put somebody on a Personal Improvement
 8   Program.  In other words, you admonish them and
 9   discipline them.  You're on probation is what they do.
10   They'd put you on a probationary period for not
11   meeting your deadline of the 15 a day.
12             And, of course, giving me the other case
13   which was hers, personally assigned by Mr. Zellerbach,
14   which hadn't even been staffed.  The memorandum hadn't    15:47:28
15   been done.  The discovery hadn't been turned over.
16   Nothing had been Bates-stamped.  Court orders had not
17   been followed.  And this was all dumped in my lap
18   right when I'm in the middle of trying to go receive
19   medical treatment in the Mayo Clinic and after Chief
20   Greenberg has told me no new cases will be assigned to
21   me.
22        Q    You had said previously that you thought
23   Mr. Fransdal harassed you by putting you out on paid     15:47:57
24   leave on November 6th.  Is that what you meant to
25   say?
```

```
 1      A    I'm sorry.  I don't think I said that she
 2   harassed me by putting me out on November 6th.
 3   I think -- not to be nitpicky -- I'm sorry -- but I
 4   think that might be your paraphrasing.
 5      Q    So you don't believe that one of her acts of
 6   harassment was putting you out on paid leave on
 7   November 6, 2014?
 8      A    One of her acts of harassment was calling me
 9   into that meeting, yes, and putting me on
10   administrative leave.  And, yes, it was paid.          15:48:30
11      Q    So that was harassment on her part of you?
12      A    Yes, I think -- I think it was because,
13   again, she had agreed -- again, they were all in the
14   meeting and made the decision.
15      Q    I'm sorry.  I thought you said she was not in
16   the meeting on November 6th when you were put on paid
17   leave.
18      A    You are correct.  I didn't say that.
19   Everything in its entirety.  She was in the meeting
20   with management, the meeting that I was not attending.
21   She was not in the meeting where the punishment was    15:48:59
22   delivered, so to speak, and I was actually put out on
23   administrative leave.
24      Q    But you believe that that was an act of
25   harassment toward you on her part because you believe
```

1     she participated in the decision to make that

2     happen?

3          A     Correct.  And I think it was her intention --

4     not only did she participate in it, it was her

5     intention -- I think she was an instrumental force in

6     putting me on administrative leave.  Her and Sean          15:49:26

7     Lafferty are very, very close.

8          Q     It sounds like to me from some of your

9     testimony that you were very afraid you were going to

10    be terminated.  Is that correct?

11         A     Yes.

12         Q     And when did you start to have that fear?

13         A     In the meeting where -- the meeting where

14    Sean Lafferty came in to put me out on FMLA and

15    slammed down, you know, his hand on the paperwork, got    15:49:59

16    very, I'll call it, violent, he was aggressive in his

17    demeanor.  That was scary.  That was -- it's not the

18    way meetings are ever done.  I've never even seen that

19    in any organization, that conduct, particularly from

20    an A.D.A. and an attorney.  That was appalling.  That

21    was -- it was clear to me that there was an intent to

22    fire me, particularly when I -- "Don't ask me how to

23    fill out the paperwork.  Don't ask me how it's done.

24    I don't know."

25               Well, why not?  You're the one in charge        15:50:29

```
 1    who's telling me -- or ordering that I go out on

 2    FMLA.

 3            And then I call Human Resources and -- or

 4    they call me, rather, and say, "You don't have to go

 5    out on FMLA."

 6            And I was told by Sean Lafferty, "You have

 7    no choice.  You are going out.  You will go out on

 8    FMLA."

 9            Why?  Why can't you just let me seek

10    treatment?  I'd already taken care of my cases.

11            So at that point was when I started thinking,

12    okay, this is more than just somebody who's upset over      15:50:56

13    something.  There is, again, a driving force and a

14    goal in mind.

15       Q    Did you believe he wanted to fire you because

16    of the disagreement with him over the Parker case?

17       A    Yes.  That was a contributing factor, not in

18    its entirety, not the sole factor, but that was the

19    start of it.

20       Q    Did you feel as if you fell out of favor with

21    him when you disagreed with him about the Parker

22    case?

23       A    I wouldn't say I was ever in favor with him.      15:51:28

24    I had a cordial working relationship, but that

25    happened early on because, as I recall, I think they
```

```
 1    took over the end of 2010 or 2011, so it may have
 2    been, I think -- what? -- two thousand -- actually,
 3    2011 is when Mr. Zellerbach took over and Mr. Lafferty
 4    was assigned, so early on.  If he was out here --
 5    let's say he got to Indio in maybe March, let's say,
 6    we're talking about July, I'm already having, you know        15:51:59
 7    problems over this Parker case with him.
 8        Q    So you feel like things got off to a bad
 9    start with him?
10        A    Yes.
11        Q    Did you feel prior to that before
12    Mr. Lafferty came to the Indio office that you were
13    well regarded in the office?
14        A    I think so.  But by whom?  I'm going to say
15    by management, yes.
16        Q    And you feel that that changed when
17    Mr. Lafferty took on his position?
18        A    Yes, I do.                                            15:52:30
19        Q    Did you feel that Ms. Fransdal held you in
20    high regard for your work?
21        A    She was my supervisor.  I'm going to say in
22    2012 she took over for Mr. Sterling, for Otis, who
23    went to the bench, so prior to that she was in
24    Riverside, I think, for at least a year, so we had no
25    contact.  And I don't think she had any regard for me
```

1    one way or another that I knew of, but once she took          15:52:58
2    over, yes, I think she had regard for my -- for my
3    performance because they get rated -- the supervisors
4    get rated on the number of cases that are taken to
5    trial, so when I take a case to trial and I win, they
6    get, you know, applauded and their evaluations look
7    good.  So in that sense for pragmatic reasons, yes, I
8    think she did.
9         Q    In 2013 do you think she continued to hold
10   you in high regard for you work?
11        A    Oh, no.
12        Q    And what do you think changed then?                 15:53:29
13        A    I think probably right around maybe -- I
14   think in August sometime is when I started discovering
15   more things on the Parker case.
16             We have a letter from somebody, an inmate in
17   jail, and he said Roger -- "You got the wrong man.
18   Roger Parker didn't do it."
19             And then he -- he wrote this cryptic letter
20   that was like "Silence of the Lambs," and so my         15:53:58
21   investigator and I were looking at this going, "What
22   does this mean?"  And then we started investigating,
23   and, of course, I got DNA results back from the
24   Department of Justice which redacted the blood on
25   the -- one of the murder weapons and now it completely

1    excluded Roger Parker, so that was delivered somewhere
2    around that time --
3        Q    And --
4        A    -- to Ms. Fransdal.
5        Q    -- Ms. Fransdal did not hold you in high
6    regard anymore because of that event on the Parker           15:54:27
7    case?
8        A    Not on that event alone.  I think that was a
9    contributing factor.  I think there were multiple
10   things.
11           Number one, the DNA changed.  I kept saying
12   to dismiss the case.  And then we had the admissions
13   from the Parker case, the jail calls from the roommate
14   who said that he did it, and then, of course, we had
15   my not wanting to take the Lidy case or not -- me not
16   wanting to take it but me reporting her to her boss,        15:55:00
17   David Greenberg, and saying, "Hey, why is she giving
18   me this case when Mr. Zellerbach personally assigned
19   it to her?"
20       Q    Why do you think that the new evidence you
21   got in the Parker case had anything to do with how
22   Mr. Fransdal viewed your performance?
23       A    Her demeanor, her attitude, the way she
24   treated me.
25           Again, the things that I've mentioned

                              218                    Volume I

1    earlier; the sarcasm, no time to talk to me about          15:55:25

2    cases, no time to -- not so much the time but just how

3    she responded to me.  The demeanor completely

4    changed.

5         Q    How is that tied to the Parker case?

6         A    Because it started after I delivered the bad

7    news about the Parker case and started saying --

8              Bless you.

9              -- and started saying, "You need to dismiss

10   this case."

11        Q    You think that was news she did not want to

12   receive?

13        A    Oh, absolutely.

14        Q    And she blamed you as the messenger?

15        A    I think, yes.  She told me outright, "I know     15:56:00

16   the guy did it."

17             I said, "Well, I'm not going to argue.  I'm

18   not going to get into an argument whether he did it or

19   not, but let's look at the evidence, what we have.

20   The evidence shows that, no, we can't prove beyond a

21   reasonable doubt that he did it.  We can't even -- you

22   know, we can't even get probable cause on him

23   arguably."  So we had a difference of opinion on

24   that.

25        Q    And you think the difference of opinion was

1    enough for her to no longer respect your work?

2        A    That I don't know.   I -- I don't know.   I                    15:56:29

3    don't know whether -- maybe she did respect my work,

4    yes, but she put that aside when she started treating

5    me as she did.   I can just say that it was enough for

6    her to start treating me differently and to start be

7    harassing to me and sending me these text messages

8    saying, "You have a meeting," you know, "tomorrow at

9    8:30 in the morning" or "nine or clock," and "You have

10   a meeting today at," you know, "at four o'clock," and,

11   of course, participating in management meetings about

12   me and making decisions and demoting me to filings.                    15:56:59

13   Again, trying to pass off her cases to me when she

14   knew darn well that I couldn't take it.

15       Q    How many -- when you refer to these meetings,

16   is there a specific number of meetings you have in

17   mind when that happened?

18       A    No, I don't.   Prior to each one of the

19   meetings I had with Mr. Lafferty, there was always a

20   meeting that I knew of before because I would show up

21   early, and on one occasion they actually shut the                     15:57:28

22   door -- looked at me, shut the door and started

23   talking.

24            On the other occasions, they -- the door was

25   already shut, and I thought, wow, that's usually not

```
 1    the way the meetings go.  Usually everyone shows up at

 2    the same time.  When the door is shut and now you're

 3    going over your scheduled meeting time and

 4    Mr. Lafferty opens the door and says, "Come on in."

 5         Q    How many meetings did they have that you

 6    referred to when you're being texted to come to the

 7    meeting and you're late?

 8         A    I'm estimating, and I'm going to say maybe

 9    three.

10         Q    And are those different from the meetings you

11    showed up early for?

12         A    Yes.

13              Well, hold on a second.  The initial question

14    was how many did she text me and say, "Show up for the

15    meeting, you're late."

16              You know, when she -- she never texted me and

17    said I was late.  That was Sean Lafferty who texted me

18    and said I was late.

19              What I said was she texted me and said I have

20    a meeting tomorrow at 9:00 a.m. and "You have one at

21    four o'clock today."

22         Q    She was telling you when her meetings were?

23         A    No, when my meetings were.  She would text me

24    and say -- you have the text messages.  You can look

25    at those.
```

15:57:59

15:58:29

1      Q    Are you referring to emails?

2      A    Text messages.

3      Q    Did -- I don't believe you produced any text

4    messages, so I'm not sure what you're referring to.

5      A    Okay.  We'll have to go back and make sure

6    that's produced, too.

7           But yes, she would text-message me.  I don't

8    know why she wouldn't actually call.  I don't know why

9    she couldn't send me an email.  But she preferred a          15:58:59

10   text message.

11     Q    Do you have text messages that you've saved

12   in your possession at home?

13     A    Yes.

14     Q    And these text messages are from employees of

15   the County of Riverside to you?

16     A    Yes.

17     Q    In addition to text messages from Tricia

18   Fransdal, are there other -- any other text messages

19   you still possess from County of Riverside employees

20   to you?

21     A    I think -- yes, I think one from Selne Sorg,

22   Selne, S-e-l-n-e, Sorg, S-o-r-g.                             15:59:28

23     Q    And what is the general content of the Selne

24   Sorg text?

25     A    The general content or context of those is

```
 1    that she had problems with Sean Lafferty, he was a
 2    snake, he tried to put her on probation and tried to
 3    reprimand her and tried to have her sign something        16:00:00
 4    that wasn't true and she wouldn't sign it, and that
 5    escalated and caused the problems.
 6         Q    Are you -- this is a female?
 7         A    Yes.
 8         Q    Are you still in contact with her?
 9         A    No.
10         Q    Did she agree to testify on your behalf in
11    this action?
12         A    No.  I didn't ask her if she's willing to
13    testify.  I was just trying to get Mary Montez's          16:00:26
14    number.
15         Q    Were you seeking Mary Montez's number for
16    something having to do with this lawsuit?
17         A    No.  Mary Montez had called me, I think, is
18    what she'd done.  She didn't call me directly.  She
19    called a friend of mine.
20         Q    Were you just trying to return that phone
21    call?
22         A    Yes.  Ultimately I did return the phone call.
23         Q    And that -- did that have anything to do with   16:00:58
24    this lawsuit?
25         A    No.
```

1          She just said, "Mr. Ross, I just want to

2     confirm that you're no longer working here.  We were

3     told today" -- Mary Montez was a secretarial

4     supervisor, and she said, "We were told today that you

5     are no longer working here, and I just wanted to

6     confirm that that was true."

7          Q     Was she just concerned about your welfare?

8          A     I don't know.  I just -- she didn't say.  The

9     conversation was not very long.                          16:01:30

10         Q     The meetings that Ms. Fransdal was texting

11    you about, are those the ones you referred to before

12    where Mr. Lafferty was present, Mr. Greenberg was

13    present, Ms. Fransdal was present and yourself?

14         A     Yes.

15         Q     And you believe there were less than five of

16    those?

17         A     Meetings?  I think so.  There may have been

18    five, but I think -- I think there were about four of

19    them, as I recall.

20         Q     Do you believe you got four or five texts       16:01:58

21    from her then?

22         A     No, I don't -- I don't believe so.  I think

23    that -- I can remember I got maybe three, three texts

24    from her, I think, going by memory.

25         Q     And then you got one email from Mr. Lafferty

1    saying, "You're late.  The meeting is going on now"?

2         A    I got a phone call from him saying that,

3    "Where are you?  Your meeting was started six minutes

4    ago.  You're late."

5              I'm like, "Oh."                                    16:02:29

6              "Get up here."

7              "Okay."

8         Q    When do you believe was the first time you

9    told one of your supervisors that you were going to be

10   needing to undergo some medical -- medical

11   treatments?

12        A    I would say mid June, maybe -- beginning of

13   June probably, mid June, somewhere in there.

14        Q    Of 2013?

15        A    Yes.

16        Q    Do you recall who was the first supervisor

17   you told?

18        A    Tricia Fransdal.

19        Q    And was that an in-person conversation?        16:02:59

20        A    Yes, it was.

21        Q    Was that an emotional conversation for you?

22        A    No.

23        Q    Was that an emotional conversation for

24   Ms. Fransdal?

25        A    She had a reaction when I told her the

```
 1    potential disorders or diseases, and she didn't seem
 2    to understand.  And I explained it to her, it's
 3    serious, as the doctors explained to me, it's very
 4    serious, and she did put her hands on her mouth and
 5    went [indicating], and then she put them down and        16:03:28
 6    after that I said -- I started explaining to her -- I
 7    transitioned and said, "Well, you might want to take
 8    my cases and give them to somebody else because if it
 9    comes back that I do have these disorders, you know, I
10    won't be able to continue.  More over, it might cause
11    an appellate issue of incompetence or whatnot by the
12    defense."  And I requested to go to filings, and she
13    changed her tone and went -- she wasn't conciliatory
14    anymore, and she said, "No," very matter of fact.
15    "Hang on to your cases.  If it turns out that you        16:03:58
16    can't continue, we'll deal with it then."
17         Q    Did she cry in that meeting?
18         A    No.
19         Q    From that point forward was Ms. Fransdal not
20    conciliatory towards you?
21         A    No.  No.  She was at different points in
22    time.  I mean you can't generalize and say she never    16:04:27
23    was.  At certain points in conversation we had, she
24    was.  When discussing my illness and what was wrong,
25    yes, she appeared to be concerned.
```

1      Q    Did you believe her concern to be genuine?

2      MR. WEAVER:  Objection.  Calls for speculation.

3      THE WITNESS:  When she would first do the

4  concern -- for instance, in the first conversation

5  that I just explained in her office where she put her         16:04:59

6  hands to her mouth, that looked genuine, but then five

7  seconds later I'm explaining that I need to have my

8  cases taken, I need to be transferred, and she just,

9  matter of fact, "No, we're not going to do that.  If

10  you need it, you know, when the time comes, then we'll

11  discuss that issue."  Just cold as ice.  I thought

12  wow, that isn't -- and I don't mean to be offensive or

13  rude.  I'm just trying to convey how she was.  So that

14  made me to question the sincerity of her emotion or          16:05:27

15  her -- well, any concern that she had.  But at

16  minimum, whether I questioned it or not, at least she

17  was nice at that particular moment, which I

18  appreciate.

19  BY MS. KOLE:

20      Q    Were there any other acts that you -- or

21  conduct by Ms. Fransdal that you considered to be

22  harassing towards you that you haven't already

23  described?

24      A    I think I've covered it all.                        16:05:59

25           Excuse me.

                        227                    Volume I

```
 1        MS. KOLE:  Can we go off record for a moment?

 2        MR. WEAVER:  Yes, of course.

 3        VIDEOGRAPHER:  The time is 4:06 p.m. and we're off

 4   the record.

 5                 (Whereupon a discussion was held

 6             off the record.)

 7        VIDEOGRAPHER:  The time is 4:17 p.m. and we're        16:17:34

 8   back on the record.

 9   BY MS. KOLE:

10        Q    Mr. Ross, earlier I asked you for

11   Mr. Van Wagenen's conduct toward you that you

12   considered harassing, and you did respond to that and

13   listed a few things.

14             You -- I'm just going to summarize them for

15   you so you can see if there's anything else you want       16:17:58

16   to add to that.

17             The meetings that took place that Sean

18   Lafferty, Tricia Fransdal, David Greenberg and

19   yourself were present, that Mr. Van Wagenen approved

20   those meetings or knew they were taking place.

21             The demotion to filings was at his approval

22   or direction.

23             And while you were on admin leave, the phone

24   call that you received -- I believe it was from -- not

25   directly from Mr. Van Wagenen but from someone who was     16:18:29
```

```
 1    assisting him about coming to a meeting and HIPAA
 2    rights.
 3              Is there anything else that Mr. Van Wagenen
 4    did toward you that you believe is harassing?
 5         A    No, but the only thing I think you left out,
 6    if you want me to cover that, I remember he told
 7    Antonio Fimbres that I would be reprimanded and
 8    basically risked being fired if I didn't turn over my
 9    medical records, and he claimed that that was directed
10    to him by somebody in County of Riverside.  He didn't      16:18:59
11    articulate who.  I did ask Rene Goldman.  That was the
12    person -- the head H.R. person who over at County had
13    directed Mr. Van Wagenen, you know, to say this and
14    what the statute was that they were going by, and that
15    was never responded to.  I never got a response from
16    that.
17         Q    Is there anything else that you can think of      16:19:29
18    at this time that was conduct by Mr. Van Wagenen that
19    was harassing toward you?
20         A    Yes.  After -- in the period in which I was
21    on administrative leave, I had sent a -- I'd read a
22    letter from my attorney to the district attorney's
23    office stating that I had essentially quit, exercised
24    constructive termination, and then there was a letter
25    sent back stating, no, I had to show up to work.           16:19:57
```

1       And then I wrote a response saying, "No, I

2   quit."

3       And then there was another letter that was

4   sent back by Mr. Van Wagenen saying, you know, "We're

5   going to -- basically you can risk insubordination for

6   abandoning your job and be punished accordingly, which

7   would be termination if you don't show up."

8       So there were, I think, three letters written

9   to him and wouldn't -- he wouldn't concede that I no

10  longer worked there.  And I think, in my opinion, that        16:20:27

11  was an attempt to state that he fired me or the

12  district attorney's office fired me instead of me

13  saying I quit.  Hence, when I go to apply for another

14  job, if I don't say that I was fired, he could then

15  turn around when contacted by another employer and

16  say, "Oh, no.  We terminated Mr. Ross.  He didn't

17  quit."

18      And then, of course, he could -- if he chose,

19  he could turn around and report to the State Bar that

20  I was being unethical and lying.  So I thought that

21  was -- that was part of the harassment as well.          16:20:59

22      Q   Was there anything else that Mr. Van Wagenen

23  was involved in that you're aware of that was

24  harassing toward you?

25      A   No, not that I can think of right now.

1       Q    What is your understanding of the County of

2   Riverside designation of your separation from

3   employment?

4       MR. WEAVER:  Objection.  Calls for speculation.

5           To the extent you know, answer it.

6       THE WITNESS:  My understanding of what they

7   believe happened or what I believe happened?                16:21:29

8           My belief is constructive termination.

9           I believe that they believe that they

10  terminated me based on Mr. Van Wagenen's letters

11  for job abandonment.

12  BY MS. KOLE:

13      Q    Let me just ask a few questions about that.

14          Do you think that the County of Riverside

15  fired you?

16      A    That was --

17      MR. WEAVER:  Objection.  Asked and answered.

18      THE WITNESS:  I think -- I think no, myself, they       16:21:57

19  didn't fire me.  Constructive termination.  I quit, in

20  other words, because of the conditions.  However,

21  those letters from Mr. Van Wagenen, when you read

22  them, particularly the last -- I think the last two

23  talked about job abandonment, those made it -- those

24  made it kind of -- implied that, yes, I may have --

25  they may have believed that they in fact were

```
 1    terminating me for not showing back up to work by the      16:22:26
 2    dates that they prescribed and I had, quote, abandoned
 3    my job and pursuant to the MOU, the Memorandum of
 4    Understanding, the union agreement -- according to the
 5    letter it quoted the MOU and said I could be, you know
 6    disciplined and impliedly terminated for abandoning my
 7    job.  I think that's kind of an ambiguous area that
 8    they left open for interpretation, and it may be
 9    possible, yes.
10    BY MS. KOLE:
11        Q    Did you read the letter that you got, the
12    last letter you got, about the separation -- your        16:22:57
13    separation from the County of Riverside?
14        A    Yes, that I was separated on, I think,
15    June 12th.
16        Q    Did you see the words "job
17    abandonment/voluntary resignation"?
18        A    No.  I may have seen it, but on the top of my
19    head right now, I can't remember.
20             But you're right.  In that one -- that one I
21    don't think it said, "You're fired," but I think it
22    just said my date of termination was -- I'm no longer
23    employed, my date of termination would be June 12.
24             You're right.  It didn't say anything about
25    job abandonment there.                                    16:23:29
```

1       Q    Just to make sure I got everything, were

2    there any other acts that you believe were harassment

3    by Jeff Van Wagenen?

4       A    No.

5       Q    And you also believe that Paul Zellerbach

6    engaged in conduct that was harassing of you?

7       A    Yes.

8       Q    And what was -- what was the conduct that

9    Mr. Zellerbach engaged in that --

10      A    By his --

11      Q    -- harassed you?

12      A    I'm sorry.

13          By Mr. Lafferty's admissions to me or        16:23:59

14    statements to me in my meetings with him that we've

15    already discussed, he made it clear that he was

16    taking -- he was collaborating with Mr. Zellerbach and

17    Mr. Van Wagenen and collectively they were making

18    these decisions which we previously discussed, putting

19    me on administrative leave, putting me down to

20    filings, demoting me, and, of course, the other things

21    we talked about with regards to the public statements    16:24:29

22    and the denigration.

23      Q    And the other things that you testified about

24    with the public statements was the employee award that

25    was given by Mr. Zellerbach where he said you won it

1    because you were anal?

2         A    Anal retentive, yes.

3         Q    And --

4         A    I think anal, anal retentive, something like

5    that, not that it matters.  But I mean I was, like,

6    "That was a weird -- did he just call me" --

7         MS. KOLE:  Don't say it.

8         THE WITNESS:  Exactly.                          16:25:00

9         MS. KOLE:  I was making a comment to opposing

10   counsel.

11   BY MS. KOLE:

12        Q    Are you -- did Mr. Zellerbach make any other

13   comments to you or about you in your presence that you

14   found harassing?

15        A    Whenever I met that gentleman, he was less

16   than cordial with me.  I didn't find him -- there were

17   a couple times I did find him pleasant and            16:25:29

18   professional, which I appreciated very much.

19             When I was in trial one time in Riverside, my

20   understanding is a judge spoke to him who I was in

21   trial with.  He told me -- he said, "I will speak to

22   Mr. Zellerbach."

23             After that, Mr. Zellerbach was -- had a

24   different demeanor toward me.  That was just for the

25   duration of that trial.

```
 1           And I think I'd met him once, maybe twice,
 2    just at the end of the day coming back to the district
 3    attorney's office.
 4           Other than that, no, he was -- he was not        16:25:59
 5    friendly or cordial with me.  He was kind of curt,
 6    rude, obnoxious, belligerent.
 7       Q    What is an example of Mr. Zellerbach being
 8    belligerent towards you?
 9       A    I think, like I said, in the -- in, well,
10    here.  That Hanh and Werntz case that went over to     16:26:27
11    Lisa Di Maria, I had to staff that for a death
12    penalty.  We do a staffing to see whether a case
13    should be filed as a death penalty case, whether we're
14    seeking the death penalty.
15           I had spoken to several of my supervisors --
16    Mr. Sterling, Mr. Lafferty -- prior to this staffing,
17    and we all concluded that it was not a
18    death-penalty-eligible -- or it may have been
19    technically eligible but we should not proceed with
20    death because we couldn't prove first degree murder.    16:26:59
21           And then, of course, when we got into the
22    actual staffing -- and I was the prosecutor so I had
23    to make the presentation -- he made the decision that
24    we were going to go death, and everybody, of course,
25    then agreed with him, "Yes, death."  I was in
```

```
 1    disbelief as to how everybody overnight had changed

 2    their opinions, and at the conclusion of saying we

 3    were going to go death, I said, "Mr. Zellerbach, sir,

 4    how do you propose that I articulate to the jury that      16:27:28

 5    this is first degree murder?  We can't prove it."

 6            And he got very upset, slammed his hand down

 7    on the ground and yelled at me, and said, "It's death.

 8    It's been staffed.  Enough."

 9            That would be an example.

10       Q    Who was present when he had that outburst?

11       A    Mr. Coffee, Ron Coffee, would be a chief

12    deputy district attorney.

13            Mike Soccio -- Michael Soccio, S-o-c-c-i-o.

14    He's, I think, a chief deputy district attorney.          16:27:55

15            Jeff Van Wagenen, assistant district

16    attorney.

17            Sean Lafferty, assistant district attorney.

18            And Otis Sterling wasn't present, but he was

19    watching it and interacting through whatever we have

20    there, computers and, you know, the screens where he

21    can talk into the microphone and we can see him,

22    whatever it's called.  I forget what they call it.       16:28:27

23    Excuse me.

24       Q    And did this occur in 2011?

25       A    It may have been 2012.
```

1    Q    Did you give the Hahn and Werntz case to Lisa
2  Di Marie in 2011?
3    A    I think -- no, I think in 2012 I gave that
4  case to her.  Going by memory, I think it was 2012.        16:28:51
5    Q    Were there any other times when you believe
6  Mr. Zellerbach was belligerent to you?
7    A    Yes, but I can't remember them right now off
8  the top of my head.
9    Q    And when you said, "curt, rude, obnoxious and
10  belligerent," --
11    A    Uh-huh.
12    Q    -- were you thinking of different episodes,
13  or were those four adjectives -- would you say all         16:29:25
14  four of those adjectives describe the event you just
15  told us about where Mr. Zellerbach slammed his fist on
16  the table and said it's staffed?
17    A    That would be an example, but I think there's
18  other instances where he didn't act in the same manner
19  but yet he was still curt and rude.
20    Q    So there were some curt and rude incidents
21  that were of a lower level than the obnoxious or
22  belligerent ones?
23    A    Yes.
24    Q    Can you remember any of the curt or rude ones         16:29:58
25  at this time?

```
1      A    Sure.

2           I remember at the employee-of-the-month award

3      when he called me anal retentive and then the little

4      smile that he had.

5           And then there were just other times other

6      than that, you know, getting in front of everybody and

7      the whole office pretty much is there, that would be a

8      rude indication or an example of when he was rude.

9      Q    I'm sorry.  Was the getting in front of

10     everybody else in the whole office there, is that the

11     employee-of-the-month example?

12     A    No.  That is our annual banquet for our

13     awards for employees of the year, that sort of thing.      16:30:29

14     And he was -- my investigator got the

15     investigator-of-the-year award, and rather than

16     standing up saying for doing a great job in the

17     prosecution of X case, he stood up there and said,

18     "We're giving this to Investigator Dougan because

19     he can put up with Chris, and we all know, you know,

20     he's anal, he's anal retentive, and Chris can put up

21     with him."

22          I mean the way it was conveyed to me -- I was

23     not there -- but, to be frank, people came back and

24     said, "Wow, Mr. Zellerbach just called you an A-hole     16:30:58

25     in front of the whole office last night."
```

1          I went, "Oh, no."

2      Q      Maybe I misheard you.  I thought you said

3  "anal retentive," and now you say "A-hole."  Those are

4  obviously two different things.

5      A      Correct.

6          My understanding, it was people -- when they

7  conveyed it to me, they said -- the next day people

8  were coming to work saying, "Mr. Zellerbach just

9  called you an A-hole last night," and I went, "What?"

10         Then I started asking people, and they said

11  "Yeah, he did."

12         And I said, "He said 'A-hole'?"

13         And they said, "Well, no.  He said 'anal

14  retentive' or 'anal' or something like that."

15         "Okay."

16         So that was people's rendition or their --        16:31:29

17     Q      And that's --

18     A      -- summary.

19     Q      -- separate from giving you the

20  employee-of-the-month award and calling --

21     A      Correct.

22     Q      -- you anal retentive?

23     A      Correct.

24     Q      Those are two separate incidents?

25         Those are two separate incidents?

```
 1      A    Yes, they are.

 2      Q    But you were not present at the annual

 3   banquet when the second incident occurred?

 4      A    Correct.

 5      Q    But were you present at the first incident?

 6      A    Yes.

 7      Q    And do you consider the curtness or the        16:31:56

 8   rudeness to be harassment?

 9      A    Yes.

10           I'll be honest with you.  I tried to avoid

11   that man after those sort of encounters.

12      Q    Did you consider coming back to work at the

13   district attorney's office after the election in    16:32:30

14   2014?

15      A    Yes, I did.  However, I have to tell you when

16   you ask have I spoken with anyone at the -- I think

17   you asked about text messages or -- with the district

18   attorney employees, maybe about six weeks ago I came

19   into contact with Mr. John Aki.  I was actually eating

20   lunch with Tom Daily in Indio, and Mr. Aki walked in

21   as I was ordering, and Mr. Aki had with him Ryan Monis   16:32:59

22   who's an investigator in our office.

23           Then a few moments later after that, Chuck

24   Cervello, C-e-r-v-e-l-l-o -- he was another

25   investigator from our office who entered and made
```

```
 1    contact with John Aki -- and Mr. Aki asked me -- he
 2    said, "Hey, how you doing?  Are you working?"
 3              And I said, "No."
 4              And he said, "Are you coming back to work
 5    with us?"  And I thought that was strange because he         16:33:28
 6    will be the new executive A.D.A.  He will take over
 7    for Mr. Van Wagenen in Riverside.  Michael Hestrin's
 8    made that quite clear -- Michael Hestrin,
 9    H-e-s-t-r-i-n -- and so has Mr. Aki.
10              And I said, "No, not that I'm aware of."
11              And then he started to tell me about his
12    lawsuits that he had.  He had a recent one.  I think
13    he's had three or four lawsuits against
14    Mr. Zellerbach.
15              And he said, "I dismissed my lawsuit," and he     16:33:59
16    started to tell me about it, "my lawsuit against
17    Mr. Zellerbach."
18              And I said, "That's wonderful, John.  Why are
19    you telling me this?"
20              And he said, "Well, you know, I don't think
21    the County should be responsible for Mr. Zellerbach's
22    actions."
23              And I said, "Okay" -- excuse me -- and I
24    agreed with him.
25              And then he said, "So are you coming back to
```

1   work for us?"

2          And I said, "John, you just asked me that

3   question.  Why are you asking me that question again?"

4          And he said, "Let me ask it another way.  Do          16:34:29

5   you want to come back to work for us?"

6          I just looked at him, and I thought, oh, and

7   then he started continuing on about dropping the

8   lawsuit or how he dropped his lawsuit.

9          And I said, "Okay.  That's great.  Thank

10  you."

11         And I said, "We'll just have to wait and see

12  what happens."

13         I took that as kind of an extortive view.  I

14  thought, great, you know, now you have somebody who,

15  number one, is going to be the new A.D.A.  He knows

16  whether he's going to hire me back or not or offer me

17  the job, and he's asking me if I want to come back,          16:34:59

18  and impliedly or implicitly there is:  You drop your

19  lawsuit and we'll go ahead and bring you back.

20         So I thought this is just something I don't

21  want to go back to.  More over, Mr. Zellerbach was a

22  judge for ten years.  He's got a lot of friends on

23  that bench.  All it takes is one defense attorney to

24  go, "Objection.  Prosecutorial misconduct."

25         "Sustained."

1          "Counsel you have to report to the State

2     Bar."

3          "Oh."

4          I don't need that and, believe it or not,

5     that does happen, and I -- so I don't want to risk

6     that.

7          More over, there are supervisors who are          16:35:29

8     still going to work in that office, and there's

9     nothing I'm going to do, and I'm going to have to see

10    them every day.  And after having been through what

11    I've went through, I really don't want to make contact

12    or be around those people.  They will -- they'll be

13    looking, you know, at any chance they can to -- I

14    don't know -- undermine my career.  So, you know, bad

15    place as it is at this point, no, I have no intention

16    or desire to go back.

17    Q    I asked you about the election --

18    A    Uh-huh.

19    Q    -- in 2014 --

20    A    Uh-huh.

21    Q    -- when you found out that Mr. Zellerbach and     16:35:59

22    Mr. Lafferty were going to be leaving the office.

23    A    Uh-huh.

24    Q    At that time did you consider coming back?

25    A    The thought had crossed my mind, yes.  But,

                          243                    Volume I

```
 1    again, in the back of my mind the problem I had, I had
 2    to weigh it, and I've seen these judges do this.  I've
 3    seen judges, you know, "Yes, prosecutorial
 4    misconduct."
 5            Oh, I do not want to be in that position.  I
 6    don't go to the country club over there, you know,
 7    Victory Country Club or whatever it is, and I just --      16:36:29
 8    I'm not in the good-old-boy network.  I do my job.  I
 9    go to work, and that's it.  And so there's a risk, and
10    that's the way it works.  People -- you know, you go
11    to get a job -- you know, I've applied to, like, 40
12    jobs, and I haven't had maybe one person contact me on
13    a job with my credentials as a prosecutor.  It's
14    because they call up the office -- I've seen it happen
15    when I worked there -- and they ask, "Hey, who's this
16    Chris Ross guy?  Why is he leaving?"  And none of it's
17    on the record, and it's all hush-hush, and then, "Oh."
18    And you never receive an interview.  You never receive      16:37:00
19    anything.  These are the risks you run.  People, you
20    know, do talk.  We all know it.  And they don't do it
21    on the record, and they don't make it public.
22            So that was running through my mind.  I
23    thought, no, I don't really want to go back into that
24    environment.
25            But then I thought, well, Michael Hestrin
```

```
 1    might be a different -- he was a prosecutor, and I

 2    thought he may be a different type of leader.  It may

 3    change the way, you know, the office is run.  And so I

 4    had to kind of weigh that, and that's where I was at a        16:37:28

 5    balancing point at that point in time.

 6              And then a few weeks ago, maybe six weeks

 7    ago, my encounter with John Aki kind of, you know,

 8    tipped my thought process or made the decision for

 9    me.

10       Q    In December of 2013 why did you make the

11    decision not to go to the fit-for-duty exam with the

12    doctor from UCI?

13       A    I didn't not make a decision to go there.

14    They never gave me the doctor's examination for UCLA.

15    I wanted to go to UCLA.  They wanted me to go to               16:37:59

16    UC Irvine, and I -- my mom had just had a stroke when

17    that happened.  I said, "I can't leave my mom.  I'm in

18    Los Angeles."  So I needed to stay with my mom, and I

19    asked them to make the appointment for UCLA, and that

20    was nurse Julie Witchik -- Wiltchik, W-i-l-t-c-h-i-k,

21    and she said, "Not a problem."

22              At that point I never got -- I never got an

23    appointment.  I kept emailing her and contacting her           16:38:28

24    saying, "Do you want me to make the appointment for

25    you?"  It's not that hard.  Neurology will take you.
```

```
 1          And she said, "No, we can't find anybody in
 2   Los Angeles or anybody in Southern California who will
 3   take you because you won't give us your medical
 4   records and they won't see you unless they have your
 5   medical records."
 6      Q    I think you misheard my question.  I'm going
 7   to ask it again --
 8      A    Uh-huh.
 9      Q    -- so the record's clear.
10          In December of 2013 why did you make the
11   decision not to go at that time for the
12   fitness-for-duty exam with the doctor at UCI?
13      A    You said --                                    16:38:59
14   MR. WEAVER:  Asked and answered.
15   THE WITNESS:  Didn't you say "UCLA" last time?
16   MS. KOLE:  No.
17   THE WITNESS:  Oh, you said "UCI"?  I think I just
18   answered that for you.
19   BY MS. KOLE:
20      Q    To have a clear record, you responded to what
21   you thought I asked about UCLA; right?  I'd appreciate
22   it if you'd answer the question about why you did not
23   go to the UCI doctor.
24      A    Sure.
25          Again, my mom had an endarterectomy.  I
```

1    needed to stay in Los Angeles.  I don't know how to

2    spell "endarterectomy."  It was a surgery on her

3    artery because she had a stroke.  She was ambulatory.        16:39:27

4    She was in the hospital for 12 days.  I needed to take

5    care of her, her pets, her house, et cetera, and I

6    could not leave Los Angeles.  From the time she came

7    home, I had -- I was her caregiver.  I had to take

8    care of her.  And so I requested to go to UCLA, and,

9    of course, Ms. Wiltchik said not a problem, she would

10   do that.

11         Later on through subsequent contacts on

12   multiple occasions via email, she stated that, no,         16:39:58

13   UCLA would not see me without my medical records.  And

14   she also stated that -- eventually she stated that no

15   other doctor in the Southern California or local area

16   would see me -- in the local Southern California area

17   would see me without my medical records.

18   Q    What do you mean by "medical records"?

19   A    Medical records.  That's what she said.  You

20   can ask her for specifics.

21   Q    I'm asking for your understanding.

22        Did you think you had to arrive at the office

23   with a big stack of medical records?

24   A    Which -- okay.  So which -- I'm sorry.  I'm         16:40:31

25   confused.

1          Do you want to know what I thought she meant

2     by "medical records" or whether I had to arrive with a

3     big stack of medical records?

4          Q    I'm asking you if what you thought was to

5     needed to arrive at the fitness-for-duty doctor with a

6     big stack of medical records.

7          A    No, she did not say that, if you want me to

8     elaborate.

9          Q    When you say "medical records," what -- what

10    are you referring to?

11         A    I'm referring to what she referred to, and

12    she stated that she needed my medical records                    16:41:00

13    including my treatment records from the Mayo Clinic

14    and/or Cedars-Sinai, and she needed all of them and

15    any other records that I had from my medical records,

16    and they needed to be provided to this examining

17    doctor, otherwise, they refused to treat me.

18         Q    So she told you you had to get your medical

19    records from the Mayo Clinic and Cedars-Sinai and

20    provide them to the fitness-for-duty doctor?

21         A    No, I had to provide them to her and they

22    would provide them to the fitness-for-duty doctor.               16:41:29

23              In fact, an appointment -- she said they

24    refused to even make an appointment with me until I --

25    until they had reviewed the medical records.

                              248                    Volume I

1    MS. KOLE:  Okay.  I suggest we wrap up for today,

2    and I propose the following stipulation:

3         That we relieve the court reporter of her

4    duties under the code.

5         Oh, I guess I should have asked you first if

6    there's any questions you want to ask today.          16:41:59

7    MR. WEAVER:  No, certainly not.

8         And just to be clear, we're not continuing

9    tomorrow.  We'll meet and confer to come up with a

10    mutually convenient date.

11    MS. KOLE:  Yes, I'd like to do that.

12    MR. WEAVER:  Very good then.

13    MS. KOLE:  Okay.  I'll stipulate that we relieve

14    the court reporter of her duties under the code.

15         I think we should go ahead and have this

16    transcript prepared.

17    MR. WEAVER:  I agree.

18    MS. KOLE:  And I would propose that perhaps

19    Mr. Ross has 45 days to review it since we're coming    16:42:30

20    up to the holiday period and that counsel will apprise

21    me of any changes made to the deposition and when it

22    is signed;

23         That if for any reason the original is lost,

24    that a certified copy may be used for any and all

25    purposes.

1          And am I forgetting anything?

2      MR. WEAVER:  I'll maintain the original.

3      MS. KOLE:  Okay.

4      MR. WEAVER:  I stipulate to that.                    16:43:00

5      MS. KOLE:  Thank you.

6      VIDEOGRAPHER:  This marks the conclusion of media

7  Number 3 in the continuing deposition of Christopher

8  Ross.

9          Today's date is December 9, 2014.  The time is

10  4:43 p.m. and we are off the record.

11              (The proceedings were adjourned

12          at 4:43 p.m.)

13                  --oo0oo--

14          (DECLARATION UNDER PENALTY OF

15          PERJURY ON THE FOLLOWING PAGE)

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5           DECLARATION UNDER PENALTY OF PERJURY

6

7       I hereby declare under penalty of perjury that

8   the foregoing is my deposition under oath; are the

9   questions asked of me and my answers thereto; that I

10  have read same and have made the necessary

11  corrections, additions or changes to my answers that I

12  deem necessary.

13      In witness thereof, I hereby subscribe my name

14  this _12___ day of _January_____, _2015_.

15

16

17

18  ---------------------------------
                    CHRISTOPHER ROSS
19                    (Volume I)

20

21

22

23

24

25

                        251                    Volume I

```
 1                        CERTIFICATE

 2                            OF

 3                CERTIFIED SHORTHAND REPORTER

 4

 5          The undersigned Certified Shorthand Reporter,

 6   licensed in the State of California, does hereby

 7   certify:

 8          That the foregoing deposition was taken

 9   before me at the time and place therein set forth, at

10   which time the witness was duly sworn by me;

11          That the testimony of the witness and all

12   objections made at the time of the examination were

13   recorded stenographically by me and were thereafter

14   transcribed, said transcript being a true copy of my

15   shorthand notes thereof;

16          That the dismantling of the original

17   transcript will void the reporter's certificate.

18          I further declare that I have no interest in

19   the outcome of the action.

20          In witness whereof, I have subscribed my name

21   this date: _____ 12/16/14 _____.

22

23                          Certificate Number 2974

24

25
```

252                                    Volume I

1

2                                   **CORRECTIONS**

3

4    <u>Page</u>      <u>Line</u>          <u>Is</u>          <u>Should Be</u>      <u>Reason for Change</u>

5    45 ln 10        "prosecutors"        "attorneys"

6    58 ln 19                              "position" after A.D.A.

7    74 ln 25                             ","  at end of sentence

8    85 ln 18        "work the"           "work with the"

9    104 ln 5        "prosecutor had"     "prosecutor who had"

10   110 ln 13       "at minimum"         "at a minimum"

11   113 ln 1        "denying anything"   "denying everything"

12   129 ln 17       "I got"              "I got up"

13   136 ln 18       "Had to"             "I had to"

14   137 ln 13       "about that"         "about that later"

15   142 ln 1        "overall which"      "which overall"

16   150 ln 13   "Knowledge and intent to act"   "Knowledge, intent, and an act"

17   171 ln 25       "This a"             "This is a"

18   202 ln 14       "you're getting"     "you're not getting"

19   204 ln 8        "we are"             "like our"

20   210 ln 25       "Said"               "He said"

21   ~~[struck through]~~

22   243 ln 45   "so, you know, bad place"   "so, you know, as bad

23                                             a place"

24

25                  Signature of witness _____

# Exhibits

TORNELL & COTTEN
PROFESSIONAL COURT REPORTERS

1401 N. TUSTIN AVE.
SUITE 160
SANTA ANA, CALIFORNIA 92705
(714) 543-1600
FAX (714) 543-1614

www.tornellandcotten.com

e-mail: depos@tornellandcotten.com

1   Chris M. Heikaus Weaver, Bar No. 231907
    Darren J. Campbell, Bar No. 223088
2   Aitken Campbell Heikaus Weaver, LLP
    3877 Twelfth St.
3   Riverside, CA 92501
    Telephone: (951) 530-4840
4   Facsimile:   (951) 344-1762
    chris@achwlaw.com
5   darren@achwlaw.com

6
    Attorneys for Plaintiff
7   CHRISTOPHER ROSS

8

9

10

11                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                              **COUNTY OF RIVERSIDE**

13

14   CHRISTOPHER ROSS,                    )   Case No. P.S.C.1403729
                                          )
15          Plaintiff.                    )   *Assigned to the Hon. Judge David M.*
                                          )   *Chapman, Department PS2*
16   v.                                   )
                                          )   **PLAINTIFF CHRISTOPHER ROSS'**
17   COUNTY OF RIVERSIDE; PAUL            )   **RESPONSES TO DEFENDANT**
     ZELLERBACH, as an individual and as the )  **COUNTY OF RIVERSIDE'S SPECIAL**
18   District Attorney, SEAN LAFFERTY, as an )   **INTERROGATORIES, SET ONE**
     individual and as an Assistant District )
19   Attorney; DAVID GREENBERG, as an    )
     individual and as the Chief Deputy District )   Complaint Filed: July 10, 2014
20   Attorney; JEFFREY VAN WAGENEN, as   )   Trial Date: None Set
21   an individual and as an Assistant District )   Demurrer: October 31, 2014
     Attorney, TRICIA FRANSDAL, as an     )   Case Management Conference: January 6,
22   individual and as a Deputy District Attorney )   2015
                                          )
23                                        )
            Defendants.
24   _____

25

26                                                        

27

28                                        1

PROPOUNDING PARTY:   Defendant, COUNTY OF RIVERSIDE

RESPONDING PARTY:    Plaintiff, CHRIS ROSS

SET NO.:                  ONE

      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

      Plaintiff Chris Ross (hereafter "Plaintiff") responds as follows to Special Interrogatories – Set One, propounded by Defendant County of Riverside (hereafter "Defendant").

## SPECIAL INTERROGATORIES

**SPECIAL INTERROGATORIES NO. 1:**

      Identify all dates YOU (as used herein, the term "YOU" and "YOUR" shall refer to Plaintiff Christopher Ross) received MEDICAL TREATMENT (as used herein, the term "MEDICAL TREATMENT" shall refer to treatment, examinations, and/or consultations provided or performed by any health care provider) at Cedars-Sinai Medical Center from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO.1:**

      May 24, 31; June 5

**SPECIAL INTERROGATORIES NO. 2:**

      Identify all dates YOU received MEDICAL TREATMENT at the Mayo Clinic in Arizona from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO.2:**

      July 15, 17, 18, 19, 2013, August 2, 28, 29, 30, 2013; September 6, 9, 18, 19, 2013; October 1, 2013; November 14, 2013.

**SPECIAL INTERROGATORIES NO. 3:**

      Identify all dates YOU received MEDICAL TREATMENT at the UCLA Medical Center from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 3:**

PLAINTIFF CHRIS ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL INTERROGATORIES, SET ONE

1   None.

2   **SPECIAL INTERROGATORIES NO. 4:**

3   Identify all dates YOU received MEDICAL TREATMENT at the UCLA Neurology Outpatient

4   Clinic from February 1, 2013 to June 12, 2014.

5   **RESPONSE TO SPECIAL INTERROGATORIES NO. 4:**

6   None.

7   **SPECIAL INTERROGATORIES NO. 5:**

8   Identify all dates YOU received MEDICAL TREATMENT from Eli Baron, M.D. from February

9   1, 2013 to June 12, 2014

10  **RESPONSE TO SPECIAL INTERROGATORIES NO. 5:**

11  May 24 and June 5, 2013.

12  **SPECIAL INTERROGATORIES NO. 6:**

13  Identify all health care providers from whom YOU have received MEDICAL TREATMENT

14  relating to Amyotrophic Lateral Sclerosis from February 1, 2013 to June 12, 2014.

15  **RESPONSE TO SPECIAL INTERROGATORIES NO. 6:**

16  Dr. Tatini, Dr. Vargas, Dr. Dunkel-Driver, Dr. Ross, Dr. Bogle, Dr. Chang.

17  **SPECIAL INTERROGATORIES NO. 7:**

18  Identify all dates YOU received MEDICAL TREATMENT relating to Amyotrophic Lateral

19  Sclerosis from February 1, 2013 to June 12, 2014.

20  **RESPONSE TO SPECIAL INTERROGATORIES NO. 7:**

21  July through September 2013.

22  **SPECIAL INTERROGATORIES NO. 8:**

23  Identify all health care providers from whom YOU have received MEDICAL TREATMENT relating

24  to Post-Traumatic Concussion Syndrome from February 1, 2013 to June 12, 2014.

25  **RESPONSE TO SPECIAL INTERROGATORIES NO. 8:**

26  Dr. Tatini, Dr. Vargas, Dr. Dunkel-Driver, Dr. Bogle

27  **SPECIAL INTERROGATORIES NO. 9:**

28

3

**PLAINTIFF CHRIS ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL
INTERROGATORIES, SET ONE**

1   Identify all dates YOU received MEDICAL TREATMENT relating to Post-Traumatic

2   Concussion Syndrome from February 1, 2013 to June 12, 2014.

3   **RESPONSE TO SPECIAL INTERROGATORIES NO. 9:**

4   July through September 2013.

5   **SPECIAL INTERROGATORIES NO. 10:**

6   Identify all health care providers from whom YOU have received MEDICAL TREATMENT

7   relating to any medical condition for which YOU allege YOU attempted to obtain work accommodation

8   from February 1, 2013 through June 12, 2014 from YOUR former employer the County of Riverside.

9   **RESPONSE TO SPECIAL INTERROGATORIES NO. 10:**

10  Dr. Baron, Dr. Tatini, Dr. Ross, Dr. Chivers, Dr. Butters, Dr. Jameson, Dr. Schiff, Dr. Dunkel-

11  Driver, Dr. Young, Dr. Chang, Dr. Lewis, Dr. Vargas, Dr. Parish, Dr. Pittelkow, Dr. Wethe, Dr. Karlin,

12  Dr. Hu, Dr. Smith.

13  **SPECIAL INTERROGATORIES NO. 11:**

14  Please describe the substance of all communications YOU had with the County of Riverside

15  about YOUR medical condition from February 1, 2013 to June 12, 2014.

16  **RESPONSE TO SPECIAL INTERROGATORIES NO. 11:**

17  Plaintiff had conversations with Riverside County Nurse Julie Wiltchik regarding scheduling a

18  medical examination regarding symptoms of myelopathogenesis and ataxia for Plaintiff's fitness for

19  duty.

20  **SPECIAL INTERROGATORIES NO. 12:**

21  Please describe the substance of all communications YOU had with Paul Zellerbach about

22  YOUR medical condition from February 1, 2013 to June 12, 2014.

23  **RESPONSE TO SPECIAL INTERROGATORIES NO. 12:**

24  Plaintiff does not recall any communications between he and Paul Zellerbach directly.  However,

25  Sean Lafferty told Plaintiff several times that Mr. Lafferty had spoken directly to Mr. Zellerbach about

26  Plaintiff's situation.

27

28

**PLAINTIFF CHRIS ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL INTERROGATORIES, SET ONE**

**SPECIAL INTERROGATORIES NO. 13:**

Please describe the substance of all communications YOU had with Sean Lafferty about YOUR medical condition from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 13:**

Plaintiff sent a letter to David Greenberg regarding his medical situation. Sean Lafferty discussed Plaintiff's medical situation and treatment with Paul Zellerbach, Jeffrey Van Wagenen, and others. The communications concerned, among other things, Plaintiff's medical treatment and its effect on the homicide unit; Plaintiff's job performance; Plaintiff's transfer from homicides into the filings department; the Mayo Clinic's diagnosis of post traumatic concussion syndrome and diseases that had been ruled out; Plaintiff's need for a reduction of stress in his job; accusations that Plaintiff was being insubordinate in refusing to provide the details of his medical diagnosis and treatment; Plaintiff's need for leave under the Family Medical Leave Act; and the Union Memorandum of Understanding allegedly authorizing the County to require Plaintiff to produce a doctor's note to return to work and to be examined by a physician for a fitness for duty examination.

**SPECIAL INTERROGATORIES NO. 14:**

Please describe the substance of all communications YOU had with David Greenberg about YOUR medical condition from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 14:**

Plaintiff discussed with Mr. Greenberg the Cedars Sinai physician diagnosis of symptoms of myelopathogenesis and ataxia; other potential diagnoses; the Mayo Clinic diagnosis of post traumatic concussion syndrome; Plaintiff's trial schedule and the lack of any scheduling conflicts; Plaintiff's request for an accommodation in the form of no new assignment of cases until conclusion of treatment at Mayo Clinic; Plaintiff's reassignment; and Plaintiff's need for a reduction of stress.

**SPECIAL INTERROGATORIES NO. 15:**

Please describe the substance of all communications YOU had with Jeffrey Van Wagenen about YOUR medical condition from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 15:**

Plaintiff does not recall any communications directly with Mr. Van Wagenen about his medical condition, but Sean Lafferty told me several times that he had spoken directly to Mr. Van Wagenen about my situation.  In addition, Mr. Van Wagenen did speak with Plaintiff's union representatives-Anthony Fimbres and John Aki-about his situation.

**SPECIAL INTERROGATORIES NO. 16:**

Please describe the substance of all communications YOU had with Tricia Fransdal about YOUR medical condition from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 16:**

Plaintiff discussed with Tricia Fransdal his medical condition, his need for a reduction of stress; his case load; and the reassignment to a new position.

**SPECIAL INTERROGATORIES NO. 17:**

Please describe the substance of all communications YOU had with the County of Riverside about YOUR request(s) for work accommodation from February 1, 2013 to June 12, 2014.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 17:**

Plaintiff objects that this request is vague and ambiguous.  The County is not a person with whom Plaintiff could have communications.  Plaintiff did have various discussions about his disability and medical condition and need for accommodation or leave as discussed in response to other interrogatories.

**SPECIAL INTERROGATORIES NO. 18:**

Please describe the substance of all communications YOU had with Paul Zellerbach about YOUR request(s) for work accommodation from February 1, 2013 to June 12, 2004.

**RESPONSE TO SPECIAL INTERROGATORIES NO. 18:**

Plaintiff does not recall any communications between he and Paul Zellerbach directly.  However, Sean Lafferty told Plaintiff several times that Mr. Lafferty had spoken directly to Mr. Zellerbach about Plaintiff's situation.

**SPECIAL INTERROGATORIES NO. 19:**

6

1     Please describe the substance of all communications YOU had with Sean Lafferty about YOUR

2  request(s) for work accommodation from February 1, 2013 to June 12, 2004.

3  **RESPONSE TO SPECIAL INTERROGATORIES NO. 19:**

4     Plaintiff discussed with Mr. Lafferty his need for a reduction of stress temporarily, the need for a

5  temporary break from assignment of new cases, and the County's threat to reassign Plaintiff.

6  **SPECIAL INTERROGATORIES NO. 20:**

7     Please describe the substance of all communications YOU had with David Greenberg about

8  YOUR request(s) for work accommodation from February 1, 2013 to June 12, 2004.

9  **RESPONSE TO SPECIAL INTERROGATORIES NO. 20:**

10    Plaintiff discussed with Mr. Greenberg his need for a reduction of stress temporarily, the need

11  for a temporary break from assignment of new cases, and the County's threat to reassign Plaintiff.

12  **SPECIAL INTERROGATORIES NO. 21:**

13    Please describe the substance of all communications YOU had with Jeffrey Van Wagenen about

14  YOUR request(s) for work accommodation from February 1, 2013 to June 12, 2004.

15  **RESPONSE TO SPECIAL INTERROGATORIES NO. 21:**

16    Plaintiff does not recall any communications between he and Jeffrey Van Wagenen directly.

17  However, Sean Lafferty told Plaintiff several times that Mr. Lafferty had spoken directly to Mr. Van

18  Wagenen about Plaintiff's situation.

19  **SPECIAL INTERROGATORIES NO. 22:**

20    Please describe the substance of all communications YOU had with Tricia Fransdal about YOUR

21  request(s) for work accommodation from February 1, 2013 to June 12, 2004.

22  **RESPONSE TO SPECIAL INTERROGATORIES NO. 22:**

23    Plaintiff discussed with Ms. Fransdal his need for a reduction of stress temporarily, the need for a

24  temporary break from assignment of new cases, and the County's threat to reassign Plaintiff.

25

26

27

28

PLAINTIFF CHRIS ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL
INTERROGATORIES, SET ONE

Dated: November ⸺, 2014

**AITKEN CAMPBELL HEIKAUS WEAVER, LLP**

By ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

Chris Heikaus Weaver
Attorney for Plaintiff
CHRISTOPHER ROSS

8

<u>VERIFICATION</u>

STATE OF CALIFORNIA                )
                                   )  ss:
COUNTY OF RIVERSIDE                )

I, CHRISTOPHER ROSS, declare:

I am the Plaintiff in this action.  I have read the foregoing **PLAINTIFF CHRISTOPHER ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL INTERROGATORIES, SET ONE** and know the contents thereof; that the information contained therein is true of my own knowledge except as to matters which are based on my information and belief and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 12, 2014 at Riverside, California.

Christopher Ross

9

**PLAINTIFF CHRIS ROSS' RESPONSES TO DEFENDANT COUNTY OF RIVERSIDE'S SPECIAL INTERROGATORIES, SET ONE**

(PROOF OF SERVICE BY MAIL – FRCP RULE 5)
STATE OF CALIFORNIA, COUNTY OF RIVERSIDE

I am a resident of/employed in Riverside County, California; I am over 18 years of age and not a party to the within action; my business address is 3890 Eleventh St., Riverside, CA 92501.

On November 13, 2014, I served the documents listed below on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| CYNTHIA W. KOLE<br>WOODRUFF, SPRADLIN & SMART, APC<br>555 Anton Boulevard, Suite 1200<br>Costa Mesa, California 92626-7670 | Attorneys for Defendants<br>COUNTY OF RIVERSIDE, et al. |
|---|---|

☒     BY MAIL: I deposited such envelope, with postage thereon fully prepaid, in the United States mail at Anaheim, California.

☐     BY PERSONAL SERVICE: I arranged for delivery of such envelope by hand to the office(s) of the addressee(s).

☐     BY EXPRESS MAIL: On the date stated herein, I personally caused said document(s) to be delivered to the office(s) of the addressee(s) by placing document(s) in a UPS Next Business Day Delivery.

☐     BY ELECTRONIC SERVICE THROUGH ATTORNEY SERVICE: I electronically uploaded a true copy in Adobe "pdf" format to a qualified attorney service for electronic filing through the Court's system. During the electronic filing process, I selected "e-Service" to the e-mail address of the parties on the attached Service List. It is my understanding that the attorney service sends an e-mail to the selected parties with a link to the electronically filed document.

☐     BY FACSIMILE: Pursuant to C.C.P. Section 1013(e) and 1013(f) I caused said documents to be transmitted to the fax number(s) of the office(s) of the addressee(s):

**Plaintiff Christopher Ross' Responses to Form Interrogatories – Employment Law; Plaintiff Christopher Ross' Responses to Special Interrogatories; Plaintiff Christopher Ross' Responses to Requests for Admission; Plaintiff Christopher Ross' Responses to Requests for Production of Documents; CD containing document production**

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed on November 13, 2014 at Riverside, California.

_____
Chris Heikaus Weaver

RECEIVED

CLAIM# 060-14  SUM# 14-143

JUL 24 2014

CLERK OF THE BOARD OF SUPERVISORS
COUNTY OF RIVERSIDE, STATE OF CALIFORNIA
BY_____ Deputy

**COPY**

**SUM-100**

## SUMMONS
### (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 10 2014

C. Banda

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

COUNTY OF RIVERSIDE; Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CHRISTOPHER ROSS

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| (El nombre y dirección de la corte es): Riverside Superior Court | (Número del Caso): |
| 3255 E. Tahquitz Canyon Way | 1403729 |
| Palm Springs, CA 92262 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):

Chris M. Heilscus Weaver, 3877 Twelfth St., Riverside, CA 92501; 951-530-4840

| DATE: JUL 10 2014 | Clerk, by C. Banda | , Deputy |
|---|---|---|
| (Fecha) | (Secretario) | (Adjunto) |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): County of Riverside

   under: ☐ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☒ other (specify): unknown
4. ☒ by personal delivery on (date): 7-24-14

SUMMONS

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov



DEFENDANT'S EXHIBIT NO. 2 FOR IDENTIFICATION Ross DATE 12/9/14 RPTR: pt

COPY

Chris M. Heikaus Weaver, Bar No. 231907
Darren J. Campbell, Bar No. 223088
Aitken Campbell Heikaus Weaver, LLP
3877 Twelfth St.
Riverside, CA 92501
Telephone: (951) 530-4840
Facsimile:  (951) 344-1762
chris@achwlaw.com
darren@achwlaw.com

Attorneys for Plaintiff
CHRISTOPHER ROSS

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 10 2014

C. Banda

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

| | |
|---|---|
| CHRISTOPHER ROSS, | Case No. P.S.C. 1403729 |
| Plaintiff, | COMPLAINT FOR RETALIATION AND DISABILITY DISCRIMINATION |
| v. | DEMAND FOR JURY TRIAL |
| COUNTY OF RIVERSIDE; PAUL ZELLERBACH, as an individual and as the District Attorney; SEAN LAFFERTY, as an individual and as an Assistant District Attorney; DAVID GREENBERG, as an individual and as the Chief Deputy District Attorney; JEFFREY VAN WAGENEN, as an individual and as an Assistant District Attorney, TRICIA FRANSDAL, as an individual and as a Deputy District Attorney | |
| Defendants. | |

Plaintiff CHRISTOPHER ROSS alleges:

1
COMPLAINT FOR DAMAGES

## NATURE OF ACTION

1.     Plaintiff Christopher Ross – a disabled veteran and highly successful career prosecutor – has been the subject of a campaign of harassment, discrimination and retaliation by his employer, the County of Riverside, and supervisors. More specifically, Plaintiff is being punished for: (1) exercising his right of free speech and his full compliance with his legal and ethical obligations as a prosecutor in recommending dismissal of murder charges against an innocent man; and (2) his medical disability, sustained during the course of his military service.

## JURISDICTION AND VENUE

2.     Plaintiff Christopher Ross is a citizen of California, residing in Los Angeles County, California. During the relevant time period herein, Plaintiff was employed by Defendant County of Riverside.

3.     Defendant County of Riverside was and is a duly chartered public entity, empowered under the laws of the State of California with the authority to act as the governing party for the County of Riverside.

4.     Defendant Paul Zellerbach is the duly elected District Attorney for the County of Riverside. He is a former Judge of Riverside Superior Court. Plaintiff is informed and believes that during the relevant time period, Defendant Zellerbach resided in Riverside County.

5.     Defendant Sean Lafferty is the Assistant District Attorney for the County of Riverside, Southwest Division. Defendant Lafferty has been elected as a Judge of Riverside Superior Court. Plaintiff is informed and believes that during the relevant time period, Defendant Lafferty resided in Riverside County.

6.     Defendant David Greenberg is the Chief Deputy District Attorney for the County of Riverside. Plaintiff is informed and believes that during the relevant time period, Defendant Greenberg resided in Riverside County.

7.     Defendant Jeffrey Van Wagenen is the Assistant District Attorney for the County of Riverside. Plaintiff is informed and believes that during the relevant time period, Defendant Van Wagenen resided in Riverside County.

8.      Defendant Tricia Fransdal is a Deputy District Attorney for the County of Riverside. Plaintiff is informed and believes that during the relevant time period, Defendant Fransdal resided in Riverside County.

<u>FACTUAL BACKGROUND</u>

<u>DEFENDANTS RETALIATED AGAINST PLAINTIFF FOR OBJECTING TO</u>

<u>THEIR INSISTENCE THAT HE PROSECUTE AN INNOCENT MAN FOR MURDER</u>

9.      Plaintiff Christopher Ross began his employment with the Riverside County District Attorney's Office on October 1, 2005. Ross is a talented and successful prosecutor. He quickly rose through the ranks until he was prosecuting the most serious offenses, including death penalty cases. His record as of June 2013 was 59-0-1.

10.     In 2011, Plaintiff was assigned a murder case against Roger Wayne Parker. He was assigned the case after another prosecutor refused to prosecute the case due to lack of evidence against the accused. In late 2011, Plaintiff completed a memo analyzing the case against Parker, in which he concluded that the current evidence was insufficient to prosecute Parker. Plaintiff then requested further DNA analysis of physical evidence against Parker. The results of this analysis were inconclusive at best. Plaintiff then (in May 2012) completed another memo, in which he recommended -- after thorough analysis of all evidence -- that the District Attorney "[d]ismiss the case as it appears rife with reasonable doubt." In Plaintiff's view, the facts demonstrated extremely shoddy police work that coerced a confession from an innocent man with significant intellectual disabilities who plainly knew nothing about the crime. The evidence, in fact, pointed to another individual as the guilty party.

11.     Plaintiff's supervisor at the District Attorney's office refused to accept Plaintiff's recommendation, ordering that Plaintiff submit yet more physical evidence for DNA analysis. These results continued to be inconclusive at best and arguably supported the accused's innocence.

12.     Plaintiff also conducted further investigation into the case. He discovered that another suspect, whom the police initially ruled out, had been recorded confessing to the murder. In October 2013, Plaintiff issued an updated memo notifying the District Attorney's office of this fact and recommending dismissal of the case against Parker. Plaintiff's supervisor, Defendant Sean Lafferty,

responded with anger and hostility.  Ultimately, Defendant Lafferty and the District Attorney's Office reassigned the Parker case to another prosecutor.  Defendant Lafferty instructed Plaintiff not to turn over exculpatory evidence -- the recorded confession -- to Parker's attorney.

13.     On information and belief, only weeks before the filing of this action, the District Attorney's office formally dismissed all charges against Parker.

<u>DEFENDANTS SUBJECTED PLAINTIFF, A VETERAN, TO HARASSMENT, DISCRIMINATION</u>
<u>AND RETALIATION BASED ON HIS MEDICAL CONDITION</u>

14.     In approximately July 2013, a doctor recommended that Plaintiff see a neurologist based on symptoms he was displaying.  He was initially evaluated at Cedars-Sinai, where he was warned that he might be suffering from a number of neurological conditions, including amyotrophic lateral sclerosis (ALS or "Lou Gehrig's disease").  In August 2013, Plaintiff began travelling to the Mayo Clinic in Arizona for diagnosis by specialists.  Ultimately, Plaintiff was diagnosed with Post-Traumatic Concussion Syndrome.  His doctors believe that Plaintiff suffered from traumatic brain injuries while serving in the Army in Iraq, where he served on the frontlines dealing with explosives on a regular basis.

15.     Plaintiff told his supervisor Tricia Fransdal in late July 2013 that he needed a medical evaluation.  He requested an accommodation in the form of a transfer out of his homicide assignment until his diagnostic procedures were complete.  Ms. Fransdal refused the accommodation request until Plaintiff had a full diagnosis.  The very next day, she called Plaintiff into her office and assigned him two new murder cases, bringing his total cases to 8 murder cases.  By comparison, the other members of the homicide team were handling 3, 6 and 10 murder cases, respectively.

16.     Plaintiff took steps to schedule his cases to accommodate his medical treatment at the Mayo Clinic.  In approximately the second week of August, Defendant Chief Deputy District Attorney David Greenberg called Plaintiff and informed Plaintiff that he was aware of Plaintiff's medical situation.  Mr. Greenberg asked whether Plaintiff needed to transfer to a complaint-filing position and have his cases transferred to other prosecutors.  Plaintiff told him this was unnecessary that he had adjusted his calendar and hearing dates to accommodate his periodic visits to the Mayo Clinic until the end of the year.

17.    Plaintiff, however, did request an accommodation from Mr. Greenberg in the form of no further assignment of homicide cases until Plaintiff's medical evaluation at the Mayo Clinic was complete. Plaintiff explained that they would discuss any further necessary accommodations after the diagnosis was complete because Plaintiff anticipated that he would be able to try cases with many of the possible diagnoses. The discussion at this time was pleasant and professional.

18.    In or about early October 2013, after Plaintiff was transferred off of the Parker case, Ms. Fransdal assigned him another homicide case. Plaintiff reminded Ms. Fransdal that he had requested that he not be assigned additional homicide cases through the end of the year while visiting the Mayo Clinic for evaluation. Plaintiff requested that she refrain from assigning the case to him, at least temporarily. Ms. Fransdal refused and insisted that he was obligated to take the case now.

19.    Plaintiff went to Mr. Greenberg and complained that Ms. Fransdal was not accepting his request for a reasonable accommodation, contrary to Defendant Greenberg's earlier agreement that no additional cases would be assigned to Plaintiff while undergoing medical evaluation.

20.    About a week thereafter, Plaintiff was summoned to a meeting with Defendant Assistant District Attorney Sean Lafferty, Defendant Greenberg, and Ms. Fransdal. Defendant Lafferty demanded to know what was medically wrong with Plaintiff. Plaintiff informed him that he had been diagnosed with Post-Traumatic Concussion Syndrome as a result of military service, as well as a possible autoimmune disorder. Plaintiff informed his superiors that he was still being evaluated, but that he had been advised by his treating doctors to avoid stress. Plaintiff told his supervisors that he would keep them informed of updates.

21.    In this meeting, Defendant Lafferty told Plaintiff that he was a non-productive member of the homicide unit because (1) he was not going to trial in the following six weeks, and (2) he could not take two more new murder cases, and that Defendant Lafferty had no one else available to whom he could assign the cases. Defendant Lafferty then informed Plaintiff that he was being demoted to a filings assignment because of his medical condition.

22.    Defendant Lafferty's assertion that Plaintiff was a "non-productive" employee was false because (1) it is not uncommon for homicide prosecutors to go six weeks or more without going to trial,

1   and (2) at that time, Plaintiff was carrying more homicide cases than several other prosecutors in the

2   unit.

3        23.   During the last week of October 2013, Plaintiff was called into another meeting and told

4   by Defendant Lafferty that Plaintiff was "going out on FMLA leave." Plaintiff had never requested to

5   go out on leave. When Plaintiff later explained this to Human Resources, the Human Resources

6   employee informed him that he did not have to go out on FMLA leave unless he wanted to. Plaintiff

7   informed her that he did not want or need to use FMLA leave at that time.

8        24.   A few days later, Plaintiff was summoned to another meeting with Defendant Lafferty.

9   Defendant Lafferty confirmed that Plaintiff was being demoted to filings effective November 1.

10   Defendant Lafferty also told Plaintiff that he was required to provide a doctor's note stating that Plaintiff

11   was medically able to work, and if Plaintiff did not do so, he would not be allowed to "return" to work.

12   At this point, Plaintiff had never left work and was not required to provide any proof of his ability to

13   "return" to work. Defendant Lafferty continued to insist that Plaintiff had to provide him with a

14   doctor's note. Plaintiff repeatedly explained that he was not required to do so because he had never

15   been on leave.

16        25.   A few days later, Plaintiff was summoned to another meeting with Defendant Lafferty.

17   Defendant Lafferty began by again asking what was medically wrong with Plaintiff. Plaintiff again

18   explained the diagnosis. Defendant Lafferty became agitated and angry and began yelling at Plaintiff.

19   He accused Plaintiff of insubordination for refusing to provide a doctor's note to return to work. After a

20   break, Plaintiff returned to the meeting along with his Union representative.

21        26.   Defendant Lafferty stated that he was sending Plaintiff home under a provision of the

22   governing Memorandum of Understanding ("MOU"), which permits a department head to place a

23   prosecutor on leave where there is good cause to believe that the he or she may be a danger to the health

24   of the public, himself, or other District Attorney employees. Defendant Lafferty, however, refused to

25   provide his good cause basis during that meeting and stated he would do so in writing later.

26        27.   Since that meeting, Plaintiff has been on administrative leave. Under the provision of the

27   MOU, the County of Riverside must arrange for the employee to be evaluated by an independent

28

1   medical specialist. The County first attempted to send Plaintiff to a County-employed doctor. When

2   Plaintiff objected, the County then demanded that Plaintiff provide his medical records. Plaintiff

3   objected that the evaluation is required to be an independent evaluation. The County has refused to

4   permit Plaintiff to return to work unless he provides his medical records for evaluation.

5        28.    On or about January 27, 2014, Assistant District Attorney Jeffrey Van Wagenen informed

6   Plaintiff's union representative that Plaintiff was obligated to waive his rights under HIPPA and provide

7   his medical records. Mr. Van Wagenen stated that failure to do so would lead to discipline for

8   insubordination. The County continued to refuse to permit Plaintiff to return to work unless he provided

9   medical records prior to a fitness for duty exam.

10        29.    Plaintiff resigned his employment on or about April 24, 2014, being unable to return to

11   work under the intolerable conditions established by Defendants. No reasonable person would have

12   continued working in the position under those circumstances.

13        30.    On information and belief, Defendants Fransdal, Lafferty, Greenberg, and Van Wagenen

14   acted at the specific direction of Zellerbach and with his express knowledge and consent of their actions.

15   EXHAUSTION OF REMEDIES

16        31.    On February 27, 2014, Plaintiff filed a claim for damages with the County of Riverside.

17   On March 10, 2014, the Clerk of the Board of Supervisors rejected the claim and issued a letter

18   indicating that Plaintiff had six months to file suit under California law.

19        32.    On February 11, 2014, Plaintiff filed a complaint against Defendants with the Department

20   of Fair Employment and Housing ("DFEH") alleging multiple violations of California's Fair

21   Employment and Housing Act ("FEHA"). Plaintiff subsequently received a Right To Sue letter from the

22   DFEH.

23   FIRST CLAIM FOR RELIEF

24   Violation Of California Labor Code Section 1102.5

25   (Against All Defendants)

26        33.    The preceding paragraphs of this Complaint are realleged and herein incorporated by

27   reference.

28

7
COMPLAINT FOR DAMAGES

34.     California Labor Code Section 1102.5 bars employers from retaliating against employees for disclosing a violation of a state or federal statue or regulation or refusing to participate in activity that would result in violation of a state or federal statute or regulation.

35.     Plaintiff was retaliated against because he reported to his employer that it was in violation of the law by prosecuting an innocent man in violation of guarantees to due process under the Fifth and Sixth Amendments to the U.S. Constitution (and similar guarantees under the California Constitution), the bar against cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution (and similar guarantees under the California Constitution), the Fourteenth Amendment's bar against discriminatory prosecution, falsely imprisoning a defendant without probable cause in violation of California Penal Code Section 236, and prosecuting without probable cause in violation of California Rule of Professional Conduct 5-110.

36.     The retaliation took the form of assigning him additional cases when Plaintiff had asked for a temporary break from new cases, demoting Plaintiff (depriving him from significant "overtime" compensation), placing Plaintiff on administrative leave, and pressuring Plaintiff to waive his HIPPA rights. Ultimately, this retaliation led to the constructive termination of Plaintiff's employment.

37.     As a direct result of the retaliation faced by Plaintiff, he has sustained, and continues to sustain, substantial losses in earnings and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

## SECOND CLAIM FOR RELIEF

### Disability Discrimination And Retaliation In Violation Of

### The Fair Employment And Housing Act

### (Against Defendant County of Riverside)

38.     The preceding paragraphs of this Complaint are realleged and herein incorporated by reference.

39.     At all times herein mentioned, the FEHA, embodied in Government Code section 12940 was in full force and effect. This act prohibits discrimination based on physical and mental disability, as well as on other grounds.

6

40.     Defendant County of Riverside is a qualified employer subject to the requirements of FEHA.

41.     Defendant County of Riverside discriminated against Plaintiff on the basis of his real or perceived disability.  This disability has caused Plaintiff to suffer significant limitations to major life activities, including insomnia, unsteady gait, and problems with elimination.  On information and belief, Defendant County of Riverside perceived Plaintiff to have a neurological condition that significantly interfered with his ability to, among other things, work.  The discrimination includes demoting Plaintiff and placing him on administrative leave, requiring clearance from a doctor to return to work, and the constructive termination of his employment.

42.     As a result of the discriminatory acts, Plaintiff suffered from stress and anxiety which has negatively impacted his physical and emotional condition.

43.     Plaintiff believes and thereon alleges that any claims of misconduct, necessity, or performance issues as the basis for any disciplinary actions against Plaintiff are pretextual and meant to disguise the discriminatory reasons for his treatment.

44.     As a direct and proximate cause of the discrimination, Plaintiff has suffered and continues to suffer general, compensatory, and special damages, including lost wages and benefits, future loss of wages and benefits, and emotional distress and physical illness in an amount unknown, but according to proof at trial.

45.     Moreover, Plaintiff is entitled to attorneys' fees and costs for bringing suit alleging these violations.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees as a result of his FEHA claims against County of Riverside, and the other defendants.  Plaintiff is presently unaware of the precise amount of these expenses and fees, but seeks an award of attorneys' fees and costs according to proof at trial.

THIRD CAUSE OF ACTION

Failure To Engage In the Interactive Process In Violation Of The

Fair Employment And Housing Act

(Against Defendant County of Riverside)

9

46.     Plaintiff realleges and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

47.     At all times herein mentioned, the FEHA, embodied in Government Code section 12940 was in full force and effect. This act requires that employers engage employees known to have disabilities in the interactive process.

48.     Defendant County of Riverside is a qualified employer subject to the requirements of FEHA.

49.     When Plaintiff requested accommodations as alleged above, Defendant County of Riverside failed to engage Plaintiff in the interactive process. Accordingly, Plaintiff's requests for a reasonable accommodation were ignored.

50.     As a result of the County's failure to engage with Plaintiff in the interactive process, Plaintiff was discriminated against based on his perceived or actual disability and was never given a reasonable accommodation. Plaintiff has suffered from stress and anxiety which has negatively impacted his physical and emotional condition due to the County failure to engage in the interactive process.

51.     Plaintiff believes and thereon alleges that any claims of misconduct, necessity, or performance issues as the basis for any disciplinary actions against Plaintiff are pretextual and meant to disguise the discriminatory reasons for his treatment.

52.     As a direct and proximate cause of the discrimination, Plaintiff has suffered and continues to suffer general, compensatory, and special damages, including lost wages and benefits, future loss of wages and benefits, and emotional distress and physical illness in an amount unknown, but according to proof at trial.

53.     Moreover, Plaintiff is entitled to attorneys' fees and costs for bringing suit alleging these violations. Plaintiff has incurred and continues to incur legal expenses and attorneys' fees as a result of his FEHA claims against the County. Plaintiff is presently unaware of the precise amount of these expenses and fees, but seeks an award of attorneys' fees and costs according to proof at trial.

<u>FOURTH CAUSE OF ACTION</u>

Failure To Provide A Reasonable Accommodation Under The

Fair Employment And Housing Act

(Against Defendant County of Riverside)

54.     Plaintiff realleges and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

55.     At all times herein mentioned, the FEHA, embodied in Government Code section 12940 was in full force and effect.  This act requires that employers provide reasonable accommodations to employees with actual or perceived disabilities.

56.     Defendant County of Riverside is a qualified employer subject to the requirements of FEHA.

57.     When Plaintiff requested accommodations as alleged above, Defendant County of Riverside failed to engage Plaintiff in the interactive process.  Accordingly, Plaintiff's requests for a reasonable accommodation were ignored.

58.     Defendant County of Riverside failed to provide a reasonable accommodation relating to Plaintiff's need for a temporary pause from receiving new case assignments.  Due to the County's failure to provide Plaintiff with a reasonable accommodation, Plaintiff has suffered from stress and anxiety which has negatively impacted his physical and emotional condition.

59.     Plaintiff believes and thereon alleges that any claims of misconduct, necessity, or performance issues as the basis for any disciplinary actions against Plaintiff are pretextual and meant to disguise the discriminatory reasons for his treatment.

60.     As a direct and proximate cause of the discrimination, Plaintiff has suffered and continues to suffer general, compensatory, and special damages, including lost wages and benefits, future loss of wages and benefits, and emotional distress and physical illness in an amount unknown, but according to proof at trial.

61.     Moreover, Plaintiff is entitled to attorneys' fees and costs for bringing suit alleging these violations.  Plaintiff has incurred and continues to incur legal expenses and attorneys' fees as a result of

COMPLAINT FOR DAMAGES

his FEHA claims against the County.  Plaintiff is presently unaware of the precise amount of these expenses and fees, but seeks an award of attorneys' fees and costs according to proof at trial.

### FIFTH CAUSE OF ACTION

Disability Harassment Under The

Fair Employment And Housing Act

(Against Defendants County of Riverside, Lafferty, and Van Wagenen)

62.     Plaintiff realleges and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

63.     At all times herein mentioned, the FEHA, embodied in Government Code section 12940 was in full force and effect.  This act prohibits employees, and nonemployees, from creating a hostile work environment by harassing their co-workers and subordinates on the basis of an actual or perceived disability.  This act makes employers liable for the harassment of their employees when the employer knew or should have known of the harassment and failed to prevent it.

64.     Under the FEHA (Govt. Code Section 12940(j)), individual employees are personally liable for their acts of harassment.  Similarly, an employer for purposes of harassment law is any entity employing one or more individuals.  The County of Riverside is a qualified employer for this purpose.

65.     As alleged above, Defendants harassed Plaintiff due to his actual or perceived disability including without limitation by repeatedly asking him to disclose his medical condition, by threating him with insubordination, by insisting he waive his HIPPA rights, by attempting to make him take FMLA leave involuntarily, and by demoting him.  The harassment of Plaintiff was both severe and pervasive.  The conduct was not welcomed by Plaintiff.

66.     As a result of the harassment suffered by Plaintiff, he has suffered from stress and anxiety which has negatively impacted his physical and emotional condition.

67.     As a direct and proximate cause of the harassment, Plaintiff has suffered and continues to suffer general, compensatory, and special damages, including lost wages and benefits, future loss of wages and benefits, and emotional distress and physical illness in an amount unknown, but according to proof at trial.

68. Moreover, Plaintiff is entitled to attorneys' fees and costs under Govt. Code Section 12965(b), which provides that "the court, in its discretion, may award to the prevailing party. . . reasonable attorney's fees and costs, including expert witness fees." . Plaintiff has incurred and continues to incur legal expenses and attorneys' fees as a result of his FEHA claims against Defendants. Plaintiff is presently unaware of the precise amount of these expenses and fees, but seeks an award of attorneys' fees and costs according to proof at trial.

69. The conduct by Defendants was willful and malicious and in conscious disregard of Plaintiff's rights with the intent to vex, injure and annoy him, such as to constitute oppression, fraud and/or malice under California Civil Code section 3294. Accordingly, Plaintiff is entitled to punitive damages in an amount appropriate to punish and make an example of Defendants. Plaintiff seeks punitive damages only against the individual Defendants and not the County of Riverside.

## SIXTH CAUSE OF ACTION

### Failure To Prevent Harassment, Discrimination And Retaliation Under The

### Fair Employment And Housing Act

### (Against Defendant County of Riverside)

70. Plaintiff realleges and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

71. At all times hereto, the FEHA, in particular Government Code section 12940(k), was in full force and effect. This subsection imposes a duty on employers to take all reasonable steps necessary to prevent discrimination, harassment and retaliation from occurring. As alleged above, the County of Riverside violated this subsection and breached its duty by failing to take all reasonable steps necessary to prevent harassment, discrimination and retaliation from occurring.

72. As alleged above, the County of Riverside's conduct violates the FEHA. As a direct and proximate cause of said conduct, Plaintiff has suffered and continues to suffer general, compensatory, and special damages, including past and future lost wages, bonuses and benefits; and emotional distress and physical illness in an amount unknown, but according to proof at trial.

73. Plaintiff also is entitled to attorneys' fees and costs under Govt. Code section 12965(b),

1   which provides that "the court, in its discretion, may award to the prevailing party. . . reasonable

2   attorney's fees and costs, including expert witness fees." .  Plaintiff has incurred and continues to incur

3   legal expenses and attorneys' fees as a result of his FEHA claims against the County of Riverside.

4   Plaintiff is presently unaware of the precise amount of these expenses and fees, but seeks an award of

5   attorneys' fees and costs according to proof at trial.

6                                   SEVENTH CAUSE OF ACTION

7                              Intentional Infliction Of Emotional Distress

8                    (Against Defendants Zellerbach, Lafferty, Fransdal, and Van Wagenen)

9        74.    Plaintiff realleges and incorporates herein by reference each of the allegations set forth

10  above as if fully set forth herein.

11       75.    In perpetuating the wrongful conduct described herein, Defendants Zellerbach, Lafferty,

12  Fransdal, and Van Wagenen abused the special positions they held in relation to Plaintiff.  Defendants

13  acted with the knowledge that they could manipulate and damage Plaintiff's interest and well-being.

14       76.    Plaintiff is informed and believes that Defendants Zellerbach, Lafferty, Fransdal, and Van

15  Wagenen intended to and did cause Plaintiff to suffer from severe emotional distress due to the

16  outrageous behavior of Defendants in harassing, discriminating and retaliating against Plaintiff.

17       77.    As a result of these acts, Plaintiff suffered from stress and anxiety which negatively

18  impacted his physical and emotional condition.

19       78.    Through their outrageous and unprivileged conduct as described herein and above,

20  Defendants Zellerbach, Lafferty, Fransdal, and Van Wagenen acted with the intent to cause, or with a

21  reckless disregard for the probability of causing, Plaintiff to suffer humiliation, isolation, mental

22  anguish, loss of job opportunities and reputation, and severe physical and emotional distress.

23       79.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues

24  to suffer general, compensatory, and special damages, including lost wages and benefits, future loss of

25  wages and benefits, loss of career opportunities, prejudgment interest, consequential and incidental

26  damages, plus tort damages including humiliation, isolation, emotional distress and physical injuries in

27  an amount unknown, but according to proof at trial.

28

1       80.   Based on Defendants' course of conduct, which was willful, malicious, knowing,

2   intentional, and in conscious disregard for Plaintiff's rights and safety, Plaintiff seeks an award of

3   punitive and exemplary damages in an amount according to proof at trial to punish Defendants, and each

4   of them, and deter similar conduct in the future.

5

6                             <u>PRAYER FOR RELIEF</u>

7   WHEREFORE, Plaintiff prays for judgment as follows:

8       1.   General and compensatory damages including all lost wages, in a sum according to proof at

9           time of trial;

10      2.   Consequential and incidental damages in a sum according to proof at time of trial;

11      3.   Damages for mental and emotional distress in a sum according to proof at time of trial;

12      4.   General and special damages in a sum according to proof at time of trial;

13      5.   Payment of Plaintiff's reasonable and actual attorney fees in a sum according to proof at

14          time of trial;

15      6.   For costs of suit herein incurred;

16      7.   Injunctive relief;

17      8.   Pre-judgment interest at the legal prevailing rate;

18      9.   Punitive and exemplary damages in a sum according to proof at time of trial; and

19      10.  For such other and further relief as the Court deems just and proper.

20  Dated: July 9, 2014        AITKEN CAMPBELL HEIKAUS WEAVER, LLP

21

22                      By                         
                            Chris Heikaus Weaver

23                          Attorney for Plaintiff
                            CHRISTOPHER ROSS

24

25

26

27

28

1    ### DEMAND FOR JURY TRIAL

2    Plaintiff hereby demands trial of his claims by jury to the extent authorized by law.

3

4    Dated: July __, 2014          AITKEN CAMPBELL HEIKAUS WEAVER, LLP

5                                  By _____

6                                     Chris Heikaus Weaver
                                       Attorney for Plaintiff
7                                      CHRISTOPHER ROSS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COPY

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Chris M. Heikaus Weaver (SBN 231907) Aitken Campbell Heikaus Weaver, LLP 3877 Twelfth St. Riverside, CA 92501 | |

TELEPHONE NO.: 951-530-4840    FAX NO.: 951-344-1762
ATTORNEY FOR *(Name):* Christopher Ross

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Riverside
STREET ADDRESS: 3255 E. Tahquitz Canyon Way
MAILING ADDRESS:
CITY AND ZIP CODE: Palm Springs, CA 92262
BRANCH NAME: Palm Springs

CASE NAME:
ROSS v. COUNTY OF RIVERSIDE, ET AL

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: P.S.C. 1403729 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[✓] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary    b.[ ] nonmonetary; declaratory or injunctive relief    c.[✓] punitive

4. Number of causes of action *(specify):* seven

5. This case [ ] is [✓] is not    a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 9, 2014
Chris M. Heikaus Weaver
_____    _____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

COPY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

☐ BANNING 135 N. Alessandro Rd., Banning, CA 92220
☐ BLYTHE 265 N. Broadway, Blythe, CA 92225
☐ HEMET 880 N. State St., Hemet, CA 92543
☐ MORENO VALLEY 13800 Heacock St., Ste. D201, Moreno Valley, CA 92553

☐ MURRIETA 30755-D Auld Rd., Suite 1226, Murrieta, CA 92563
☒ PALM SPRINGS  3255 E. Tahquitz Canyon Way, Palm Springs, CA 92262
☐ RIVERSIDE 4050 Main St., Riverside, CA 92501
☐ TEMECULA 41002 County Center Dr., #100, Temecula, CA 92591

RI-030

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number and Address):
Chris M. Heikaus Weaver (SBN 231907)
Aitken Campbell Heikaus Weaver, LLP
3877 Twelfth St.
Riverside, CA 92501
TELEPHONE NO.: 951-530-4840    FAX NO. (Optional): 951-344-1762
E-MAIL ADDRESS (Optional): chris@achwlaw.com
ATTORNEY FOR (Name): Christopher Ross

PLAINTIFF/PETITIONER: Christopher Ross

DEFENDANT/RESPONDENT: County of Riverside

FOR COURT USE ONLY

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 10 2014

C. Banda

CASE NUMBER:
P.S.C.   1403729

CERTIFICATE OF COUNSEL

The undersigned certifies that this matter should be tried or heard in the court identified above for the reasons specified below:

☒   The action arose in the zip code of: 92201 _____

☐   The action concerns real property located in the zip code of: _____

☒   The Defendant resides in the zip code of: 92201 _____

For more information on where actions should be filed in the Riverside County Superior Courts, please refer to Local Rule 1.0015 at www.riverside.courts.ca.gov.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date _07/09/14_____

Chris M. Heikaus Weaver
(TYPE OR PRINT NAME OF DECLARANT/PARTY MAKING DECLARATION)

▶ _____
(SIGNATURE)

Approved for Optional Use
Riverside Superior Court
RI-030 (Rev. 06/15/12)

CERTIFICATE OF COUNSEL

Page 1 of 1
Local Rule 1.0015
www.riverside.courts.ca.gov/localfrms/localfrms.shtml

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
3255 E. Tahquitz Cyn Way
Palm Springs, CA  92262
www.riverside.courts.ca.gov

NOTICE OF DEPARTMENT ASSIGNMENT FOR ALL PURPOSES

CHRISTOPHER ROSS VS COUNTY OF RIVERSIDE

CASE NO. PSC1403729

This case is assigned to the Honorable Judge David M. Chapman  in Department PS2 for case management purposes. The  Case Management Conference is scheduled for 01/06/15  at  8:30  in Department PS2.

The  plaintiff/cross-complainant  shall  serve  a  copy  of  this  notice  on  all defendants/cross-defendants who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP Section 170.6 (a) (2) shall be filed in accordance with that section.

Requests for accommodations can be made by submitting Judicial Council form MC-410 no fewer than five court days before the hearing. See California Rules of Court, rule 1.100.

CERTIFICATE OF MAILING

I certify that I am currently employed by the Superior Court of California, County of Riverside, and that I am not a party to this action or proceeding.  In my capacity, I am familiar with the practices and procedures used in connection with the mailing of correspondence.   Such correspondence is deposited in the outgoing mail of the Superior Court.  Outgoing mail is delivered to and mailed by the United States Postal Service, postage prepaid, the same day in the ordinary course of business.  I certify that I served a copy of the foregoing NOTICE on this date, by depositing said copy as stated above.

Court Executive Officer/Clerk

Date: 07/10/14                                      by: _____

CINDY M BANDA, Deputy Clerk

cdilazano
1/28/14



SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
www.riverside.courts.ca.gov

Self-represented parties: http://riverside.courts.ca.gov/selfhelp/self-help.shtml

---

**ALTERNATIVE DISPUTE RESOLUTION (ADR) –**
*INFORMATION PACKAGE*
(California Rules of Court, Rule 3.221; Local Rule, Title 3, Division 2)

**\*\*\* THE PLAINTIFF MUST SERVE THIS INFORMATION PACKAGE
ON EACH PARTY WITH THE COMPLAINT. \*\*\***

---

## What is ADR?

Alternative Dispute Resolution (ADR) is a way of solving legal disputes without going to trial. The main types are mediation, arbitration and settlement conferences.

## Advantages of ADR:

- Faster:  ADR can be done in a 1-day session within months after filing the complaint.
- Less expensive:  Parties can save court costs and attorneys' and witness fees.
- More control:  Parties choose their ADR process and provider.
- Less stressful:  ADR is done informally in private offices, not public courtrooms.

## Disadvantages of ADR:

- No public trial:  Parties do not get a decision by a judge or jury.
- Costs:  Parties may have to pay for both ADR and litigation.

## Main Types of ADR:

**Mediation:**  In mediation, the mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to create a settlement agreement that is acceptable to everyone.  If the parties do not wish to settle the case, they go to trial.

## Mediation may be appropriate when the parties:

- want to work out a solution but need help from a neutral person; or
- have communication problems or strong emotions that interfere with resolution; or
- have a continuing business or personal relationship.

## Mediation is not appropriate when the parties:

- want their public "day in court" or a judicial determination on points of law or fact;
- lack equal bargaining power or have a history of physical/emotional abuse.

**Arbitration:**  Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome.  In "binding" arbitration the arbitrator's decision is final; there is no right to trial.  In "non-binding" arbitration, any party can request a trial after the arbitrator's decision.  The court's mandatory Judicial Arbitration program is non-binding.

Adopted for Mandatory Use
Riverside Superior Court
RI-ADR1A (Rev. 1/1/12)

Arbitration may be appropriate when the parties:
- want to avoid trial, but still want a neutral person to decide the outcome of the case.

Arbitration is not appropriate when the parties:
- do not want to risk going through both arbitration and trial (Judicial Arbitration)
- do not want to give up their right to trial (binding arbitration)

**Settlement Conferences:**   Settlement conferences are similar to mediation, but the settlement officer usually tries to negotiate an agreement by giving strong opinions about the strengths and weaknesses of the case, its monetary value, and the probable outcome at trial.   Settlement conferences often involve attorneys more than the parties and often take place close to the trial date.

### RIVERSIDE COUNTY SUPERIOR COURT ADR REQUIREMENTS
ADR information and forms are posted on the ADR website: http://riverside.courts.ca.gov/adr/adr.shtml

General Policy:
Parties in most general civil cases are expected to participate in an ADR process before requesting a trial date and to participate in a settlement conference before trial.  (Local Rule 3200)

Court-Ordered ADR:
Certain cases valued at under $50,000 may be ordered to judicial arbitration or mediation. This order is usually made at the Case Management Conference. See the "Court-Ordered Mediation Information Sheet" on the ADR website for more information.

Private ADR (for cases not ordered to arbitration or mediation):
Parties schedule and pay for their ADR process without Court involvement.  Parties may schedule private ADR at any time; there is no need to wait until the Case Management Conference. See the "Private Mediation Information Sheet" on the ADR website for more information.

**BEFORE THE CASE MANAGEMENT CONFERENCE (CMC), ALL PARTIES MUST:**
1. Discuss ADR with all parties at least 30 days before the CMC.  Discuss:
   - Your preferences for mediation or arbitration.
   - Your schedule for discovery (getting the information you need) to make good decisions about settling the case at mediation or presenting your case at an arbitration.
2. File the attached "Stipulation for ADR" along with the Case Management Statement, if all parties can agree.
3. Be prepared to tell the judge your preference for mediation or arbitration and the date when you could complete it.

(Local Rule 3218)

**RIVERSIDE COUNTY ADR PROVIDERS INCLUDE:**
- The Court's Civil Mediation Panel (available for both Court-Ordered Mediation and Private Mediation).  See http://adr.riverside.courts.ca.gov/adr/civil/panelist.php or ask for the list in the civil clerk's office, attorney window.
- Riverside County ADR providers funded by DRPA (Dispute Resolution Program Act): Dispute Resolution Service (DRS) Riverside County Bar Association: (951) 682-1015 Dispute Resolution Center, Community Action Partnership (CAP): (951) 955-4900

Adopted for Mandatory Use
Riverside Superior Court
RI-ADR3A (Rev. 1/1/12)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | COURT USE ONLY |
|---|---|
| TELEPHONE NO.:      FAX NO. *(Optional):* <br> E-MAIL ADDRESS *(Optional):* <br> ATTORNEY FOR *(Name):* | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE**

    ☐   Banning - 135 N. Alessandro Road, Banning, CA 92220
    ☐   Hemet - 880 N. State Street, Hemet, CA 92543
    ☐   Indio - 46-200 Oasis Street, Indio, CA 92201
    ☐   Riverside - 4050 Main Street, Riverside, CA 92501
    ☐   Temecula - 41002 County Center Drive, Bldg. C - Suite 100, Temecula, CA 92591

| PLAINTIFF(S): <br><br> DEFENDANT(S): | CASE NUMBER: |
|---|---|
| **STIPULATION FOR ALTERNATIVE DISPUTE RESOLUTION (ADR)** <br> (CRC 3.2221; Local Rule, Title 3, Division 2) | CASE MANAGEMENT CONFERENCE DATE(S): |

**Court-Ordered ADR:**

Eligibility for Court-Ordered Mediation or Judicial Arbitration will be determined at the Case Management Conference. If eligible, the parties agree to participate in:

    ☐   Mediation          ☐   Judicial Arbitration (non-binding)

**Private ADR:**

If the case is not eligible for Court-Ordered Mediation or Judicial Arbitration, the parties agree to participate in the following ADR process, which they will arrange and pay for without court involvement:

    ☐   Mediation          ☐   Judicial Arbitration (non-binding)
    ☐   Binding Arbitration      ☐   Other (describe): _____

Proposed date to complete ADR: _____.

**SUBMIT THIS FORM ALONG WITH THE CASE MANAGEMENT STATEMENT.**

| PRINT NAME OF PARTY OR ATTORNEY <br> ☐ Plaintiff ☐ Defendant | SIGNATURE OF PARTY OR ATTORNEY | DATE |
|---|---|---|
| PRINT NAME OF PARTY OR ATTORNEY <br> ☐ Plaintiff ☐ Defendant | SIGNATURE OF PARTY OR ATTORNEY | DATE |
| PRINT NAME OF PARTY OR ATTORNEY <br> ☐ Plaintiff ☐ Defendant | SIGNATURE OF PARTY OR ATTORNEY | DATE |
| PRINT NAME OF PARTY OR ATTORNEY <br> ☐ Plaintiff ☐ Defendant | SIGNATURE OF PARTY OR ATTORNEY | DATE |

☐ Additional signature(s) attached

Adopted for Mandatory Use
Riverside Superior Court
RI-ADR10 (Rev. 1/1/12)

       **ALTERNATIVE DISPUTE RESOLUTION (ADR)**
       **STIPULATION**

| | |
|---|---|
| **From:** | Ross, Christopher |
| **Sent:** | Friday, September 27, 2013 5:08 PM |
| **To:** | Lafferty, Sean |
| **Cc:** | Greenberg, David; Fransdal, Tricia; Aki, John; Fimbres, Antonio |
| **Subject:** | Rotation Meeting on September 26 |
| **Attachments:** | Transfer meeting..doc |
| | |
| **Categories:** | Important |

Hi Sean,

Attached is a document expressing my thoughts on my situation after I have had today to reflect. Please read it and take it into consideration when making your decision on my reassignment.  Have a great weekend everyone.

*Christopher Ross*
*Senior Deputy District Attorney*
*Homicide Prosecution Unit*
*Major Crimes Division*
*Riverside County District Attorney's Office*
*Phone (760) 863-8216*
*Fax (760) 863-8215*



1



September 27, 2013

Hi Sean,

  I just had some reflections on our meeting yesterday morning with you, Dave, Tricia and me regarding my potential reassignment. I really appreciate your consideration for my well-being and trying to accommodate a stress free environment for me while I am currently being treated/evaluated at the Mayo Clinic Hospital for neurological, autoimmune and stress conditions. Thank you all for your patience with me in this matter.

  As you all well have known, I have been seeking treatment/evaluations since July of this year. I know the uncertainty of my medical condition is frustrating for you, and, Sean, as you pointed out yesterday in our meeting, it concerns you as it places a burden on the homicide unit. I apologize for any inconvenience that I have caused the Office, but please, I just ask that you be patient until the end of November of this year. As I stated in the meeting, and as I told Dave back in early August, I believe it would be in my best interest and the Office's best interest to keep my in current unit of assignment. As I said yesterday, my cases do not have any last days forcing trial within the next 60 days. Thus, I will be able to appear in court on my cases and prepare them for trial; and at the same time, this will enable me the flexibility required to receive treatment as needed at the Mayo Clinic in Arizona.

  What bothers me is that in the meeting you stated that your concern for the Homicide Unit, related to my situation, was that you could only have "productive" members assigned to the Homicide Unit. Hence, by deductive logic, I am currently not a "productive" member of the Homicide Unit. You then clarified that a "productive" member of the Unit is someone who (1) goes to trial and (2) someone who can accept new cases. You then stated your intention in the meeting was to change my assignment from the Homicide Unit to a full time position as a filing deputy. However, you also made it clear that while assigned to a filing position, you expected me to still help out with my currently assigned nine murder cases and two other felony cases. This would in essence, have me work my current full time assignment and simultaneously work a second full time assignment in filings. I feel that this would be far too strenuous and stressful for me, let alone anyone in this Office. This is having me work two full time assignments simultaneously. I will respect your decision in this matter. However, I believe that I am only able to handle a single assignment based upon my current medical conditions.

  In the meeting, I am confused about one thing. I told you that I had been informed that the filing requirement was 300 cases per month. I also told you my concerns that the filing requirements of 300 a month would induce too much stress on me during this period of medical treatment and diagnosis. You replied that 300 filings per month was not true. You explained that it was more like 15 case filings per day. We work an average of 20 to 22 days per month. 15 filings per day over 20 days is 300 filings in a one month period. 15 filings per day in a 22 day period is 330 case filings in a month period. This is what confuses me. If I am transferred to this assignment, I will do my very best, but, based upon my current medical conditions and the limitations proscribed by my treating physicians in terms of work load, I am uncertain that I will be able to reach these expectations.

  During the meeting you stated that you had no one to assign two current murder cases to at this time and you needed to assign them to me to work on and try (commensurate with being a "productive" homicide team member). I understand this problem that my health situation creates for you and the Homicide Unit. In fact, as I stated in the meeting, when I originally informed Tricia of my medical diagnosis and treatment with the Mayo Clinic in July of this year, I asked to have my cases reassigned while I undergo medical treatment during the rest of this year. Tricia graciously explained to me that my request was not possible because the Office had no one to reassign my cases to.

  However, when vetting your indicated reasons for moving me to filings for the next three months, I think such a transfer would not be in the best interest of my health or the Homicide Unit. For example, as you responded to my question in the meeting yesterday morning, even if another prosecutor were available to take my murder cases, her or she would not be able to prepare for or expected to go to trial on my cases within the next three months. As I have previously stated in this communication, none of my cases have last days set for

1

trial within the next 90 days. Thus, this precludes the requirement of me going to trial in the next 60 days as a factor requiring me to transfer to another unit of assignment.

As you stated yesterday in the meeting and as Tricia told me back July and around September 11, when she gave me her assigned special circumstance murder case to prepare for death penalty staffing, preliminary hearing and trial (BLF12002021-People v. McBeth, Moor, Liday), you have no other attorneys who you can reassign my murder cases to. Also, as you stated yesterday in the meeting, you currently have two unassigned murders that you need me to take because no other prosecutor is available to take them.

Please think and employ your own reasoning. By taking my murder cases from me, you will be further burdening the Homicide Unit. Now you will have 11 murders and two other felony cases to reassign with no available Deputy DA to reassign them to. Transferring me to filings will exacerbate Homicide Unit's problem and fail to alleviate the need for a productive member of the Homicide Unit.

Respectfully, I disagree that I am not a productive member of the Homicide Unit because I cannot go to trial for the next 60 days and cannot have any new homicides assigned to me for that same time period. As I stated during the meeting, it is my position that it would be best for the Homicide Unit and my health to keep me in my current position of assignment and not assign me any new cases until December, when we will know my health concerns. I think that the Homicide Unit can function status quo for 60 without me going to trial or taking on any new cases. Thank you for your consideration.

Best Regards,

Chris

2

# DISTRICT ATTORNEY'S OFFICE
# RIVERSIDE COUNTY

## M E M O R A N D U M

September 16, 2013

TO:        All **Eastern** SDDAs and Deputy District Attorneys

FROM:     Paul E. Zellerbach, District Attorney

SUBJECT:  Rotation Request

We are interested in hearing from you regarding your assignment preferences for the upcoming 2013 rotations, which will take effect November 4, 2013.

Please complete the form below. **Return a copy to Silvia Davila** no later than September 30, 2013. If you have any questions please do not hesitate to ask.

Thank you.

NAME:  _Chris Ross_          DATE:  _9-30-13_

Misdemeanor DDAs: Please list all of your assignments since you were hired.
Felony DDAs: Please list all of your assignments since being promoted to a felony assignment.
SDDAs:  Please list *only* your assignments since becoming an SDDA.

| | ASSIGNMENT | DATES | SDDA |
|---|---|---|---|
| 1. | Homicide | present | Fransdal |
| 2. | Seca | | |
| 3. | serious & violent | | |
| 4. | General Felonies | | |
| 5. | Vehicular manslaughter | | |
| 6. | Prelim | | |
| 7. | misdemeanors | | |
| 8. | | | |

Total # of jury trials: _49-0-1_   Misd. Jury trials _17-0-0_  Felony jury trials _32-0-1_
        (W-L-H)             (W-L-H)             (W-L-H)

Where do you want to go for the next rotation?  Please list three choices, even if your 1st choice is "Stay where I am."

1. Stay where I am:   Yes _____   No _____   Current Unit: _____
2. Move to: _Something with no stress, no quotas, No deadlines, no pressure._
3. Move to: _____

Comments: _____

_____

Dates of currently approved vacation/sabbatical: _____

PEZ:ljt

DEFENDANT'S
EXHIBIT NO. 4
FOR IDENTIFICATION
Ross
DATE 12/6/14   RPTR: pt
PENGAD 800-631-6989