# EXHIBIT C



OFFICE OF THE DISTRICT ATTORNEY
# COUNTY OF RIVERSIDE
Disposition Staffing

**PAUL ZELLERBACH**
DISTRICT ATTORNEY

| | |
|---|---|
| **Defendant:** Roger Wayne Parker | **Agency:** DHS PD |
| **Victim:** Brandon Taiwan Stevenson | **Report No.:** 103D-5232 |
| **Date of Offense:** 03/18/2010 | **Inv Officers:** Det. Jim Henson |
| **Charges:** CT 1-187(a) | **Location:** 13190 Desert View Dr Desert Hot Springs, CA 92240 |

**DDA:** Christopher Ross

**Defense Attorney:** Jose Rojo, Conflict Panel

**Case:** INF10000647

## DEFENSE OFFER:

Pending Notice?

## FACTS

Willie Womack (approx 50 yrs old) rented a house in Desert Hot Springs. He took in Roger Parker (20 yrs old) as a roommate. (Mr. Parker is the defendant in this case.) They resided together as roommates.

The victim, "Tennessee" (Brandon Stevenson) was homeless. He would hang out around the house. Mr. Womack would socialize with the Victim and allow him to hang out in the garage but not usually in the house. The defendant was not friends with the Victim; he just knew him through Mr. Womack and casual association. The defendant was not known to harbor any animosity towards Victim.

PLTF 01071

On March 18, 2010, the date of the murder, Mr. Womack last saw the Victim seated in his truck across the street from his house at approximately 1700 hours. The Victim and Mr. Womack talked a bit at that time. Mr. Womack left his house at around 1730 hours.

Mr. Womack returned home at approximately 2300 hours. The front door appeared to be opened upon his return. He parked his car in the garage and entered the house through a connecting door.

When Mr. Womack entered the house, he noticed that his TV (which he was VERY proud of) was on the floor next to the front door. The Victim was laying on the couch in the entrance-way. Mr. Womack grabbed the TV and yelled at the Victim, "Tennessee, you left the door open and someone tried to steal my TV!" Mr. Womack then took the TV back to his room and came out to wake up the Victim. He grabbed the Victim's hands and shook him. The Victim's head then fell backward, exposing his neck injuries. The victim had his throat "cut wide open" with the esophagus "completely severed." Brain matter was protruding from an injury on top of the victim's head.

Mr. Womack did not have a phone so he went to his neighbor's house and called 911 at 2308 hours. While the police were at the house and the crime scene tape was in place, a man named "Robert Clark" saw the activity and knew Roger was at a friend's house ("Alex") down the street. Mr. Clark went to tell the defendant who immediately ran back to the house.

The defendant arrived at the scene at approximately 0136 hours, bypassing crime scene tape that cordoned off the area, entering a couple feet into the living room from the garage door enterance before being stopped by police.

A search of the house revealed a large kitchen knife at the foot of the bed located inside the defendant's bedroom. The bed contained blood stains on the bedspread. The master bedroom (Mr. Womack's bedroom) contained a large kitchen knife with a bent blade, covered with blood stains.

The defendant was scene on video surveillance at the Carl's Jr. Restaurant in the nearby vicinity of the crime at approximately 2214 hours on the night of the murder.

PLTF 01072

The defendant and Mr. Womack voluntarily went to DHS PD for interviews. A toxicology screen revealed that the defendant was not under the influence of alcohol or drugs. (His blood was draw on 3/19/10 at approximately 1420 hours and sent to Bio-Tox Laboratories for analysis.) Forensic Analysis of the victim's blood revealed that he was under the influence of both methamphetamine (.201 mg/l) and amphetamines (.026 mg/l).

The autopsy revealed that the victim suffered two major stab wounds to the head, consistent with sharp force trauma from a knife and one 11 inch incised wound to the neck. The victim's wounds (neck and head) were both individually fatal. The victim had several other superficial incision wounds to the face, jaw and chest.

The police were convinced that the killer was either Mr. Womack or the defendant because they resided at the crime scene residence. After speaking with Mr. Womack, the police excluded him as a suspect. They were then confident that the defendant was the killer. A search of the crime scene revealed no signs of forced entry.

## MR. WOMACK'S STATEMENT TO POLICE:

Mr. Womack told the Police that he lives at the residence in question with his roommate - Roger Parker (the defendant). He and the defendant were the only ones with keys to the residence. Mr. Womack has known the defendant for approximately one year.

At approximately 1200 noon that day, he left his home with the defendant and went to the store. He arrived home at 1300 hours and then left to his girlfriends at approximately 1330 hours. When he left the house, the defendant had gone to sleep.

He left his girlfriend's house and then arrived home at about 1530 hours that day. When he arrived home he met the victim, who was seated inside a car across from his house. They conversed inside his garage about fixing a car and the victim's girlfriend. The victim did come inside the house to drink some tangerine juice.

The victim told him that he was waiting for his girlfriend to pick him up, because his vehicle was not working. This was the last time Mr. Womack saw the victim alive. Nothing seemed unusual during this encounter. The defendant was asleep inside the house at this time.

3

Mr. Womack left his house at around 1730 hours that same day. When he left, all of the doors and windows were secure in his home and the defendant was still asleep. The victim was inside his car across the street at this time.

Mr. Womack returned home at around 2300 hours, when he parked his car inside the home's attached garage. Mr. Womack entered his home through a door allowing entrance from inside the garage. At this time he noticed that the front door was moving.

When Mr. Womack entered, only the kitchen lights were turned on in the house. However, he saw his television placed near the front door of his home. At that moment, he also saw the victim seated on a couch located in the immediate area of the house. As he passed by the victim while walking to the television, Mr. Womack yelled at the victim, thinking he had fallen asleep and allowed someone to almost steal his television.

As Mr. Womack walked his television back to his room, he noticed that his camera was missing from inside his bedroom and that his bedroom closet was open. He turned on the lights and saw that the victim had a large cut on his neck that led him to believe that the victim was dead.

Mr. Womack then exited the house through the front door, when he noticed that the door's locking mechanism was not working as his key would not lock the door. Incidentally, Mr. Womack believed that someone must have "pried" the front door open prior to his arrival that evening.

Mr. Womack walked to a neighbors house, who he told about the victim's condition and then called 911. Mr. Womack knew the victim to be a methamphetamine addict who owed various people money.

## PHYSICAL EVIDENCE

### KNIFE FOUND IN MR. WOMACK'S BEDROOM (MASTER BEDROOM) WITH BLOOD ON IT.

This knife contained one etched fingerprint on it that DOJ determined did NOT match the defendant or Mr. Womack and had no evidentiary value.

The defendant and Mr. Womack were eliminated as DNA donors on this KNIFE BLADE.

This KNIFE BLADE was determined to contain the victim's DNA on it.

This knife handle contained DNA donors from

**BLOODSTAIN ON WHITE SWEATSHIRT FOUND IN MR. WOMACK'S BEDROOM (MASTER BEDROOM) WITH BLOOD ON IT:**

The **defendant was ELIMINATED** as a donor of DNA on this item.

This item was determined to contain both the **victim and Mr. Womack's DNA**.

**KNIFE FOUND IN THE DEFENDANT'S BEDROOM:**

This knife contained no usable fingerprints.

This knife blade tested positive for blood.

DNA analysis results are still pending.

**BEDSPREAD ON DEFENDANT'S BED WITH BLOOD ON IT:**

This item is still pending examination for blood or DNA

**BLOODSTAIN ON THE DEFENDANT'S BOXER SHORTS:**

The Victim was ELIMINATED as a donor of blood on this item (it was Roger's and a female's).

**BLOODSTAIN ON THE DEFENDANT'S BLUE SHORTS:**

Three people's DNA were determined to be on these shorts.

Mr. Womack and the victim are eliminated as DNA donors on this item.

The defendant and a female were determined to be DNA donors on this item.

Defendant's Blue Jeans still pending analysis

**DEFENDANT'S DARK PANTS:**

A small blood stain was found at the bottom of the pants on one leg.

DNA tests results are still pending.

**DEFENDANT'S FIRST CONTACT WITH THE POLICE AT THE SCENE**

5

The defendant arrived on the scene at approximately 0136 hours. He was contacted by authorities, when he then told them that he resided in crime scene residence, however, he had spent that evening at a friend's home.

The defendant was voluntarily transported to the DHS police station for questioning. It is not indicated in the police reports whether or not the defendant saw the victim when he entered the crime scene that morning. There is also no indication that the defendant was questioned about what he had scene when he entered the crime scene.

### DEFENDANT'S STATEMENTS

The defendant was initially interviewed at the DHS police station at approximately 04:15 hours, 08:00, and 12:40 hours on 3/18/10, He'd been at the station since about 1 in the morning.

During the interviews, the defendant adamantly denied knowing anything. He said he'd left the house at 17:00 hours. Mr. Womack and the victim both were not there when he left the house. The defendant only returned back home after "Robert" came and got him. He was cooperative – he signed a "consent to search" form; he agreed to take a lie detector test; agreed to give his fingerprints, give blood, give a DNA swab, give the police anything they wanted. After the first interview, he went with the police to his friend Alex's house and gave the police the pants he had worn to Alex's house.

During the interviews, the police told the defendant about nearly ALL of the evidence collected during their investigation. They even went so far as showing him photos of the knife found in the bedroom and the smear of blood where the knife was wiped. Investigators told him who the victim was, how he was killed, the injuries, where he was located, the knives that were found, where they were found, where blood was found in the house.

Additionally, as they were trying very diligently to get him to confess, they **continually** told him that he had the right to defend himself if someone broke into his house and that self defense is legal.

### Interview Examples:

> **Cop** – "If he broke into that house, and you were scared, there's a penal code section that says that's not a crime."

> **Cop** – "I think you're a good person and Tennessee bastard kept fucking with you. He kept taking your stuff and you probably had it up to here."
>
> Δ - "No, there you go again. You're saying taking. No, he never took any of my stuff, he always asked."
>
> Δ - "Oh my God, how can you change all my words"
>
> **Cop** – "Listen…there must've been some reason for you to do what you did"

After several hours of this, Roger said, "I told you the truth the whole time. I'm tryin' to think of a reason now. I'm tryin' to think of a lie I could tell you." Officers then tell the defendant that Mr. Womack has kicked him out of his residence. The defendant inquires about this. After police reiterate and confirm that he has been kicked out of Mr. Womack's residence, the defendant tells police to take him to jail.

The defendant says that he would rather stay in jail than live on the streets. He said that he had no place to go, so just take him to jail. One of the officers then tells the defendant, ***"Didn't I tell you about self defense?" The defendant responds, "Fine then! It was self defense because I am tired of this bullshit!"*** The defendant continues, *very sarcastically*, and says that it was self defense; that because they said he hit him in the head with a pan, he hit him in the head with a pan.

Since they said he sliced his throat, he sliced his throat, since they said…etc. So the police considered this a confession. However, the defendant repeatedly says that he was never in the house with Tennessee that day and that he did not kill him and did not know who did. The defendant tells the police that he has told them the truth repeatedly, but they don't believe him, so he will make up a lie and tell them what they want to hear.

After the defendant sat in a jail cell for an hour, he asked to speak to the detective. It was now 16:00 hours (he'd been at the station since 01:00 hours). The defendant now, calmly, told them it was self defense because he was asleep and woke up and heard noises. He gave this story that contained VERY LITTLE DETAIL (and he wasn't asked for any further detail) and the detective was very leading with his questions.

7

PLTF 01077

The defendant was taken to the scene to conduct a video taped re-enactment. During the re-enactment, again Roger gives very little detail and he is not asked to further explain. What he does explain makes absolutely no sense and belies the physical evidence at the scene (e.g. the piece of the pot).

The defendant changes details of his explanation during his interviews and reenactment. Specifically, how many times he hit the victim over the head with the piece of pottery; whether the victim fell to the ground after being hit in the head with the pottery; what he heard the victim say prior to fighting with him; where the victim was located when he first encountered him; how he cut the victim's throat; when he got the knife to cut his throat, etc. The defendant needed to leave the area during the reenactment when he saw the blood because he started to dry heave and was going to be sick.

The piece of pottery that the defendant says that he picked up and hit the victim over the head with, had no blood, hair or tissue on it. The pottery was jagged and frail, not able to inflict the type of injury to the victim's head. Also of note is that during the interview the defendant at first said he hit the victim over the head with a pan. One of the officers responded, do you mean a pot, like the flower pot by the door? The defendant then replied, yes, a piece of pottery from the flower pot by the door.

### Witness Elixeo Valdez (Alex)

Mr. Valdez stated that the defendant came over to his house on 3/18/11 at approximately 12:00 noon to 1630 hours and again that same day from 2030 hours to 2130 hours. Mr. Valdez had been drinking all day and fell asleep between 1200 hours to 1630 hours.

The defendant came over and started watching cartoons on the second visit. He brought a pair of pants, a blanket and $300 with him. The defendant had been staying with him for a couple of weeks because he and his roommate were not getting along and had been fighting.

### Witness Robert Clark

At approximately 2300 hours he went over to Mr. Valdez's residence, where he saw him and the defendant watching a movie. Mr. Clark left Mr. Valdez's house a short time later, when he saw the police congregating at the crime scene. He returned to Mr. Valdez's house where he told the

8

PLTF 01078

defendant about the police. Both men then ran to the crime scene. (The time stated by this witness is a couple of hours off of when the defendant was contacted by police at the scene.)

### Larry Shaw (Mr. Womack's neighbor)

Mr. Shaw stated that Mr. Womack came over to his house and was pounding on his front door. Mr. Womack told him to call the police, so he called 911. When dispatch starated asking questions, he turned the phone over to Mr. Womack. (This interview does not state what time or dated that Mr. Womack came over to his house.)

### Witness Ava Venerable

On 3/20/10, this witness informed the police that she was the girlfriend of the victim. She had heard that the victim had robbed somebody for crystal meth and had been doing bad things out on the street. She turned over a note that she found in the victim's truck. Ms. Venerable stated that this note was written by a girl who was lending him a black Mustang to drive, which was now missing. The note is in police custody and reads as follows:

*TY-If U See This Note And I An not W/U, U need to Admediatly Stop What U are Doing And try to Find Me R Call.*
      *LK*

### Shelly Craycraft (Mr. Womack's Girlfriend)

Ms. Carycraft said that on 3/18/10, Mr. Womack was at her house between the hours of 1700 and 2300 to take care of her. Also, Mr. Womack was at her house earlier that day.

### Maria Pacheco (Mr. Womack's neighbor)

This witness saw nothing and heard nothing.

### Christopher Arana (Mr. Womack's other neighbor)

This witness saw nothing and heard nothing.

### Carina Flores (Mr. Womack's other, other neighbor)

This witness saw Mr. Womack sitting on the wall in front of his house with an unknown black male adult with braids in the afternoon on 3/18/10.

9

PLTF 01079

### Christina Williams (Defendant's sister)

She stated that she goes to Kaplan College and was in class on 3/18/10. She left for school at about 1700 and arrived home at approximately 2300. She did not see defendant at her house that day or the day before. She was home all day on Wednesday, 3/17/10, and stated that the defendant never came by her house.

### Christopher Herrera (Ms. Williams' Husband)

On 3/18/10, he was at home in DHS, watching his kids, when the defendant came by at around 1800 hours. The defendant sat down on the couch and watched a "disaster movie" with he and his children. The defendant appeared to be tired when he arrived. He noticed nothing out of the ordinary.

### Cruz Herrera (Christopher Herrera's brother)

The defendant was at he and his brother and sister in law's house on 3/18/10. He does not know what time the defendant arrived, but knows that the defendant left at about 2130 hours that evening.

### DEFENDANT'S CRIMINAL HISTORY
### BORN: March 26, 1989
### CA Violent Behavior
### 1. Arrested on 12/06/2000 for PC 240/242 by Santa Ana PD

Defendant (11 years old) was placed in a group home by Riv. Co. Social Services. This home had six other children. On the date in question, the defendant ripped a phone off of the kitchen wall, threw a computer on the floor, when an adult female in the home tried to stop him. The defendant threw six steel frame chairs at her, which injured her wrist. He also "bit" her right forearm below the elbow and spit in her face. A 10 year boy tried to help Ms. McCullum during the incident. He was punched by the defendant. An 8 year old boy also tried to assist Ms. McCullum and was knocked to the ground and had his hand stomped by the defendant. The police arrived and removed the defendant from the home.

### 2. Detained on 02/03/2005 for PC 245(a)(1) GBI Likely in Los Angeles:
**Released, handled informally.** (15 years old)

PLTF 01080

3. **01/26/2005-Metropolitan Hospital, Norwalk, CA**

The defendant (15 years old) was admitted to the Metropolitan State Hospital in San Bernardino, CA on November 25, 2003 and released on February 1, 2005, when he was arrested and charged with three counts of PC 245(c) and one count of PC 243.

On 01/25/05, the defendant was playing with a female patient, when the defendant became mad and said, "I am going to fuck that bitch up." He then punched her in the stomach and mouth, chipping her tooth. The defendant was approached by state hospital police and asked to go back to his unit. The defendant got mad and started fighting with the staff and officers. One female staff member was hit several times on the left side of the head and other parts of her body with a closed fist by the defendant. The defendant bit another officer in the hand three times, drawing blood. He then spit the blood and his saliva in the officer's eyes. The defendant bit another officer in the forearm during this incident and also spit blood into her eyes.

4. **12/15/06 – Somerset School, Perris, CA**

**Arrested on 12/15/2006 for PC 71 (Threatening a Public or School Officer), PC 242, PC 243.1, in Corona, CA. SWJ002027: Petition sustained for PC 240: 182 Days Juvenile Hall**

The defendant (17 years old) walked by a student seated in a classroom and "bumped" him. The seated student responded, "Don't fucken bump me." The defendant then punched the seated student on the head while standing over him. The teacher immediately intervened and pinned the defendant up against the wall. Three other school officials entered the classroom to contain the defendant in his stage of primal rage. During this outrage, the defendant punched the first school official in his face several times before help arrived. Before finally managing to control this beastly situation, the defendant managed to bite another school official in the left forearm, the left breast and the upper lip.

5. **01/01/2007 – Riverside County Juvenile Hall**

January 1, 2007, the defendant (17 years old) was in Riverside County Juvenile Hall when he was asked to be quiet by a group counselor-Virgil Ivery. The defendant told her, "Fuck you, you fucking bitch." The defendant was escorted back to his room, where he went out of control and started kicking and punching his door until his hand was bleeding. Several staff entered the room, tried to calm the defendant, unsuccessfully. The defendant then began to bite and tear his mattress. The defendant was told to stop and calm down. His response, "Fuck you, I don't wanna see you." The defendant was O.C. pepper sprayed, when he then puched one officer in the jaw

and lunged forward and bit through five layers of clothing and drew blood on one of the officers right upper chest. Another officer was bit in the right forearm during the submission of the defendant.

WA Criminal History

6. **Pierce County, WA: Arrest on 03/13/2008 for felony Assault.**

   **Convicted of Felony Malicious Mischief**

The defendant (19 year old) was living with his father in Tacoma, Washington. The defendant told his father that his cell phone was stolen. The father and defendant began to argue. The defendant took a hammer and his fists and destroyed approximately $3000.00 worth of damage- glass table, TV, doors, computer, etc. The defendant was stopped by the father. The defendant then grabbed a 13.5 inch bucher knife with an 8 inch blade, told his father that he was going to kill him and then attacked his father. The father took the knife from the defendant in a struggle. The defendant tried to disarm the alarm and accidently set it off. The police arrived and noticed redness on the father's neck and chest. The police also noticed blood on the walls and carpet throughout the house.

The defendant admitted to damaging the apartment and said it was because he didn't like being yelled at and he was mad that someone stole his $500 cell phone. He said that he tried to kill himself when his father grabbed his arms to stop him. This caused the knife to fall behind the couch where police found it. **The defendant told the police to take him to jail because it would be easier for him to die there.**

PLTF 01082